Gary Underwood Scharff, OSB #883031
Lead Attorney
Law Office of Gary Underwood Scharff
621 S.W. Morrison Street, Suite 1300
Portland, OR  97205
Tel.: 503-493-4353
Fax: 503-517-8143
Email: gs@scharfflaw.com

Heather A. Brann, PC OSB # 040495
Of Counsel
PO Box 11588
Portland, OR  97211
Tel.: 503 490-6563
Email: branns@earthlink.net
Of Attorneys for Absorbent Technologies, Inc.,
Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>Absorbent Technologies, Inc.,<br><br><br>     Debtor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.:  13-31286-tmb11
Chapter 11

**MOTION FOR ORDER:
(A) AUTHORIZING DEBTOR TO
OBTAIN POSTPETITION
FINANCING PURSUANT TO 11 U.S.C.
§§ 105, 362, 364(c)(1), 364(c)(2),
364(d)(1) AND 364(e);
(B) GRANTING POSTPETITION
LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE
STATUS; AND
(C) AUTHORIZING DEBTOR TO
ENTER INTO AGREEMENTS WITH
POSTPETITION LENDER**

☐ Hearing: _____ m, 4/__/2013
Courtroom 4, Bankruptcy Court

     Absorbent Technologies, Inc., debtor in possession in this case ("Debtor" or "Movant"),

hereby moves the court for an order giving debtor:  (i) authority pursuant to §§364(c)(1),

**MOTION FOR ORDER AUTHORIZING
DEBTOR TO OBTAIN POSTPETITION
FINANCING AND RELATED RELIEF** - 1

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

364(c)(2) and 364(d0(1) of the United States Bankruptcy Code, 11 U.S.C. §§101-1330 (the "**Bankruptcy Code**"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-1 of the Local Rules of the United States Bankruptcy Court for the District of Oregon (the "**Local Rules**"), for the Debtor to obtain post-petition loans of up to $1,000,000 jointly from Joseph A. Nathan living trust ua dtd 12/30/1996, Joseph A. Nathan trustee ("Nathan") and United Phosphorus Inc. ("**UPI**" and, jointly with Nathan, "**Lender**"), with each providing one half of such loan, secured by first priority security interests in and liens upon all of the Debtor's intellectual property, whether existing or hereafter acquired, and all proceeds thereof, pursuant to §§ 364(c)(2) and 364(d)(1) of the Bankruptcy Code, (ii) authority for the Debtor to enter into the Debtor in Possession Financing Agreement dated April [  ], 2013 between Lender and Debtor (the "**DIP Agreement,**" set forth as Exhibit A attached hereto), and (iii) approval of the terms and conditions of the DIP Agreement, and (iv) the granting to Lenders allowed super-priority administrative claim status pursuant to §364(c)(1) of the Bankruptcy Code.

THIS MOTION CONTAINS NONE OF THE PROVISIONS IDENTIFIED IN LOCAL BANKRUPTCY FORM 541.7.

In support of the Motion, Debtor submits herewith the Declaration of David Moffenbeier, its Chief Executive Officer, and further represents as follows:

### JURISDICTION

1.    The consideration of this Motion constitutes a "core proceeding" pursuant to 28 U.S.C. §§157(b)(2)(A), (D), (G), (K), (M) and (O) and 1334, and this Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§157 and 1334.

**MOTION FOR ORDER AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING AND RELATED RELIEF** - 2

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

## FACTUAL AND PROCEDURAL BACKGROUND

2.     On March 8, 2013 (the *"Petition Date"*), the Debtor filed an emergency voluntary petition for reorganization under chapter 11 of the Bankruptcy Code to avert termination of the lease on its principal manufacturing facility located in Albany, Oregon.

3.      Since the Petition Date Debtor has continued in the management and possession of its business and properties as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

4.     Debtor's business, ten years old, consists of the manufacture and sale of a super-absorbent polymer starch product, brand name Zeba®, designed to be included with fertilizer and seeds or seedlings of various crops at the time of planting and initial irrigation.  The product captures water otherwise lost to evaporation, river run-off and seepage into the subsurface water table, greatly improving the hydration of seeds and roots.  The use of Zeba® has been demonstrated over years of testing and sales to significantly increase crop yields, especially in dry soils and climates.

5.     The Zeba® manufacturing process is complex.  In Debtor's early years, developing methods to allow production in sufficient quantities to provide a profitable cost/price ratio proved challenging.  ATI eventually developed and patented such a manufacturing process. As a result of the collapse in bank lending beginning in 2008-2009, however, ATI was unable to acquire bank financing to complete construction of its new factory and install its special manufacturing equipment to take advantage of that production innovation.  With production continuing to occur in relatively limited quantities at high costs, Debtor struggled to sustain its business leading, eventually, to this bankruptcy filing.

**MOTION FOR ORDER AUTHORIZING
DEBTOR TO OBTAIN POSTPETITION
FINANCING AND RELATED RELIEF** - 3

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

6.    UPI's parent company, United Phosphorus Limited (***"UPL"***), a multinational

corporation, is extensively engaged in the production and sale of materials designed to enhance

agricultural production, especially in third world countries, including India, where limited

irrigation affects agricultural productivity.  UPL regards Zeba® as a potentially valuable product

for its business.  Debtor has communicated with UPL concerning that party's interest in

submitting a purchase order to a new corporate entity ("Newco") which, subject to negotiation of

terms acceptable to UPL and the investors in Newco, would be formed for the purpose of

acquiring substantially all of Debtor's assets, either through a plan or a 363 sale, and entering

into a foreign distribution and licensing arrangement with UPL.  The Debtor expects that two of

the minority investors in Newco, subject to certain conditions being met, would be UPI and

Nathan.  While those transactions have not been fully negotiated, are dependent on the Debtor

securing a majority investor, and are not presently before the Court, the Debtor is hopeful that a

transaction can be structured that would compensate creditors and yield an operating entity to

assume leases, retain employees and resume operations to capitalize on the Zeba® product.

### NEED FOR DIP FINANCING

7.    To operate its business or engage in an orderly sale of its assets, Debtor has an

immediate need to borrow $1,000,000, or a net new credit facility of $933,000,[1] to pay

immediate post-petition expenses and to generate progress toward the liquidating plan.  The

$933,000 will cover expenses identified in the budget submitted through May 30, 2013,

---

[1] This Motion follows an earlier request by Debtor for authority to borrow from Nathan. That motion was granted by the Court on April 5, 2013 (the "First DIP Financing Order"), and a loan of approximately $67,000 was provided to Debtor on that date.  This Motion seeks authority to borrow up to $1,000,000 in total, $67,000 of which would be used to repay the indebtedness under the First DIP Financing Order, for a net request here for credit of up to $933,000.

**MOTION FOR ORDER AUTHORIZING
DEBTOR TO OBTAIN POSTPETITION
FINANCING AND RELATED RELIEF** - 4

including adequate protection payments, professional fees, insurance premiums, and payroll (the "DIP Budget"). That budget is attached to the DIP Agreement as Exhibit 1 thereto.  Debtor requests by separate motion a hearing on shortened time, because without the proposed financing, the Debtor will suffer immediate and irreparable harm.

8.      Despite vigorously seeking out sources of Debtor In Possession financing (the "DIP Loan") since the Petition Date, Debtor has been unable to obtain unsecured credit allowable under §503(b)(1) of the Bankruptcy Code, or pursuant to §§364(a) and (b) of the Bankruptcy Code, except on the terms and conditions set forth herein.  Lender is unwilling to lend to Debtor except on the terms of the DIP Agreement, a copy of which is attached hereto as Exhibit 1.  No source of interim financing exists on this date other than from the Lender.  Debtor anticipates seeking additional DIP Loan from UPI and Nathan, or some other financing source that would take out the loan approved pursuant to this Motion and provide additional funding to cover additional postpetition costs going forward, but the Debtor presently has no commitment for such further financing.

9.      The terms of the DIP Agreement between the Debtor and Lender pursuant to which the proposed financing will be provided has been negotiated in good faith and at arm's length as that term is used at §364(e) of the Bankruptcy Code and are in the best interests of the Debtor and its creditors.

10.     The ability of the Debtor to continue its business and maximize the value of its assets under chapter 11 of the Bankruptcy Code depends upon obtaining such financing from Lender.  Payroll to Debtor's employees and the costs of their health care insurance premiums, partially satisfied from the First DIP Financing Order, must continue to be paid for Debtor to retain these workers' services, survive in bankruptcy, and retain the value essential to the asset

acquisition projected to occur through the participation of Newco and its investors.  Other

obligations incurred since the Petition Date, and continuing costs of operations, all as set forth in

the DIP Budget, must be paid timely for Debtor to remain in existence and afford a return to its

creditors. The relief granted by this Court pursuant to this Emergency Financing Order is

necessary to avoid such immediate and irreparable harm to the Debtor's estate.

## TERMS OF THE DIP AGREEMENT

11.    The terms of the DIP Agreement are set forth in Exhibit 1 and can be summarized

as follows:  (a) lending of $1,000,000 to be as set forth above; (b) interest rate of 8% per annum

on outstanding advances; (c) reimbursement of Lenders' reasonable expenses associated with the

credit facility, including attorney fees; (d) termination in the event of Debtor default; and (e)

adequate protection consisting of the granting of (i) a first priority lien pursuant to 11 U.S.C. §§

364(c)(2) and 364(d)(1) on all of the Debtor's intellectual property assets and all proceeds

thereof, whether now existing or hereafter arising, and (ii) an allowed superpriority

administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code.

## LEGAL ARGUMENT

12.    The court on motion may give a trustee leave to borrow funds according to terms

required by a lender, including the granting of a superpriority administrative expense and senior

lien on unencumbered property, where this is necessary to preserve the estate and is in the best

interests of creditors.  11 U.S.C. Section 364(c) and (d).  Debtor has complied with the federal

and local bankruptcy rules and has made its showing as to the need for relief under these

provisions of the Bankruptcy Code.  The Debtor notes that it is granting liens on all of its

intellectual property and all proceeds thereof, whether now existing or hereafter arising, pursuant

to both Section 364(c)(2) and 364(d)(1) of the Bankruptcy Code.  The Debtor believes that its

**MOTION FOR ORDER AUTHORIZING
DEBTOR TO OBTAIN POSTPETITION
FINANCING AND RELATED RELIEF** - 6

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

intellectual property assets and all present and future proceeds thereof are unencumbered by any perfected pre-petition liens.  At various times prior to the Petition Date the Debtor did grant certain liens on "proceeds" of its intellectual property, but not a lien on the underlying intellectual property itself, to various holders of its secured debt.  Given those prior grants of liens on proceeds, UPI is unwilling to extend any portion of the DIP Loan unless all of the DIP Loan obligations (including both the $500,000 principal amount to be advanced by UPI and the $500,000 principal amount to be advanced by Nathan) are secured by the protections of a first priority priming lien on all of the Debtor's intellectual property and all proceeds thereof (as more particularly set forth in the DIP Agreement) pursuant to section 364(d)(1) of the Bankruptcy Code.  Nathan takes no position on that issue.  The Debtor believes that such priming liens are appropriate, and no adequate protection of the prepetition liens that are so primed is necessary, because pursuant to section 9-322 of the Uniform Commercial Code those liens were not perfected as of the Petition Date because no proceeds had yet come into being, and pursuant to Section 522 of the Bankruptcy Code the prepetition liens are not enforceable against the Debtor or property of its estate with respect to proceeds that come into being after the commencement of this bankruptcy case.

12.     The form of an order granting Debtor permission to borrow and to enter into the DIP Agreement, and providing Lender an allowed superpriority administrative expense right of repayment and a first priority security interest in and lien on all of Debtor's intellectual property and all proceeds thereof, and reasonable findings in connection with such requested relief, is attached hereto as Exhibit 2.  Debtor respectfully submits that the proposed form of order is appropriate and requests that the Court enter it.

//

**MOTION FOR ORDER AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING AND RELATED RELIEF** - 7

**NOTICE OF MOTION AND HEARING**

13.     A hearing on this motion has been set for _____, April __, 2013, in

Courtroom 4, United States Bankruptcy Court for the District of Oregon, 1001 SW Fifth Avenue,

7th floor, Portland, OR 97204.

14.     Each of the parties set forth below received due notice of the Motion pursuant to

Bankruptcy Rules 4001(b)(1), (c)(1) and (d)(1) and 1007(d) and the Local Rules: (a) the Office

of the United States Trustee (via ECF), and (b) all parties in interest that have filed a Notice of

Appearance (via ECF); (c) all creditors known to the Debtor as asserting liens against the

Debtor's assets; and (d) all members of the Official Committee of Unsecured Creditors and their

counsel.

15.     The notice of the Motion and the request for expedited hearing constitutes good

and sufficient notice to the parties in interest pursuant to Bankruptcy Rules 2002, 4001(c) and (d)

and 9014, the Local Rules and §102(1) of the Bankruptcy Code, as required by §§364(c) and (d)

of the Bankruptcy Code, and no further notice of, or hearing on, the relief sought in the Motion is

necessary or required.

**CONCLUSION**

WHEREFORE, Movant prays for an order of the form attached hereto as Exhibit 2 to be

entered, authorizing Debtor to obtain post petition financing pursuant to the terms set forth in the

DIP Agreement, to enter into the DIP Agreement, and to provide Lender, without limitation:  (a)

a first priority lien on all of the intellectual property of Debtor and all proceeds thereof pursuant

//

//

**MOTION FOR ORDER AUTHORIZING
DEBTOR TO OBTAIN POSTPETITION
FINANCING AND RELATED RELIEF** - 8

to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, and (b) a superpriority

administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code.

DATED this 19th day of April, 2013.

/s/ Gary Underwood Scharff
Gary Underwood Scharff,
Attorney for Debtor

**MOTION FOR ORDER AUTHORIZING
DEBTOR TO OBTAIN POSTPETITION
FINANCING AND RELATED RELIEF** - 9

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

Gary Underwood Scharff, OSB #883031
Lead Attorney
Law Office of Gary Underwood Scharff
621 S.W. Morrison Street, Suite 1300
Portland, OR  97205
Tel.: 503-493-4353
Fax: 503-517-8143
Email: gs@scharfflaw.com

Heather A. Brann, PC OSB # 040495
Of Counsel
PO Box 11588
Portland, OR  97211
Tel.: 503 490-6563
Email: branns@earthlink.net
Of Attorneys for Absorbent Technologies, Inc.,
Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>Absorbent Technologies, Inc.,<br><br>       Debtor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) □<br>□ | Case No.:  13-31286-tmb11<br>Chapter 11<br><br>**DECLARATION OF DAVID MOFFENBEIER IN SUPPORT OF SECOND MOTION FOR INTERIM BORROWING ORDER**<br><br>Preliminary Hearing: _____am/pm, 4/____/2013<br>Courtroom 4, Bankruptcy Court |

I, DAVID MOFFENBEIER, state as follows:

1.      I am over the age of 18 and make this statement from personal knowledge and if

called upon to testify would testify as set forth herein.

**DECLARATION OF DAVID MOFFENBEIER** -
1

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

2.      I am the chief executive officer of Absorbent Technologies, Inc., debtor in possession in this case ("Debtor" or "ATI").  I have held that position since November 5, 2012.  I make this declaration in support of Debtor's second motion for Debtor In Possession financing, which motion seeks leave to borrow from United Phosphorus Limited ("UPL") and Joseph A. Nathan living trust ("Nathan") (collectively, "Lender").

3.      Debtor's business consists of the manufacture and sale of a super-absorbent polymer starch product, brand name Zeba®, to be included with fertilizer and seeds or seedlings of various crops at the time of planting and initial irrigation.  The product captures water otherwise lost to evaporation, river run-off and seepage into the subsurface water table, greatly improving the hydration of seeds and roots.  The use of Zeba® has been demonstrated over years of testing and sales to significantly increase crop yields, especially in dry soils and climates.

4.      The Zeba® manufacturing process is complex.  In Debtor's early years, developing methods to allow production in sufficient quantities to provide a profitable cost/price ratio proved challenging.  ATI eventually developed and patented such a manufacturing process.  As a result of the collapse in bank lending beginning in 2008-2009, however, ATI was unable to acquire bank financing to complete construction of its new factory and install its special manufacturing equipment to take advantage of that production innovation.  With production continuing to occur in relatively limited quantities at high costs, Debtor struggled to sustain its business leading, eventually, to this bankruptcy filing.

5.      Debtor has communicated with UPL and Nathan concerning their interest in joining other investors to form a new entity to acquire substantially all of Debtor's assets through a liquidating Chapter 11 plan that would compensate creditors and provide additional cash to assume leases and resume operations to capitalize on the Zeba® product after bankruptcy.

6.      Debtor has already borrowed approximately $67,000 borrowed from Nathan on April 5, 2013, pursuant to the Court's order of that date (the "First Loan").  To operate its business and engage in its plan for an orderly sale of its assets, Debtor has an immediate need to borrow an additional $933,000 beyond the funds in the First Loan.  The new borrowing would pay the postpetition expenses set forth in Debtor's budget, attached as Exhibit 1 to the DIP Agreement between Debtor and the proposed Lender here.  The DIP financing requested will pay for the budgeted expenses through May 30, 2013.

7.      ATI has vigorously sought out sources of Debtor In Possession financing (the "DIP Loan") since the Petition Date, but as of this date has been unable to obtain unsecured credit other than the First Loan.

8.      The terms of the DIP Agreement between the Debtor and Lenders pursuant to which the proposed financing will be provided to the Debtor by Lenders have been negotiated in good faith and at arm's length as that term is used at §364(e) of the Bankruptcy Code and are in the best interests of the Debtor and its creditors.

9.      The ability of the Debtor to continue its business and maximize the value of its assets under chapter 11 of the Bankruptcy Code depends upon obtaining the financing requested here from Lender.  Immediate and irreparable harm to the Debtor and the Debtor's estate will result if the proposed financing is not obtained.

I affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this 18th day of April, 2013.

/s/ David Moffenbeier

**DECLARATION OF DAVID MOFFENBEIER -** 3

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

Gary Underwood Scharff, OSB #883031
Lead Attorney
Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Suite 1300
Portland, OR  97205
Tel.: 503-493-4353
Fax: 503-517-8143
Email: gs@scharfflaw.com

Heather A. Brann, OSB # 040495
Of Counsel
PO Box 11588
Portland OR  97211
Tel.: 503 490-6563
Email: branns@earthlink.net
Of Attorneys for Absorbent Technologies, Inc.,
Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re: | ) Case No.: 13-31286-tmb11 |
| | ) |
| **Absorbent Technologies, Inc.,** | ) Chapter 11 |
| | ) |
| | ) **CERTIFICATE OF SERVICE** |
| Debtor. | ) |
| | ) |
| | ) |

The undersigned hereby certifies that on April 19, 2013, she caused to be served upon the parties listed on the attached Service List, by first class mail in sealed envelopes, postage prepaid, or electronic mail per consent of the recipient, copies of the following document: Motion for Order (A) Authorizing Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(d)(1) AND 364(e); (B) Granting Postpetition Liens and Superpriority Administrative Expense Status; and (C) Authorizing Debtor to Enter into Agreements with Postpetition Lender.

DATED this 19th day of April, 2013.

     /s/ Kellie Ann Furr
Legal Assistant to Gary Underwood Scharff

**CERTIFICATE OF SERVICE** - 1

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

**LIST OF INTERESTED PARTIES**
*In re Absorbent Technology, Inc., an Oregon Corporation*
**U.S. Bankruptcy Court Case No. 13-31286-tmb11**

## ECF PARTICIPANTS

- JASON M. AYRES jayres@fwwlaw.com, cmontee@fwwlaw.com
- HEATHER A. BRANN branns@earthlink.net
- DAVID W. CRISWELL dcriswell@balljanik.com, swylen@balljanik.com
- MARJORIE A. ELKEN marjorie.elken@harrang.com, deborah.boersma@harrang.com
- SCOTT D. FINK bronationalecf@weltman.com
- NICHOLAS J. HENDERSON nhenderson@portlaw.com, csturgeon@portlaw.com, sdoberneck@portlaw.com, tsexton@portlaw.com
- SCOTT L. JENSEN slj@brownrask.com, lac@brownrask.com
- GREGG D. JOHNSON gdj@aterwynne.com, jmh@aterwynne.com
- JAMES P. LAURICK jlaurick@kilmerlaw.com, hbecker@kilmerlaw.com
- MATHEW W. LAURITSEN mlauritsen@balljanik.com, akimmel@balljanik.com
- JEFFREY C. MISLEY jeffm@sussmanshank.com, ecf.jeffrey.misley@sussmanshank.com
- MILES D. MONSON miles@andersonmonson.com, jaime@andersonmonson.com
- SHAWN B. REDIGER srediger@williamskastner.com
- CRAIG G. RUSSILLO crussillo@schwabe.com, dkinonen@schwabe.com, docket@schwabe.com, ecfpdx@schwabe.com, bankruptcynotices@schwabe.com
- SHAWN P. RYAN shawn@sryanlaw.com, donna@sryanlaw.com
- GARY U. SCHARFF gs@scharfflaw.com, kellie.furr@gmail.com
- PEENESH SHAH pshah@schwabe.com, dgibson@schwabe.com, docket@schwabe.com, ecfpdx@schwabe.com
- LEON SIMSON leon.simson@tonkon.com, laura.lindberg@tonkon.com, jeri.chavis@tonkon.com
- US Trustee, Portland USTPRegion18.PL.ECF@usdog.gov
- THOMAS K. WOLF tom@tkwllc.com, tlw@tkwllc.com

## NON-ECF PARTICIPANTS

Glen Barton
242 W. Detweiller Dr.
Peoria, IL 61615

Biotex Finance
Attn: Tommy Thompson
2121 Sage, Suite 225
Houston, TX 77056

Darrel Brett
10101 SE Main Street
Portland, OR 97216

Commerce Bank
1211 SW Fifth Avenue
Suite 1250
Portland, OR 97204

Ephesians Equity GroupLLC
7115 N. Division St., Suite
B356
Spokane, WA 99208

Fluffco, LLC
8405 SW Nimbus Ave
Suite A
Beaverton, OR 97008

1

Insight 2811 Tech
Attn: Joe Nathan
755 West Big Beaver
Suite 1275
Troy, Michigan, 48084

Insight Tech Capital
Attn: Joe Nathan
755 West Big Beaver
Suite 1275
Troy, Michigan, 48084

Pamela and Darrell Jerden
2757 Old Myers Road
Bloomington, IN 47408

Joseph A. Nathan Living
Trust
Attn: Steven B. Grow via
email, SGrow@wnj.com
Per consent of recipient

David Summers
22 Icklingham Rd.
Cobham, Sussey
United Kingdom KT112NQ

TCT Fund
Attn: Tommy Thompson
2121 Sage, Suite 225
Houston, TX 77056

EXHIBIT 1

## DEBTOR IN POSSESSION FINANCING AGREEMENT

This Debtor in Possession Financing Agreement (this "Agreement") is made and entered into as of  April [__], 2013, by and among Absorbent Technologies, Inc., an Oregon  corporation ("Debtor"), Joseph A Nathan living trust ua dtd 12/30/1996, Joseph A Nathan trustee ("Nathan"), and United Phosphorus Inc. ("UPI"). Nathan and UPI are collectively referred to herein as "Lenders".

## RECITALS

A.      Debtor filed a petition under Chapter 11 of the Bankruptcy Code on March 8, 2013 ("Petition Date"), in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court").  Debtor's bankruptcy case is administered under Case No. 13-31286 tmb11 (the "Bankruptcy Case").

B.      Debtor currently is unable to obtain the funds required to operate after the Petition Date other than by borrowing from Lenders on the terms set forth in this Agreement. Lenders are unwilling to lend to Debtor except on the terms of this Agreement.

C.      To operate its business or engage in an orderly sale of its assets, Debtor has an immediate need to borrow funds to finance the expenses set forth in the budget attached as _Exhibit A_ and Debtor will suffer immediate and irreparable harm if it is not immediately permitted to borrow pursuant to the terms of this Agreement. Pending entry of a Bankruptcy Court order after not less than 14 days' notice as required by Federal Rule of Bankruptcy Procedure (FRBP) 4001(b), this Agreement is intended to allow Debtor to borrow only to the extent necessary to avoid immediate and irreparable harm to Debtor.

D. The parties now desire to set forth the conditions on which Lenders will make postpetition Advances to Debtor.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties agree as follows:

//

//

//

## Article 1

## INCORPORATION OF RECITALS, DEFINITIONS,

## AND EXHIBITS

**1.1 Recitals**. The foregoing recitals are incorporated into this Agreement by this reference.

**1.2 Definitions**. Except as otherwise defined here or as the context requires otherwise, (a) capitalized terms used here shall have the meanings assigned to them in Appendix A and (b) all other terms will have the meanings, if any, given to them in the Bankruptcy Code.

**1.3 Exhibits**. The exhibits referred to in and attached to this Agreement are incorporated into this Agreement by this reference.

## Article 2

## REPRESENTATIONS AND WARRANTIES

To induce Lenders to enter into this Agreement, Debtor makes the following representations, covenants, and warranties, which survive execution and delivery of this Agreement and are not affected or waived by any inspection or examination made by, or on behalf of, Lenders:

(a) Debtor is a duly authorized and existing corporation in good standing in all states in which it transacts business. Debtor has been duly authorized to enter into this Agreement and to perform its obligations and covenants as stated here.

(b) Debtor has full power and legal capacity to execute, deliver, and perform the terms and provisions of this Agreement and all of the Loan Documents that it is required to execute, deliver, and perform by the terms of this Agreement.

(c) Executing, delivering, and performing this Agreement will not constitute a breach or default under any other agreement to which Debtor is a party or by which Debtor may be bound or affected, or a violation of any law, regulation, court order, or decree of any governmental department, commission, board, bureau, agency, or instrumentality, that may affect Debtor or the Intellectual Property Collateral.

(d) Debtor is not in default under any material provision of any applicable statute, rule, order, certificate, license, or regulation of any governmental authority having jurisdiction over it or its business operations.

(e) With the exception of the Bankruptcy Case, there are no actions, suits, or proceedings pending or threatened against or affecting Debtor before any court or before any governmental or administrative body or agency that could have a material adverse effect on Debtor.

(f) Debtor has not proposed and will not propose to Lenders any Budget that will not permit Debtor to make all expenditures necessary for Debtor to comply with all requirements of this Agreement, including Article 6.

(g) Debtor has not failed to disclose to Lenders any material fact necessary to make the representations and warranties that are made, in light of the circumstances under which they are made, not misleading.

(h) Debtor owns the Intellectual Property Collateral, and upon entry of the Interim Approval Order the Intellectual Property Collateral will not be subject to any lien, security interest, encumbrance, license or other impairment that is senior to the liens granted to Lenders.

## Article 3

## CONDITIONS PRECEDENT

Before Lenders will be bound to the terms of this Agreement, or have any obligation to make any Advance to Debtor, the following conditions must have been fulfilled to Lenders' satisfaction:

(a)   Lenders shall have entered into an intercreditor agreement in form satisfactory to Lenders providing for equal participation in all Advances to Debtor, all rights regarding the Postpetition Lien and Postpetition Superpriority Claim and, to the extent of the Debtor's obligations under this Agreement, all recoveries from Debtor.

(b) An order in form satisfactory to the Lenders, in their sole discretion, approving this Agreement after a preliminary hearing must be entered by the Bankruptcy Court (the **"Interim Approval Order"**).

(c) Debtor and Lenders must execute one or more financing statements with collateral description and all other Loan Documents required by this Agreement, all in form satisfactory to the Lenders, in their sole discretion.

(d) The representations and warranties of Article 2 above must be true and correct.

(e)  No Default exists under this Agreement or under any of the Loan Documents.

## Article 4

## LOAN COMMITMENT

**4.1    Loan Agreement Advances.** Lenders agree, subject to the terms and conditions of, and relying upon the representations set forth in, this Agreement, and provided that no Event of Default then exists, to make postpetition Advances to Debtor on a pari passu basis, in an aggregate principal amount not to exceed $1,000,000.00 (the "**Loan Commitment**"), on the schedule provided in Appendix B. Notwithstanding anything in this Agreement to the contrary, no Advances will be made in the event either Lender declines to lend its share of any Advance. Notwithstanding anything in this Agreement to the contrary, neither of the Lenders shall be obligated to make Advances in excess of the principal amount of $500,000.

**4.2    DIP Note.**  All Advances under this Agreement may, at the election of Lenders, be evidenced by one or more promissory notes in form satisfactory to Lenders.  Separate notes for each Advance, however, will not be required and the amount reflected upon the records of Lenders shall be conclusive as to the amount owing Lenders from time to time, absent manifest error.

**4.3    Interest**.  All Advances under this Agreement shall bear interest at the rate of 8%.

**4.4    Reimbursement of Expenses**. In addition to all Advances made by Lenders under this Agreement, Debtor shall reimburse each of the Lenders for all costs, expenses and reasonable attorney fees incurred by Lenders in connection with or arising out of the negotiation, documentation and administration of this Agreement and the Loan Documents, including all costs and expenses incurred by Lenders following an Event of Default. All outstanding indebtedness under this Agreement, including accrued interest, fees, and expenses, shall be due in full upon the earlier to occur of: (a) an Event of Default; (b) the sale of substantially all of the Debtor's assets; or (c) May 26, 2013.

**4.5 Court Approval**. Within one (1) business day of Lenders' execution of this Agreement, Debtor shall file a motion for authorization to borrow pursuant to

the terms of this Agreement and give notice of that motion, this Agreement, the proposed Interim Approval Order and the preliminary hearing on approval of this Agreement in accordance with FRBP 4001(d). Pending entry of a Bankruptcy Court order finally approving this Agreement ("<u>Final Hearing</u>"), but subject to the entry of an Interim Approval Order in form satisfactory to Lenders in their sole discretion approving this Agreement, Debtor may borrow [$____,000] from Lenders ($66,260.85 of which shall be used to repay amounts borrowed by Debtor from Nathan pursuant to an Order of this Court entered March 5, 2013 (Docket No. 48, the "<u>First DIP Financing Order</u>")).

**4.6  Final Court Approval**. Debtor's authority to borrow from Lender continues after the Final Hearing concludes only if the Bankruptcy Court has entered an order finally approving this Agreement in form satisfactory to the Lenders in their sole discretion (the **"Final Approval Order"**).   Each of the Interim Approval Order and the Final Approval Order is an "Approval Order."

**4.7 Use of Advances.** Advances made to Debtor under this Agreement shall be used and expended by Debtor exclusively to pay expenses provided for, and in the amounts set forth, in the Budget, provided that the actual expenditures for any single Budget line item in any week may exceed the budgeted amount by 10%, provided further that the Debtor's actual aggregate expenditures for any week shall not exceed 5% of the Budgeted aggregate expenditures for that week.

**4.8 Fees of Counsel to the Debtor**. Any reference in the Budget to fees or costs of attorneys or other professional persons engaged by Debtor does not constitute authorization or consent by Lenders to disbursement of any such sums, the subordination of Lenders' security interests in the Intellectual Property to such fees or costs, or Lenders' consent to recovery of those fees or costs by Debtor or any trustee  under Section 506(c).

**4.9 Termination of Authority to Borrow from Lender**. Debtor's authority to borrow from Lenders expires when an Event of Default occurs or 11:59 p.m. on May 26, 2013 (the "<u>Budget Termination Date</u>"), whichever is earlier. Lenders may consent in writing to Debtor's borrowing from Lenders beyond the Budget Termination Date, in which case all provisions of this Agreement remain in full force and effect, except that the Budget Termination Date will be modified accordingly.

//

//

**Article 5**

**ADEQUATE PROTECTION**

**5.1 Adequate Protection**. Nothing in this Agreement bars Nathan from seeking additional or different adequate protection or relief from the automatic stay on the ground that Nathan has not been afforded adequate protection with respect to any prepetition obligations owing by Debtor to Nathan.

**5.2 Grant of Postpetition Lien**. To secure the payment and performance when due (whether at stated maturity, by acceleration or otherwise) any and all Advances and all other indebtedness, liabilities, or obligations of Debtor to Lenders under this Agreement and the Loan Documents (the "DIP Indebtedness"), Debtor hereby grants to lenders a continuing first priority security interest in and lien on all of Debtor's present and future right, title and interest in, to and under the following, whether now existing or hereafter acquired or arising (the "Intellectual Property Collateral"):

      (a)     Intellectual Property;

      (b)     IP Ancillary Rights;

      (c)     IP Licenses and other Contracts;

      (d)     Related Property; and

      (e)     Proceeds.

The Intellectual Property Collateral also includes all rights and interests developed or acquired by Debtor in any of the foregoing after the date of this Agreement ("After-Acquired Intellectual Property").

**5.5 Documentation**. The Postpetition Lien shall be a first priority security interest in and lien on all Intellectual Property Collateral pursuant to 11 U.S.C. §§ 364(c)(2) and 364(d)(1), and is attached and is perfected automatically by entry of the Bankruptcy Order approving this Agreement. Notwithstanding the automatic perfection of the Postpetition Lien, the Lenders are authorized, but not required, to file or record financing statements, intellectual property filings, notices of lien or similar instruments in any jurisdiction, or take any other action in order to validate and perfect the Postpetition Lien. Whether or not the Lenders shall, in their sole discretion, choose to file such financing statements, intellectual property

filings, notices of lien or similar instruments, or otherwise confirm perfection of the liens and security interests granted to them under this Agreement, the Postpetition Lien shall be deemed valid, perfected, allowed, enforceable, unavoidable and not subject to challenge, dispute or subordination as of the date of entry of the Bankruptcy Order.  At Lenders' request, Debtor shall promptly execute and deliver to Lenders security agreements, financing statements, and any other instruments or documents considered by Lenders to be necessary or desirable to perfect the Postpetition Lien. The automatic stay of 11 USC §362(a) is modified to permit Lender to do all acts permitted or required by this Agreement.

**5.6 Allowed Superpriority Administrative Expense Claim.**  Any Interim Approval Order and Final Approval Order shall provide all of the DIP Indebtedness shall constitute an allowed superpriority administrative expense claim in this bankruptcy case, pursuant to 11 U.S.C. § 364(c)(1), with priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject only to the Carve-Out Expenses. "Carve-Out Expenses" means (i) all unpaid fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, (ii) all unpaid fees payable to the Clerk of the Court; and (iii) all allowed but unpaid Budgeted fees and expenses of any professionals for the Debtor and the Creditors Committee for services rendered prior to an Event of Default, plus up to $50,000 in the aggregate for allowed but unpaid fees and expenses of any professionals for the Debtor and any official committee of unsecured creditors appointed in the Bankruptcy Case incurred subsequent to an Event of Default..

**5.7 No Waiver or Admission**. Nothing contained in this Agreement constitutes or causes a waiver of Nathan's rights or the priority of Nathan's liens and security interests in any prepetition property of the Debtor that is not Intellectual Property Collateral or a waiver of any right to adequate to protection of any such interest.

**Article 6**

**COVENANTS**

**6.1 Affirmative Covenants**. Debtor covenants that it shall:

(a) Maintain and preserve its corporate existence.

(b) Keep its books of account in accordance with generally accepted accounting principles, consistently applied, and reported on the basis of a fiscal year ending December 31, 2013.

(c) Provide to Lenders at or before 12 noon on each Wednesday a report containing the following information:

(i) Cash income for the prior week and for the period since the Petition Date;

(ii) Cash expenditures by Budget line items for the prior week and for the time period since the Petition Date;

(iii) A comparison of actual weekly and cumulative income and expenditures by line item to Budgeted weekly and cumulative income and expenditures by line item;

(g) A copy of Debtor's check registers, showing all checks written by Debtor during the week ending on the preceding Friday and identifying each check listed in the register by check number, date, payee, amount, and Budget category; and

(h) A report in a form reasonably satisfactory to Lenders identifying Debtor's actual collections from sales of assets, and expenditures related to such sales, for both the preceding week and the cumulative period of time since the Petition Date.

(i) Deliver to Lenders on or before the tenth day of each month ending after the date of this Agreement an aged listing, by account debtor, of accounts receivable as of the last day of the prior month

(j) Deliver to Lenders  no later than 10 days after the close of each month ending after the date of this Agreement, within 20 days after the close of each calendar quarter ending after the date of this Agreement, and within 30 days after the close of each fiscal year ending after the date of this Agreement, the following unaudited financial statements of Debtor compiled by Debtor's independent certified public accountants: balance sheet, income statement, statement of cash flows, and accounts payable and inventory listings as of the last day of the prior month and for the periods of the prior month, the fiscal quarter to the end of the prior month, and the fiscal year to the end of the prior month, all in reasonable detail and certified by Debtor to be true and correct.

(k) Provide to Lenders at no charge copies of any audited financial statements that Debtor provides to any third party.

(l) Provide to Lenders certificates of insurance and, if requested by Lender, copies of all insurance policies required by the Loan Documents, and maintain all insurance required by the Loan Documents in full force and effect.

(m) Allow Lenders or their agents, representatives, or workers to enter Debtor's places of business at any reasonable time after prior written notice to Debtor for the purpose of inspecting and copying any of Debtor's books and records, and for the purpose of performing any of the acts that Lenders are authorized to perform under the terms of this Agreement.  Any such inspection will take place during ordinary business hours and will not unduly interfere with the operation of Debtor's business. Lenders shall give Debtor reasonable notice before conducting an inspection. Twenty-four hours' notice is conclusively deemed to be reasonable. Lenders' inspection rights are in addition to all of Lenders' rights to inspect its collateral under its security agreements with Debtor and otherwise.

(n) Deliver to Lenders copies of all reports filed by Debtor or its affiliates with any governmental agency.

(o) With reasonable promptness, provide other information respecting the business, operations, and financial condition of Debtor or its affiliates as Lenders may from time to time reasonably request.

(p) Maintain all material licenses and permits, and all related or other agreements, necessary for Debtor to operate its business, as may now exist or be modified or expanded.

(q) At all times comply with any and all material regulations, rules, or requirements of any federal agency or department and of any state, local, or municipal government, agency, or department that may at any time have jurisdiction or power to regulate, license, or grant permits in respect of the facilities or activities of Debtor, whether the regulations, rules, or requirements presently exist or are modified, promulgated, or implemented after the date of this Agreement.

(r) Keep its properties in good repair and in good working order and condition, in a manner consistent with past practices and comparable to industry standards; make from time to time all appropriate and proper repairs, renewals, replacements, additions, and improvements to the properties; and keep all equipment that may now or in the future be subject to compliance with standards or rules imposed by any governmental agency or authority, or state or local governments or instrumentalities, in full compliance with those standards or rules.

(s) Duly pay and discharge all lawful claims, whether for labor, materials, rentals, or anything else, that might or could, if unpaid, become a lien or charge on Debtor's property, unless and to the extent only that the validity of a claim, after written notice of the claim is given to Lender, is being contested in good faith and by appropriate proceedings. If Debtor contests any charge as allowed above, Debtor must establish adequate reserves against possible liability with respect to the charge.

(t) Timely pay all of its employees, in accordance with its agreements with the employees and all applicable law, for services rendered after the Petition Date, and pay all payroll and other taxes imposed on Debtor with respect to its employees or otherwise that accrue after the Petition Date.

(u) Immediately advise Lender in writing of any Hazardous Materials Claim.

(v) At Debtor's sole cost and expense, keep and maintain its properties and each portion of its properties in compliance with, and not cause or permit its properties or any portion to be in violation of, any Hazardous Materials Laws.

(w) Promptly give written notice to Lender of any of the following:

(i) Any citation, order to show cause, or other legal process or order that could have a material adverse effect on Debtor, directing Debtor to become a party to or to appear at any proceeding or hearing by or before any governmental agency or instrumentality or any municipality or other agency or instrumentality that has granted Debtor a license, certificate of compliance, or permit, and include with the notice a copy of any citation, order to show cause, or other legal process or order.

(ii) Any (A) refusal or failure by any governmental agency or instrumentality to renew or extend any material license, certificate of compliance, or permit, or (B) proposed or actual revocation, termination, or modification (whether favorable or adverse) thereof, or (C) dispute or other action with respect thereto, or (D) denial or threatened denial or revocation or modification by any governmental agency or instrumentality of any material authorization required by law, or (E) notice from any governmental agency or instrumentality of the imposition of any material fines or penalties or forfeitures or (F) threats or notice with respect to any of the foregoing or with respect to any proceeding or hearing that might result in any of the foregoing.

(iii) Any dispute concerning, or any threatened nonrenewal or modification of, any material lease for real or personal property to which Debtor is a party.

(iv) Any postpetition actions, proceedings, or claims of which Debtor may have notice, that may be commenced or asserted against Debtor in which the amount involved is $50,000 or more, and that is not fully covered by insurance or that, if not solely a claim for monetary damages, could, if adversely determined, have a material adverse effect on Debtor.

(x) Promptly notify Lenders if Debtor becomes aware of a Default or Event of Default hereunder.

(y) Notify Lenders of any written offers to purchase Debtor's assets out of the ordinary course of business.

(z) Provide Lender with copies of all pleadings filed in this case, except proofs of claim, that do not evidence service on Lenders or their counsel.

(aa) Meet with Lenders on reasonable notice, at reasonable times, and at reasonable intervals to inform Lenders of the status of the Bankruptcy Case.

(bb) Upon Lenders' demand, duly execute and deliver, or cause to be duly executed and delivered, to Lenders other instruments, agreements, and documents and do or cause to be done other acts that may be necessary or proper in the reasonable opinion of Lenders to carry out more effectively the provisions and purpose of this Agreement.

**6.2 Negative Covenants**. Debtor covenants that, as long as this Agreement is in effect, and until all Advances and other obligations and indebtedness owing Lenders under this Agreement are paid or satisfied in full, Debtor shall not:

(a) Without the prior written consent of Lenders, obtain credit.

(b) Employ any Person when it will be unable to timely pay the Person the required compensation or any taxes.

(c) Cause or permit the Intellectual Property to be subject to any lien, encumbrance, license, assignment or other transfer or impairment of any kind.

(d) Without the prior written consent of Lenders, enter into any transaction, other than on terms reasonably believed to be at least as favorable as those that could be obtained from an unrelated party, in which an affiliate of Debtor has any interest, or make any payment or agree to make any payment to any such affiliate, or transfer or agree to transfer ownership or possession of any of its business or assets, tangible or intangible, real, personal, or mixed, to any affiliate.

(e) Without the prior written consent of Lenders, lend money, make credit available (other than in the ordinary course of business to customers), or lend property or the use of property to any Person, or purchase or repurchase the stock or indebtedness, or all or a substantial part of the assets or properties, of any Person, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly or by any instrument having the effect of assuring any Person's payment or performance or capability) the indebtedness, performance, obligations, stock, or dividends of any Person, or agree to do any of the foregoing, except the endorsement of negotiable instruments for deposit or collection in the ordinary course of business.

(f) Without the prior written consent of Lenders, invest in (by capital contribution or otherwise) or acquire or purchase or make any commitment to purchase the obligation or stock or equity of any Person except (i) the purchase of direct obligations of the government of the United States of America or any agency or instrumentality thereof, (ii) interest-bearing certificates of deposit or repurchase agreements issued by any commercial banking institution satisfactory to Lenders, (iii) stock or obligations issued in settlement of Debtor's claims against others by reason of bankruptcy or a composition or readjustment of debt or reorganization of any debtor of Debtor.

(g) Without the prior written consent of Lenders, enter into any business that is substantially different from and/or not connected with the businesses in which Debtor is presently engaged, or make any substantial change in the nature of its businesses or operations.

(h) Without the prior written consent of Lenders, change the chief executive office of Debtor if the effect of the change in location would adversely affect Lenders' security interest in  the Intellectual Property without (i) prior written notice to Lenders, and (ii) executing, delivering, and filing (and paying filing fees and taxes) all documents as may be necessary or advisable in Lenders' opinion to continue to perfect and protect the liens and security interests in the  Intellectual Property.

(i) Without the prior written consent of Lenders, enter into any agreement (other than employment agreements) with any Person that confers on the Person the right or authority to control or direct a major portion of the business or assets of Debtor.

(j) Permit its properties or any portion of them to be a site for the storage, use, generation, manufacture, disposal, or transportation of Hazardous Materials.

(k) Permit any Hazardous Materials that were owned or generated by Debtor to be disposed of off their properties other than in properly licensed disposal sites.

(l) Without the prior written consent of Lenders, enter into any settlement or compromise of any adversary proceeding, contested matter or other dispute involving the Intellectual Property.

## Article 7

## EVENTS OF DEFAULT

**7.1 Events of Default**. Time is of the essence in this Agreement and the Loan Documents. The occurrence of any one or more of the following constitutes an Event of Default under this Agreement and the Loan Documents:

(a)    If Debtor fails to perform any of its other obligations under, or to comply with any of the terms, conditions, and covenants that are contained in, this Agreement, or any other Loan Document or other agreement, document, or instrument that Debtor has given or in the future gives to Lenders to evidence or secure any obligation or indebtedness of Debtor to Lenders.

(b)    If any statement, warranty, or representation that Debtor makes in this Agreement or any statement, warranty, or representation that Debtor or any third party has made or in the future makes in any other Loan Document, certificate, report, or other document, instrument, or agreement that is delivered under this Agreement or in connection with any obligation or indebtedness of Debtor to Lenders, is false or inaccurate in any material respect when made.

(c)    If this Agreement shall for any reason shall fail to create a valid and perfected first priority security interest in the Intellectual Property, or if such security interest shall fail to remain in full force and effect, or if any action is taken to discontinue or to assert the invalidity or unenforceability of this Agreement, or Lenders security interest in the Intellectual Property.

(d)     Any one of the following is timely filed:  (i) notice of appeal of the Interim Approval Order or the Final Approval Order, (ii) motion for leave to appeal any Approval Order, (iii) motion to extend the time to file a notice of appeal or motion for leave to appeal any Approval Order, or (iv) motion to alter or amend any Approval Order, whether or not the Approval Order is stayed.

(e)     Custody or control of any substantial part of Debtor's property is assumed by any governmental agency or authority or any court of competent jurisdiction at the insistence of any governmental agency or authority, or any governmental regulatory agency or authority takes any final action that would have a material adverse effect on Debtor.

(f)     Any governmental agency or instrumentality refuses or fails to issue, renew, or extend any lease, license, contract, certificate of compliance, or permit with respect to the operation of Debtor's business, or any governmental agency or instrumentality denies, forfeits, or revokes any license, permit, or authorization required by law, and the government action could have a material adverse effect on Debtor.

(g)      If, in Lenders sole judgment and discretion, any event occurs that has a material adverse effect on Debtor's business or financial condition, or that materially increases Lenders' risk.

(h)     Debtor's authority to borrow from Lenders terminates or expires.

(i)     The Bankruptcy Court announces from the bench or enters any order or judgment holding any material provision of this Agreement invalid or unenforceable.

(j)     The Bankruptcy Court announces from the bench or enters any order dismissing the Bankruptcy Case or converting that case to a Chapter 7 case, or Debtor files a motion to convert that case to a Chapter 7 case.

(k)     Debtor fails to make when due any payment required under this Agreement.

(o)  A Final Approval Order, in the form attached hereto as Exhibit ____ or otherwise in form and content acceptable to Lenders in their absolute discretion, has not been entered by the Bankruptcy Court on or before May [10], 2013.

[(p) The Final Approval Order does not contain a finding and ruling that D2 holds no enforceable rights to or interest in the Intellectual Property.]

**7.2    Remedies on Default**. If an Event of Default occurs, Debtor's authority to borrow from Lenders shall automatically terminate without notice from Lenders and Lenders shall have the absolute right to refuse to disburse any funds hereunder. At their option and election and in their sole discretion, Lenders may exercise alternatively or cumulatively any or all of the rights, privileges or remedies available to Lenders at law or in equity, including as may be provided by the Uniform Commercial Code and any other applicable law. All rights and remedies given by this Agreement and the other Loan Documents are cumulative and not exclusive of any other rights or remedies available to Lenders, and no course of dealing between Debtor and Lenders or any delay or omission in exercising any right or remedy operates as a waiver of any right or remedy, and every right and remedy may be exercised from time to time and as often as is deemed appropriate by Lenders.

## Article 8

## (Intentionally Omitted)

## Article 9

## MISCELLANEOUS

**9.1    Waiver and Estoppel**. Lenders may at any time and from time to time waive in writing any one or more of the terms and/or conditions contained in this Agreement, but any waiver will be deemed to be made pursuant to this Agreement and not in modification of it, and any such waiver in any instance, or under any particular circumstances, will not be construed as a waiver of the condition or of any subsequent Default or Event of Default. No such waiver shall be effective unless provided in writing by both Lenders.  Lenders' failure to promptly exercise their rights or remedies will not be deemed to be a waiver or grounds for the claim of estoppel.

**9.2 Conflict**. The terms and conditions of this Agreement and of the Loan Documents are intended to complement and supplement each other, and are to be construed as consistent and complementary. If the terms or conditions of the Loan Documents conflict with the terms and conditions of this Agreement, the terms and conditions of this Agreement control.

**9.3 Captions**. The captions and headings are merely for convenience and are not a substantive part of this Agreement.

**9.4 Complete and Final Agreement**. This Agreement and the Loan Documents are the complete and final agreement of the parties, and no provision can or will be waived or modified by conduct or oral agreement either before or after this Agreement is executed.

**9.5 Governing Law**. The rights, duties, liabilities, and obligations of the parties under this Agreement will be construed and governed by and under the laws of the State of Oregon, excluding principles of conflict of laws.

**9.6 Notices**. All notices, requests, consents, demands, approvals, and other communications under this Agreement are deemed to have been duly given, made, or served if in writing and delivered personally or mailed by first-class mail, postage prepaid, or sent via fax, to the respective parties to this Agreement as follows:

(a) If to Debtor:  Absorbent Technologies, Inc.
8705 SW Nimbus Avenue, Suite 230
Beaverton, OR 97008

Attention:  David C. Moffenbeier

Fax: 503-699-3026

With a copy to:  Law Office of Gary Underwood Scharff
621 SW Morrison Street #1300
Portland, OR 97205

Attention:  Gary Underwood Scharff

Email: gs@scharfflaw.com

(b) If to Lenders:

United Phosphorus Inc.

630 Freedom Business Center, Suite 402

King of Prussia, PA 19406

Attention:  Rohit Kumar, General Counsel

Email: rohit.kumar@uniphos.com

With a copy to:    Pepper Hamilton LLP

Hercules Plaza, Suite 5100

1313 N. Market Street

Wilmington, DE 19801

Attn:  David M. Fournier

fournierd@pepperlaw.com


and

Joseph A. Nathan

Managing Partner

Insight Technology Capital Partners, LP

755 West Big Beaver

Suite 1275

Troy, Michigan, 48084

jnathan@azacapital.com


With a copy to:

Stephen B. Grow
Warner Norcross & Judd LLP
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, MI 49503-2487

The designation of the Persons to be notified or the address of such Persons for the purposes of notice may be changed from time to time by similar notice in writing,

except that any communication regarding a change of address is deemed to be given or made when received by the party to whom the communication was sent.

**9.8 Further Assurances**. At any time and from time to time, on the reasonable request of Lenders, the parties shall promptly execute and deliver further instruments and documents and take further actions as Lenders may reasonably request to obtain or preserve the full benefits of this Agreement and the rights and powers granted in the Agreement and granted in the Loan Documents.

**9.9 Severability**. If any provision of this Agreement is held to be invalid or unenforceable, all other provisions nevertheless continue in full force and effect.

**9.10 Counterparts**. This Agreement may be executed in one or more counterparts, each of which will constitute an original. Faxed signatures will serve as original signatures for purposes of evidencing an intent to be bound by the terms of this Agreement. The parties shall exchange original executed signature pages to Lenders on or before April 18, 2013.

**9.11 Notice**.

UNDER OREGON LAW, MOST AGREEMENTS, PROMISES, AND COMMITMENTS MADE BY LENDER CONCERNING LOANS AND OTHER CREDIT EXTENSIONS THAT ARE NOT FOR PERSONAL, FAMILY, OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY THE BORROWER'S RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION, AND BE SIGNED BY LENDER TO BE ENFORCEABLE.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement on the date first written above.

[This space intentionally left blank]

DEBTOR:

ABSORBENT TECHNOLOGIES, INC.

_____

By
Name:
Title:

LENDERS:

JOSEPH A NATHAN LIVING TRUST
UA DTD 12/30/1996, JOSEPH A
NATHAN TRUSTEE

_____

By
Name: Joseph A Nathan
Title: Trustee

UNITED PHOSPHOROUS INC.

_____

By
Name:
Title:

# APPENDIX A

## DEFINITIONS

As used in this Agreement, the following terms have the meanings set forth below:

"Advance(s)" shall mean each borrowing by Debtor pursuant to the terms of this Agreement.

"Agreement" means this debtor in possession financing agreement.

"Approval Order" has the meaning set forth in Section 4.6 of this Agreement.

"Bankruptcy Case" means Debtor's Chapter 11 Bankruptcy case pending in the Bankruptcy Court under Case No. 13-312386.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Oregon.

"Budget" means the budget attached as Exhibit A.  "Budget Termination Date" has the meaning set forth in Section 4.7 of this Agreement.

"Budgeted" means an income or expense item set forth in a Budget.

"Budgeted Item" means a Rejected Item that was given in payment of an expense that, if paid, would not cause Debtor to exceed its line-item expenditure authority under the Budget.

"Business Day" means any day except a Saturday, Sunday, or other day on which national Lenders in the state of Oregon are authorized or required by law to close.

"Contracts" means all contracts, leases, licenses, undertakings, franchise agreements or other agreements, whether oral or in written or electronic form, related in any way to any Intellectual Property, and all rights of Debtor under any of the foregoing.

"Copyright Office" means the U.S. Copyright Office.

"Copyrights" means any (a) copyrights, whether registered or unregistered, (b) copyright registrations or applications in any IP Filing Office, (c) continuations, renewals, or extensions thereof, and (d) IP Ancillary Rights related to any of the foregoing.

"Debtor" means Absorbent Technologies, Inc., an Oregon corporation.

"Default" means any condition or event that constitutes an Event of Default, or that with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Event of Default" means any of the events described in Section 7.1 of this Agreement.

"Final Hearing" has the meaning set forth in Section 4.2 of this Agreement.

"Hazardous Materials" means any oil or petrochemical products, PCBs, asbestos, urea formaldehyde, flammable explosives, radioactive materials, hazardous wastes, toxic substances, or related materials, including, without limitation, any substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," or "toxic substances" under any applicable federal or state laws or regulations.

"Hazardous Materials Claim" means (1) any and all enforcement, cleanup, removal, or other governmental or regulatory actions instituted, completed, or threatened pursuant to any applicable Hazardous Materials Laws; and (2) any and all claims made or threatened by any third party against Debtor or the property of either of them relating to damage, contribution, cost recovery, compensation, loss, or injury resulting from any Hazardous Materials.

"Hazardous Materials Laws" means all federal, state, or local laws, ordinances, regulations, orders, and directives pertaining to Hazardous Materials. "Indebtedness" means all items that, in accordance with generally accepted accounting principles, would be included in determining total liabilities as shown on the liabilities side of the balance sheet as of the date that "Indebtedness" is to be determined and, in any event, includes liabilities secured by any mortgage, deed of trust, pledge, lien, or security interest on property owned or acquired, whether or not such a liability has been assumed, and the guaranties, endorsements (other than for collection in the ordinary course of business), and other contingent obligations in respect of the obligations of other Persons.

"Intellectual Property" means all Patents, Copyrights, Trademarks and other intellectual property, whether or not embodied in any tangible medium, including licenses, know-how, trade secrets, customer and supplier lists, proprietary information, inventions, methods, process, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the right to limit the use or disclose thereof by any person or entity, pricing and cost information, business and marketing plans and proposals, consulting agreements, engineering contracts and such other assets which relate to such goodwill.

"IP Ancillary Rights" means, with respect to any other Intellectual Property, as applicable, (a) all rights to royalties, revenues, income or other payments related to such Intellectual Property, arising or payable at any time, under IP Licenses or otherwise, (b) all rights to enforce, collect or perform any Contracts related to such Intellectual Property, (c) all causes of action and rights to claim, sue for or collect damages for, or enjoin or obtain other legal or equitable relief for, any past, present or future infringement, misappropriation, dilution, violation, unfair competition, or other impairment (whether past, present or future) of such Intellectual Property, and (d) all rights to obtain any of the foregoing.

 "IP Filing Office" means the PTO (for Patents and Trademarks), the Copyright Office (for Copyrights), or any similar office or agency in any Jurisdiction.

"IP License" means any Contract in which Debtor directly or indirectly grants or is granted  a license or other right, whether exclusive or non-exclusive, (i) to use or develop any Intellectual Property, (ii) to receive royalties, revenues, income or other payment related to any Intellectual Property, or (iii) to exercise any other right with respect to any Intellectual Property.

"Loan Agreement" has the meaning set forth in Recital A of this Agreement.

"Loan Commitment" means $1,000,000.00.

"Loan Documents" means this Agreement, and all other agreements, instruments, and documents arising out of or relating to Debtor's Indebtedness to Lenders, as well as all renewals and modifications thereof.

"Loans" means the loans by Lender to Debtor.

"Patents" means any (a) letters patent of the United States or any other Jurisdiction, (b) patent applications, petty patents, patents of addition and other

filings in any IP Filing Office, (c) continuations, continuations-in-part, renewals, divisions, extensions and reexaminations thereof and (d) IP Ancillary Rights related to any of the foregoing.

 "Person" means any individual, partnership, joint venture, firm, corporation, association, trust, or other enterprise, or any government or political subdivision or agency, department, or instrumentality thereof.

"Petition Date" has the meaning set forth in Recital E of the Agreement.

"Postpetition Lien" means the security interest and lien granted by Section 5.3 of this Agreement.

"Proceeds" means whatever is receivable or received from or upon the sale, lease, license, collection, use, assignment, exchange or other disposition, whether voluntary or involuntary, of any Intellectual Property Collateral, including "proceeds" as defined in UCC Section 9-102(a)(64) and, including (i) any accounts, chattel paper, instruments, general intangibles, cash and other proceeds payable in respect of any of the Intellectual Property Collateral, (ii) any proceeds of any insurance, indemnity, warranty or guaranty payable with respect to any of the Intellectual Property Collateral, (iii) any and all claims and payments (in any form whatsoever) made or due and payable in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Intellectual Property Collateral by any Person acting under color of governmental authority, and (iv) any and all other amounts paid or payable under or in connection with any of the Intellectual Property Collateral or for or on account of any damage or injury to or conversion of any Intellectual Property Collateral by any Person.

"Property" means all the real and personal property of Debtor acquired either before or after the Petition Date, tangible or intangible, including, but not limited to, all land, buildings, fixtures, trade fixtures, accounts, contract rights, general intangibles, rights to payment of every kind, including rights to tax refunds, equipment, fixtures, trade fixtures, motor vehicles, goods, machinery, inventory, farm products, chattel paper, leases, conditional sale agreements, cash, deposit accounts, notes, documents, documents of title, instruments, securities, shares of capital stock, capital equities, and other securities of and claims against any corporation, joint venture, or partnership, pledges and agreements to pledge, rights in and claims under insurance policies, letters of credit, trademarks, trade names, trade styles, licenses, customer lists, goodwill, instruments, bills of lading, warehouse receipts and trust receipts, and all renewals, replacements, substitutions, additions, accessions, rents, profits, issues, products, and proceeds

(whether due to voluntary or involuntary disposition) of the foregoing, all whether now owned or hereafter acquired. "Property" includes proceeds, products, rents, and profits of Intellectual Property Collateral acquired by Debtor after the Petition Date, including, but not limited to, all funds hereafter deposited into the Cash Collateral Account or advanced to the Operating Account. "Property" does not include any avoidance or recovery powers of Debtor or any trustee under Bankruptcy Code Chapter 5.

"PTO" means the U.S. Patent and Trademark Office.

"Related Property" means, with respect to any Intellectual Property, (i) all accounts, deposit accounts, general intangibles, instruments, investment property and other personal property at any time constituting, evidencing or arising under or with respect to such Intellectual Property, (ii) all substitutions and replacements for any of the foregoing, and (iii) all Debtor's books, records, information and data with respect to any of the foregoing.

"Reporting Requirements" means the requirements of Section 6.1(d) of this Agreement.

"Trademarks" means (a) any marks, whether or not registered, including trademarks, service marks, tradenames, corporate names, company names, business names, trade styles, designs, logos, colors, sounds, trade dress, and any other source identifiers, (b) the goodwill of the business symbolized by or associated with the foregoing, (c) any trademark registrations, applications and other filings in any IP Filing Office, and (d) IP Ancillary Rights related to any of the foregoing.

"UPI" means United Phosphorous Inc.

EXHIBIT A

**Absorbent Technologies, Inc**

Proposed Cash Flow for Operations and Shutdown of Ferry Manufacturing
March- May 2013

| Cash Flow9 Weeks - No Production | | Est | Est | Est | Est | Est | Est | Est | Est | Est | Est | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shutdown Production-Scenario | Pre-Petition | Catch Up Exp | 1-Apr | 8-Apr | 15-Apr | 22-Apr | 29-Apr | 6-May | 13-May | 20-May | 21-May | | Comments |
| | Obligations | 3-8 to 3-31 | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | | |
| Production Raw Materials and Supplies | | | | | | | | | | | | | |
| Nitrogen | | 3,900 | | | | | | 3,900 | | | | 7,800 | Gas and Storage ( Non Explosive) |
| Acrylo | | | | | | | | | | | | - | Raw Material plus Freight |
| Purchased materials & Freight | | | | | 20,000 | | | | | | | 20,000 | Buy product from S. Africa |
| Chemicals | | | | | | | | | | | | - | Chemicals used in production |
| Starch | | | | | | | | | | | | - | Raw Material plus Freight |
| Total Supplies | - | 3,900 | - | - | 20,000 | - | 3,900 | - | - | | 27,800 | | |
| | | | | | | | | | | | | | |
| Electricity | | 4,500 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 12,375 | Operations at sub capacity (PP&L) |
| Natural Gas | | 4,300 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 9,925 | Operations at sub capacity (NW Natural Gas) |
| Water and Sewer | | 900 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 2,925 | Water minimal discharge |
| Total Utilities | - | 9,700 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 25,225 | |
| Operating Costs-Payroll | | | | | | | | | | | | | |
| Ferry Production (Tank Farm Crew) | | | | | | | | | | | | | |
| Queen Production (Dough & Finish& Lab) | | 450 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 10,158 | Matt Blanchard |
| Maintenance Crew | | 350 | 755 | 755 | 755 | 755 | 755 | 755 | 755 | 755 | 755 | 7,146 | KC Durlam |
| HSME Manager | | 3,522 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 14,087 | Glenda Fleming |
| Engineering | | | | | | | | | | | | | |
| Payroll Total | - | 4,322 | 3,008 | 3,008 | 3,008 | 3,008 | 3,008 | 3,008 | 3,008 | 3,008 | 3,008 | 31,392 | |
| Other Costs | | | | | | | | | | | | | |
| Spare Parts | | | | | | | | | | | | | Preventative Maintenance |
| City of Albany-DEQ Permits and Test | | | | | | | | | | | | | Added Water , Air& Sewer Discharge |
| Repairs &Supplies | | 325 | | | | | | | | | | | General Repairs & Maint |
| Equipment Rent (Forklifts) | | 900 | | | | | 900 | | | | | 1,800 | Lease -forklifts |
| Other Supplies/freight | | | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 675 | Other  Supplies including Freight |
| Total Other Costs | - | 1,225 | 75 | 75 | 75 | 75 | 975 | 75 | 75 | 75 | 75 | 2,475 | |
| | | | | | | | | | | | | | |
| Totals Production and Operations | - | 15,247 | 8,708 | 4,808 | 4,808 | 24,808 | 5,708 | 8,708 | 4,808 | 4,808 | 4,808 | 86,892 | |
| Admin Costs: | | | | | | | | | | | | 0 | |
| Management Payroll (8) | | 38,719 | 15,797 | 15,797 | 15,797 | 15,797 | 15,797 | 15,797 | 15,797 | 15,797 | 15,798 | 180,895 | Retain current management |
| BackPay @11,750 (10) | 117,250 | | | | | | | | | | | 117,250 | 10 employees |
| Payroll Taxes | 9,966 | 3,659 | 1,598 | 1,598 | 1,598 | 1,598 | 1,598 | 1,598 | 1,598 | 1,598 | 1,599 | 28,011 | FICA, Medicare, FUTA, SUTA |
| 401K at 3% | 3,518 | 1,267 | 509 | 509 | 509 | 509 | 509 | 509 | 509 | 509 | 509 | 9,367 | 3% match 401k |
| Rent -Queen Street | | 32,553 | | | | | 44,390 | | | | | 76,943 | FHA |
| Rent- Ferry Street | | 6,391 | 6,391 | | | | 8,613 | | | | | 21,395 | Lombard Foods |
| Rent -Beaverton Office | | 7,693 | 7,693 | | | | 10,368 | | | | | 25,754 | PS Business Parks |
| Insurance-Liability,Fire, DO | 30,261 | 19,333 | | | | | | | | | | 49,594 | Flatiron Capital |
| Insurance Health and Dental | 3,014.71 | 8,667 | 12,756 | | | | 12,756 | | | | | 37,194 | Providence , ODS |
| Insurance Worker's Comp | | - | | | 3,500 | | | 3,500 | | | | 7,000 | Liberty Mutual |
| Attorney -Gary Scharff & Credit Committee | | | | | | | | 60,000 | | | 100,000 | 160,000 | Bankruptcy Attorney |
| Accountant-Moss Adams | | | | | | | | 30,000 | | | | 30,000 | Outside Auditors |
| Repay Nathan Loan | | | | | | | | | 66,000 | | | 66,000 | Loan for FHA, Providence, Salaries |
| Patents anuity payments | | | | | | | | 25,000 | | | | 25,000 | Patents in process |
| Other Obligations (Phone-Utilities,etc) | | 10,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 19,000 | |
| Contingency | | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 5,707 | 59,707 | |
| Total Est Admin Cost | 164,009 | 134,282 | 51,744 | 24,905 | 28,405 | 24,905 | 101,032 | 139,905 | 94,405 | 24,905 | 124,613 | 913,108 | |
| | | | | | | | | | | | | | |
| Total Company Costs by Week | 164,009 | 149,528 | 60,452 | 29,712 | 33,212 | 49,712 | 106,740 | 148,612 | 99,212 | 29,712 | 129,421 | 1,000,000 | |

EXHIBIT 2

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In re:

Absorbent Technologies, Inc.,

       Debtor.

) Case No.:  13-31286-tmb11
) Chapter 11
)
) **ORDER GRANTING MOTION FOR**
) **EMERGENCY ORDER:**
) **(A) AUTHORIZING DEBTOR TO**
) **OBTAIN INTERIM POSTPETITION**
) **FINANCING PURSUANT TO 11 U.S.C.**
) **§§ 105, 362, 364(c)(1), 364(c)(2), 364(d)(1)**
) **AND 364(e);**
) **(B) GRANTING POSTPETITION**
) **LIENS AND SUPERPRIORITY**
) **ADMINISTRATIVE EXPENSE**
) **STATUS; AND**
) **(C) AUTHORIZING DEBTOR TO**
) **ENTER INTO AGREEMENTS WITH**
) **POSTPETITION LENDER**
) □
□

    Hearing: ___ __m, 4/___/2013
    Courtroom 4, Bankruptcy Court

      Upon the Motion of Absorbent Technologies, Inc., debtor and debtor-in-possession (the

"***Debtor***"), dated April __, 2013 (the "***Motion***"), seeking, *inter alia*, (i) authority pursuant to

§§364(c)(1), 364(c)(2) and 364(d)(1) of the United States Bankruptcy Code, 11 U.S.C. §§101-

1330 (the "***Bankruptcy Code***"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy

**ORDER GRANTING MOTION FOR**
**EMERGENCY ORDER AUTHORIZING**
**DEBTOR TO OBTAIN INTERIM**
**POSTPETITION FINANCING** - 1

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

Procedure (the "***Bankruptcy Rules***") and Rule 4001-1 of the Local Rules of the United States

Bankruptcy Court for the District of Oregon (the "***Local Rules***"), for the Debtor to obtain post-

petition loans of up to $1,000,000.00 jointly from Joseph A Nathan living trust ua dtd

12/30/1996, Joseph A Nathan trustee ("Nathan") and United Phosphorus Inc. (**"UPI"** and, jointly

with Nathan, "***Lenders***") secured by first priority security interests in and liens upon all of the

Debtor's intellectual property and all proceeds thereof, whether existing and hereafter acquired,

pursuant to §§364(c)(2) and 364(d)(1) of the Bankruptcy Code, (ii) authority for the Debtor to

enter into the Debtor in Possession Financing Agreement dated April [__], 2013 between

Lenders and Debtor (the "***DIP Agreement***"), (iii) approval of the terms and conditions of the DIP

Agreement, and (iv) the granting to Lenders of super-priority administrative claim status

pursuant to §364(c)(1) of the Bankruptcy Code. Upon the Motion, the files and pleadings in this

case, the record of the proceedings heretofore held before this Court with respect to the Motion

and upon completion of such hearing and after due deliberation and sufficient cause appearing

therefor, the parties hereto stipulate and the Court hereby finds and concludes as follows:

      A.      Each of the parties set forth below received due notice of the Motion pursuant to

Bankruptcy Rules 4001(b)(1), (c)(1) and (d)(1) and 1007(d) and the Local Rules: (a) the Office

of the United States Trustee; (b)  all parties in interest that have filed a Notice of Appearance in

the Debtor's chapter 11 case, including the County of Linn, through its counsel; (c) all creditors

known to the Debtor who may have liens against the Debtor's assets; and (d) counsel to the

Official Committee of Unsecured Creditors; and

      B.      The Debtor filed a voluntary petition for reorganization under chapter 11 of the

Bankruptcy Code on March 8, 2013 (the "*Petition Date*") and has thereafter continued in the

**ORDER GRANTING MOTION FOR
EMERGENCY ORDER AUTHORIZING
DEBTOR TO OBTAIN INTERIM
POSTPETITION FINANCING** - 2

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

management and possession of its business and properties as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code; and

C.      Without the proposed emergency financing, the Debtor will not have the funds necessary to pay lease and insurance obligations, post-petition payroll and other administrative expenses necessary to manage and preserve its assets and properties.  In the absence of such loans, the Debtor will suffer immediate and irreparable harm; and

D.      The Debtor has requested that the Lenders make loans and advances to the Debtor in order to provide funds to be used by the Debtor to (i) to repay the sum of $66,260.85 (the "First DIP Loan Repayment") borrowed by Debtor from Nathan pursuant to an Order of this Court entered April 5, 2013 (Docket No. 48, the *"First DIP Financing Order"*), in accordance with the provisions of paragraph 18 of this Order; and (ii) pay the obligations set forth on the Budget attached hereto as Exhibit A (the "*Approved Expenses*") which are necessary to continue in business and remain a viable entity and thereafter reorganize under chapter 11 of the Bankruptcy Code; and

E.      The Debtor is unable to obtain unsecured credit allowable under §503(b)(1) of the Bankruptcy Code, or pursuant to §§364(a) and (b) of the Bankruptcy Code, except on the terms and conditions set forth herein; and

F.      No other source of interim financing exists other than from the Lenders.  The terms of the DIP Agreement between the Debtor and Lenders pursuant to which the proposed financing will be provided to the Debtor by Lenders has been negotiated in good faith and at arm's length as that term is used at §364(e) of the Bankruptcy Code and are in the best interests of the Debtor and its creditors, and this Order is subject to, and Lenders are entitled to the benefits of, the provisions of §§363(m) and 364(e) of the Bankruptcy Code; and

**ORDER GRANTING MOTION FOR EMERGENCY ORDER AUTHORIZING DEBTOR TO OBTAIN INTERIM POSTPETITION FINANCING** - 3

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

G.      The holders of pre-petition liens granted by the Debtor on the proceeds of the

Debtors' intellectual property, but not on the intellectual property itself, do not hold perfected

liens on any such proceeds, and accordingly are not entitled to any adequate protection on

account of the liens granted to Lenders pursuant to this Order.

H.      The ability of the Debtor to continue its business and maximize the value of its

assets under chapter 11 of the Bankruptcy Code depends upon obtaining such financing from

Lenders and therefore immediate and irreparable harm to the Debtor and the Debtor's estate will

result if the proposed financing is not obtained.  The relief granted by this Court pursuant to this

Order is necessary to avoid such immediate and irreparable harm to the Debtor's estate; and

I.      The consideration of this Motion constitutes a "core proceeding" pursuant to 28

U.S.C. §§157(b)(2)(A), (D), (G), (K), (M) and (O) and 1334, and this Court has jurisdiction over

this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§157 and

1334; and

J.      The expedited notice of the Motion and hearing constitutes good and sufficient

notice to the parties in interest pursuant to Bankruptcy Rules 2002, 4001(c) and (d) and 9014, the

Local Rules and §102(1) of the Bankruptcy Code, as required by §§364(c) and (d) of the

Bankruptcy Code, and no further notice of, or hearing on, the relief sought in the Motion is

necessary or required, and

THEREFORE, ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND

DECREED, THAT:

**ORDER GRANTING MOTION FOR**
**EMERGENCY ORDER AUTHORIZING**
**DEBTOR TO OBTAIN INTERIM**
**POSTPETITION FINANCING** - 4

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

1.     This Motion is granted in part pursuant to this Order as Amended.  This Order is valid immediately and fully effective upon its entry.  (This Order may sometimes hereinafter be referred to as the "*Order*").

2.     From the date of the entry of this Order through the close of business on Termination Date (as defined in the DIP Agreement) the Debtor is hereby authorized and empowered to obtain post-petition loans and advances from Lenders, on and pursuant to the terms of this Order, and the terms and conditions set forth in the DIP Agreement as modified herein, in such amount or amounts as may be available thereunder (all post-petition obligations, liabilities and indebtedness owed by the Debtor to Lenders of whatever kind or nature or description arising under or relating to the DIP Agreement is referred to herein as the "*DIP Indebtedness*"), provided, that the outstanding principal balance of the DIP Indebtedness shall not exceed $1,000,000; and provided further that prior to entry of the Final Approval Order the outstanding principal balance of the DIP Indebtedness shall not exceed $[___,000] (inclusive of the DIP Loan Repayment). Amounts repaid on the DIP Indebtedness from time to time shall not be available for re-borrowing (i.e., Lenders are not extending a revolving credit facility).

3.     The Debtor shall be authorized to use the post-petition advances under the DIP Agreement only for payment of the Approved Expenses and subject to the terms and conditions set forth in the DIP Agreement and this Order.  Lenders' obligation to fund amounts under the DIP Agreement is expressly conditioned on the Debtor's compliance with the terms and conditions of the DIP Agreement and this Order and the absence of any pending Event of Default.  Any disbursement by the Debtor other than for Approved Expenses shall constitute an Event of Default in accordance with the provisions of this Order unless Lenders consent to those changes in writing.

**ORDER GRANTING MOTION FOR EMERGENCY ORDER AUTHORIZING DEBTOR TO OBTAIN INTERIM POSTPETITION FINANCING** - 5

4.      The Debtor is authorized and directed to execute, deliver, perform and comply with the terms and covenants of the DIP Agreement.

5.      To secure the repayment the DIP Indebtedness, Lenders shall have, and the Debtor hereby grants jointly to Lenders, pursuant to sections 364(c)(2) and 364(d)(1), effective on and after the date of this Order, a valid, binding, continuing and perfected first priority security interest in and lien on, all of Debtor's interests in Intellectual Property Collateral (as defined in the DIP Agreement) and all proceeds thereof, whether now owned or hereafter acquired by Debtor (the "***Collateral***"), and not any of Debtor's other personal property.

6.      In addition to, and without derogation of, the liens and security interests in the Collateral that are granted to Lenders by the Debtor pursuant to the DIP Agreement and this Order, the Lenders also are hereby granted an allowed superpriority administrative expense claim in this bankruptcy case, pursuant to 11 U.S.C. § 364(c)(1), with priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject only to the Carve-Out Expenses. "Carve-Out Expenses" means (i) all unpaid fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, (ii) all unpaid fees payable to the Clerk of the Court; and (iii) all allowed but unpaid Budgeted fees and expenses of any professionals for the Debtor and the Creditors Committee for services rendered prior to an Event of Default, plus up to $50,000 in the aggregate for allowed but unpaid fees and expenses of any professionals for the Debtor and the Creditors Committee incurred subsequent to an Event of Default.

7.      This Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the Lenders' security interests in and lien on the Collateral granted to Lenders as

**ORDER GRANTING MOTION FOR**
**EMERGENCY ORDER AUTHORIZING**
**DEBTOR TO OBTAIN INTERIM**
**POSTPETITION FINANCING** - 6

set forth herein, without the necessity of filing, recording or serving any financing statements, mortgages or other documents which may otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the security interests and liens granted to Lenders in this Order and the DIP Agreement.  Such security interests and liens granted to Lenders shall be prior and senior to all security interests, liens, claims, and encumbrances of all other creditors in and to the Collateral.  If Lenders shall, in their sole discretion, elect for any reason to file any such financing statements or other documents with respect to such security interests and liens, the Debtor is authorized and directed to execute, or cause to be executed, all such financing statements or other documents upon Lenders' request and the filing, recording or service (as the case may be) of such financing statements or similar documents shall be deemed to have been made at the time of and on the Petition Date.  Lenders may, in their sole discretion, file a certified copy of this Order in any filing or recording office in any County or other jurisdiction in which the Debtor has real or personal property and, in such event, the subject filing or recording officer is authorized and directed to file or record such certified copy of this Order.

8.      The Debtor is hereby authorized and directed to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements in addition to the DIP Agreement as Lenders may reasonably require as evidence of the DIP Indebtedness and for the protection of the Collateral, or which may be otherwise deemed necessary by Lenders to effectuate the terms and conditions of this Order and the DIP Agreement.

9.      The automatic stay provisions of §362 of the Bankruptcy Code are vacated and modified only to the extent necessary to permit Lenders to implement the financing of the Debtor and the provisions of this Order.

**ORDER GRANTING MOTION FOR**
**EMERGENCY ORDER AUTHORIZING**
**DEBTOR TO OBTAIN INTERIM**
**POSTPETITION FINANCING** - 7

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

10.     The Debtors are authorized and directed to provide Lenders, unless there is a written waiver by Lenders in each instance, all of the documentation, reports, schedules, assignments, financial statements, insurance policies and endorsements, access, inspection, audits, information and other rights which the Debtor is required to provide to Lenders under the DIP Agreement.

11.     Nothing herein shall be construed as consent to the allowance of any fees and expenses of the professionals retained by the Debtor or the Committee, or shall affect the right of Lenders or any other interested party to object to the allowance and payment of such fees and expenses.

12.     In the event of the occurrence of any of the following: (a) the failure of the Debtor to perform in any material respect any of its obligations pursuant to this Order; (b) the occurrence of any "Event of Default" under the DIP Agreement; (c) the termination or non-renewal of the DIP Agreement, as provided for therein and in this Order; (d) the appointment of a trustee appointed pursuant to sections §1104(a)(1) or 1104(a)(2) of the Bankruptcy Code; (e) dismissal or conversion to chapter 7 of the Debtor's chapter 11 case; (f) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating or amending this Order; (g) the Debtor's filing, without the express written consent of Lenders, of a motion requesting authority to incur indebtedness either (A) having administrative expense priority equal or superior to the administrative expense priority granted to Lenders under this Order or (B) secured by a security interest or lien in the Collateral; (h) any party (including the Debtor) filing a motion or application for an order seeking to (i) revoke, reverse, stay the implementation of, modify, supplement or amend this Order, (ii) invalidate, raise defenses to, or otherwise challenge the

**ORDER GRANTING MOTION FOR EMERGENCY ORDER AUTHORIZING DEBTOR TO OBTAIN INTERIM POSTPETITION FINANCING** - 8

extent, amount, validity, perfection, priority or enforceability of the security interests and liens of

Lenders in the Collateral (provided that the filing of a motion or complaint to determine the

existence and scope of D2 Polymer's interest, if any, in the Debtor's intellectual property shall

not be an Event of Default), or (iii) sell, assign, lease, license or encumber any Collateral unless

the DIP Obligations will be paid in full, in cash prior to or at the time of such sale, assignment,

lease, license or encumbrance; (i) the filing of any proposed chapter 11 plan that does not

provide for the payment in full, in cash, of the DIP Obligations on the effective date of such

chapter 11 plan; (j) any party obtaining relief from the automatic stay with respect to any

Collateral or any nonresidential real property lease of the Debtors (the foregoing being referred

to in this Order, individually, as an "***Event of Default***" and, collectively, as "***Events of***

***Default***");  then (unless such Event of Default is specifically waived in writing by Lenders)

either of the Lenders may, at its election, by written notice to the Debtor, the United States

Trustee and counsel for the Committee (a "***Default Notice***"), immediately cease making loans to

the Debtor under the DIP Agreement, terminate the DIP Agreement and declare all of the DIP

Indebtedness due and payable in full.

13.    Upon the payment in full of all DIP Indebtedness to Lenders, or upon the

termination of the DIP Agreement, Lenders shall have no further obligations pursuant to the

terms of this Order and/or the DIP Agreement.

14.    The provisions of this Order shall be binding upon the Debtor and its successors

and assigns, including any chapter 7 or chapter 11 trustee or other fiduciary hereafter appointed

as a legal representative of the Debtor or with respect to property of the estate of the Debtor,

whether under chapter 11 of the Bankruptcy Code or in any subsequent chapter 7 case, and shall

also be binding upon all creditors of the Debtor and other parties in interest.

**ORDER GRANTING MOTION FOR**
**EMERGENCY ORDER AUTHORIZING**
**DEBTOR TO OBTAIN INTERIM**
**POSTPETITION FINANCING** - 9

15.     The DIP Indebtedness may be used by Lenders to jointly "credit bid" for the assets and property of the Debtor as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether such sale is effectuated through section 363(k) and/or section 1129(b) of the Bankruptcy Code, or otherwise.

16.     If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect (a) the validity of any DIP Indebtedness incurred by the Debtor to Lenders prior to the effective date of such modification, vacation or stay, or (b) the validity or enforceability of Lenders' security interest and lien in the Collateral, or the priority authorized or created hereby or pursuant to the DIP Agreement, with respect to any DIP Indebtedness incurred prior to the effective date of such modification, vacation or stay.  Notwithstanding any such modification, vacation or stay, any indebtedness, obligations or liabilities incurred by the Debtor to Lenders prior to the effective date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Order, and Lenders shall be entitled to all the rights, remedies, privileges and benefits granted herein and pursuant to the DIP Agreement with respect to all such indebtedness, obligations or liabilities.

17.     The DIP Agreement is modified as set forth in this Order.   To the extent that the terms of the DIP Agreement are in conflict with the terms and conditions of this Order, the terms and conditions of this Order shall control.

18.     The advances by Lenders under the DIP Agreement to fund the DIP Loan Repayment, and the Debtor's application of such advances to make the DIP Loan Repayment, shall be effected without an actual transfer of funds by Lenders to Debtor or by Debtor to

Nathan.  Effective upon: (a) entry of this Order; and (b) Lenders making an interim advance to

Debtor under the DIP Agreement in an amount equal to [$___,000.00] less the DIP Loan

Repayment amount: (i) Debtor shall be deemed to have repaid all advances made by Nathan to

Debtor under the Debtor in Possession Financing Agreement approved under the First

Emergency Order; (ii) Nathan shall, for all purposes under the DIP Agreement and this Order, be

deemed to have advanced to Debtor an amount equal to the DIP Loan Repayment amount under

the DIP Agreement and pursuant to the terms of this Order and shall be entitled, with respect to

such advance, to all rights and remedies set forth in the DIP Agreement and under this Order;

and (iii) neither the Debtor nor Nathan shall have any further rights or obligations under the First

Order, all of which shall be supplanted by the rights and obligations of the parties under this

Order.

19.     Nothing contained in this Order shall be deemed to terminate, modify or release

any obligations of the Debtor to Nathan with respect to any pre-petition indebtedness, obligation,

or liability.

20.     The terms of this Order shall be valid and binding upon the Debtor, all creditors

of the Debtor, and all other parties in interest from and after the date of this Order by this Court.

In the event this Court modifies any of the provisions of this Order and the DIP Agreement

following any further hearing, such modifications shall not affect the rights and priorities of

Lender pursuant to this Order with respect to the Collateral and any portion of the DIP

Indebtedness which arises, or is incurred or is advanced prior to such modifications (or otherwise

arising prior to such modifications), and this Order shall remain in full force and effect except as

specifically amended or modified at such final hearing.

**ORDER GRANTING MOTION FOR**
**EMERGENCY ORDER AUTHORIZING**
**DEBTOR TO OBTAIN INTERIM**
**POSTPETITION FINANCING** - 11

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

21.    Nothing contained herein shall: (a) affect or impair Nathan's right to seek adequate protection of his interests in any pre-petition collateral; (b) be deemed to constitute or constitute a commitment by Lenders to continue to make advances to the Debtor or to finance the Debtor's chapter 11 case; or (c) limit Lenders' right to seek such other relief as to the Debtor, the Collateral or the Debtors' estate as may be otherwise provided in the Bankruptcy Code.

###

Submitted by:

_____

Gary Underwood Scharff, Esq.
Law Office of Gary Underwood Scharff
621 SW Morrison Street #1300
Portland, OR 97205
gs@scharfflaw.com
T: 503-493-4353
Attorney for Debtor

Cc:    All parties identified in Paragraph A, above.

# EXHIBIT A

**Absorbent Technologies, Inc**

Proposed Cash Flow for Operations and Shutdown of Ferry Manufacturing
March- May 2013

| Cash Flow9 Weeks - No Production | | Est | Est | Est | Est | Est | Est | Est | Est | Est | Est | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shutdown Production-Scenario | Pre-Petition | Catch Up Exp | 1-Apr | 8-Apr | 15-Apr | 22-Apr | 29-Apr | 6-May | 13-May | 20-May | 21-May | | Comments |
| | Obligations | 3-8 to 3-31 | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | | |
| Production Raw Materials and Supplies | | | | | | | | | | | | | |
| Nitrogen | | 3,900 | | | | | | 3,900 | | | | 7,800 | Gas and Storage ( Non Explosive) |
| Acrylo | | | | | | | | | | | | - | Raw Material plus Freight |
| Purchased materials & Freight | | | | | 20,000 | | | | | | | 20,000 | Buy product from S. Africa |
| Chemicals | | | | | | | | | | | | - | Chemicals used in production |
| Starch | | | | | | | | | | | | - | Raw Material plus Freight |
| Total Supplies | - | 3,900 | - | - | 20,000 | - | 3,900 | - | - | | | 27,800 | |
| | | | | | | | | | | | | | |
| Electricity | | 4,500 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 12,375 | Operations at sub capacity (PP&L) |
| Natural Gas | | 4,300 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 9,925 | Operations at sub capacity (NW Natural Gas) |
| Water and Sewer | | 900 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 2,925 | Water minimal discharge |
| Total Utilities | - | 9,700 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 25,225 | |
| Operating Costs-Payroll | | | | | | | | | | | | | |
| Ferry Production (Tank Farm Crew) | | | | | | | | | | | | | |
| Queen Production (Dough & Finish& Lab) | | 450 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 10,158 | Matt Blanchard |
| Maintenance Crew | | 350 | 755 | 755 | 755 | 755 | 755 | 755 | 755 | 755 | 755 | 7,146 | KC Durlam |
| HSME Manager | | 3,522 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 14,087 | Glenda Fleming |
| Engineering | | | | | | | | | | | | | |
| Payroll Total | - | 4,322 | 3,008 | 3,008 | 3,008 | 3,008 | 3,008 | 3,008 | 3,008 | 3,008 | 3,008 | 31,392 | |
| Other Costs | | | | | | | | | | | | | |
| Spare Parts | | | | | | | | | | | | | Preventative Maintenance |
| City of Albany-DEQ Permits and Test | | | | | | | | | | | | | Added Water , Air& Sewer Discharge |
| Repairs &Supplies | | 325 | | | | | | | | | | | General Repairs & Maint |
| Equipment Rent (Forklifts) | | 900 | | | | | 900 | | | | | 1,800 | Lease -forklifts |
| Other Supplies/freight | | | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 675 | Other Supplies including Freight |
| Total Other Costs | - | 1,225 | 75 | 75 | 75 | 75 | 975 | 75 | 75 | 75 | 75 | 2,475 | |
| | | | | | | | | | | | | | |
| Totals Production and Operations | - | 15,247 | 8,708 | 4,808 | 4,808 | 24,808 | 5,708 | 8,708 | 4,808 | 4,808 | 4,808 | 86,892 | |
| Admin Costs: | | | | | | | | | | | | 0 | |
| Management Payroll (8) | | 38,719 | 15,797 | 15,797 | 15,797 | 15,797 | 15,797 | 15,797 | 15,797 | 15,797 | 15,798 | 180,895 | Retain current management |
| BackPay @11,750 (10) | 117,250 | | | | | | | | | | | 117,250 | 10 employees |
| Payroll Taxes | 9,966 | 3,659 | 1,598 | 1,598 | 1,598 | 1,598 | 1,598 | 1,598 | 1,598 | 1,598 | 1,599 | 28,011 | FICA, Medicare, FUTA, SUTA |
| 401K at 3% | 3,518 | 1,267 | 509 | 509 | 509 | 509 | 509 | 509 | 509 | 509 | 509 | 9,367 | 3% match 401k |
| Rent -Queen Street | | 32,553 | | | | | 44,390 | | | | | 76,943 | FHA |
| Rent- Ferry Street | | 6,391 | 6,391 | | | | 8,613 | | | | | 21,395 | Lombard Foods |
| Rent -Beaverton Office | | 7,693 | 7,693 | | | | 10,368 | | | | | 25,754 | PS Business Parks |
| Insurance-Liability,Fire, DO | 30,261 | 19,333 | | | | | | | | | | 49,594 | Flatiron Capital |
| Insurance Health and Dental | 3,014.71 | 8,667 | 12,756 | | | | 12,756 | | | | | 37,194 | Providence , ODS |
| Insurance Worker's Comp | | - | | | 3,500 | | | | 3,500 | | | 7,000 | Liberty Mutual |
| Attorney -Gary Scharff & Credit Committee | | | | | | | 60,000 | | | 100,000 | | 160,000 | Bankruptcy Attorney |
| Accountant-Moss Adams | | | | | | | 30,000 | | | | | 30,000 | Outside Auditors |
| Repay Nathan Loan | | | | | | | | 66,000 | | | | 66,000 | Loan for FHA, Providence, Salaries |
| Patents anuity payments | | | | | | | 25,000 | | | | | 25,000 | Patents in process |
| Other Obligations (Phone-Utilities,etc) | | 10,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 19,000 | |
| Contingency | | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 5,707 | 59,707 | |
| Total Est Admin Cost | 164,009 | 134,282 | 51,744 | 24,905 | 28,405 | 24,905 | 101,032 | 139,905 | 94,405 | 24,905 | 124,613 | 913,108 | |
| | | | | | | | | | | | | | |
| Total Company Costs by Week | 164,009 | 149,528 | 60,452 | 29,712 | 33,212 | 49,712 | 106,740 | 148,612 | 99,212 | 29,712 | 129,421 | 1,000,000 | |