Gary Underwood Scharff, OSB #883031
Lead Attorney
Law Office of Gary Underwood Scharff
621 S.W. Morrison Street, Suite 1300
Portland, OR  97205
Tel.: 503-493-4353
Fax: 503-517-8143
Email: gs@scharfflaw.com

Heather A. Brann, PC OSB # 040495
Of Counsel
PO Box 11588
Portland, OR  97211
Tel.: 503 490-6563
Email: branns@earthlink.net
Of Attorneys for Absorbent Technologies, Inc.,
Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re: <br><br> **Absorbent Technologies, Inc.,** <br><br> Debtor. | Case No.:  13-31286-tmb11 <br> Chapter 11 <br><br> **THIRD MOTION FOR ORDER: (A) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2) AND 364(e); (B) GRANTING POSTPETITION LIENS AND PRIORITY ADMINISTRATIVE EXPENSE STATUS; AND (C) AUTHORIZING DEBTOR TO ENTER INTO AGREEMENT WITH POSTPETITION LENDER** <br><br> **Hearing: 11:00 a.m., 7/9/2013** <br> **Courtroom 4, Bankruptcy Court** |

Absorbent Technologies, Inc., debtor in possession in this case ("Debtor" or "Movant"),

hereby moves the court for an order giving debtor:  (i) authority pursuant to §§364(c)(1) and

364(c)(2) of the United States Bankruptcy Code, 11 U.S.C. §§101-1330 (the "*Code*"),

Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**")

and Rule 4001-1 of the Local Rules of the United States Bankruptcy Court for the District of

Oregon (the "**Local Rules**"), for the Debtor to obtain post-petition loans of up to $1,700,000

from Absorbent Acquisitions, Inc. ("**AAI**" or "**Lender**") secured by first priority security

interests in and liens upon all of the Debtor's intellectual property, whether existing and hereafter

acquired, pursuant to §§364(c)(2) of the Code, (ii) authority for the Debtor to enter into the

Debtor in Possession Financing Agreement dated June 24, 2013 between Lender and Debtor (the

"**AAI DIP Agreement,**" set forth as Exhibit 1 attached hereto), and (iii) approval of the terms and

conditions of the AAI DIP Agreement, and (iv) the granting to Lenders of super-priority

administrative claim status pursuant to §364(c)(1) of the Code.

**THIS MOTION CONTAINS NONE OF THE PROVISIONS IDENTIFIED IN
LOCAL BANKRUPTCY FORM 541.7.**

In support of the Motion, Debtor submits herewith the Declaration of David Moffenbeier,

its Chief Executive Officer, and further represents as follows:

**JURISDICTION**

1.      The consideration of this Motion constitutes a "core proceeding" pursuant to 28

U.S.C. §§157(b)(2)(A), (D), (G), (K), (M) and (O) and 1334.  This Court has jurisdiction

pursuant to 28 U.S.C. §§157 and 1334.

**SUMMARY OF THE TERMS OF THE AAI DIP AGREEMENT**

2.      This Motion follows two earlier requests for authority to borrow, first from

Joseph A. Nathan living trust ua dtd 12/30/1996, Joseph A. Nathan trustee ("**Nathan**"), then

jointly from Nathan and United Phosphorus Inc. ("**UPI**").  Both motions were granted, on April

5, 2013 (the "First Order"), and May 2, 2013 ("Second Order"), respectively.  The Second Order

**THIRD MOTION FOR AUTHORITY TO
OBTAIN POSTPETITION FINANCING
AND RELATED RELIEF** - 2

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

approved repayment of amounts owed on the first loan; the order requested here would allow immediate repayment of $950,000 owed on the second loan.

3.    The terms of the AAI DIP Agreement are set forth in Exhibit 1 attached hereto. But for the dollar amounts and budgets, the terms are essentially identical to those approved in the First Order and the Second Order and can be summarized as follows: (a) lending of $1,700,000 as set forth above; (b) interest rate of 8% per annum on outstanding advances; (c) reimbursement of Lenders' reasonable expenses associated with the credit facility, including attorney fees; (d) termination in the event of Debtor default; and (e) adequate protection consisting of the granting of a first position lien on Debtor's intellectual property assets, which are unencumbered but for the liens created under the existing financing, and a super-priority administrative expense lien pursuant to Section 364(c)(1) of the Code.  Under the terms of the AAI DIP Agreement the proposed loan is conditioned upon AAI obtaining its capitalization in an amount sufficient to fund this credit facility beginning on July 15, 2013.

## FACTUAL AND PROCEDURAL BACKGROUND

4.    On March 8, 2013 (the *"Petition Date"*), the Debtor filed an emergency voluntary petition for reorganization under chapter 11 of the Code.

5.    Since the Petition Date Debtor has continued to manage its business and properties as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Code.

6.    Debtor's business, ten years old, consists of the manufacture and sale of a super-absorbent polymer starch product, brand name Zeba®, designed to be included with fertilizer and seeds or seedlings of various crops at the time of planting and initial irrigation.  The product captures water otherwise lost to evaporation, river run-off and seepage into the subsurface water table, greatly improving the hydration of seeds and roots.  The use of Zeba® has been

**THIRD MOTION FOR AUTHORITY TO**
**OBTAIN POSTPETITION FINANCING AND**
**RELATED RELIEF** - 3

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

demonstrated over years of testing and sales to significantly increase crop yields, especially in dry soils and climates.

7.     The Zeba® manufacturing process is complex.  In Debtor's early years, developing methods to allow production in sufficient quantities to provide a profitable cost/price ratio proved challenging.  ATI eventually developed and patented such a manufacturing process. As a result of the collapse in bank lending beginning in 2008-2009, however, ATI was unable to acquire bank financing to complete construction of its new factory and install its special manufacturing equipment to take advantage of that production innovation.  With production continuing to occur in relatively limited quantities at high costs, Debtor struggled to sustain its business leading, eventually, to this bankruptcy filing.

8.     Debtor has operated postpetition in reliance on DIP financing from two parties interested in developing the market for Zeba®.  Nathan is a board member of, and prepetition lender to, Debtor, familiar with Zeba®.  United Phosphorus Limited ("*UPL*"), a multinational corporation, is UPI's parent company extensively engaged in the production and sale of materials designed to enhance agricultural production, especially in third world countries, including India, where limited irrigation infrastructure affects agricultural productivity.  UPL regards Zeba® as a potentially valuable product for its business.  Debtor has communicated with Nathan and UPL concerning these parties' participating with an investor group, Live Oak Group, LLP, in forming a new company to acquire Debtor' assets.  The proposed new company, Absorbent Acquisitions, Inc., an Oregon corporation ("AAI"), has been formed and is awaiting capitalization of approximately $30-$35 million expected to arrive by early July, 2013.  Subject to certain conditions acceptable to the proposed investors in AAI, that capital would be used to fund this DIP Financing facility and provide cash as part of the consideration for AAI's acquisition of

**THIRD MOTION FOR AUTHORITY TO OBTAIN POSTPETITION FINANCING AND RELATED RELIEF** - 4

substantially all the assets of Debtor pursuant to Section 363(b) of the Code. The proposed asset sale would occur in connection with a liquidating Chapter 11 plan that would compensate creditors and provide additional cash to assume leases and resume operations to capitalize on the Zeba® product after bankruptcy.

## NEED FOR DIP FINANCING

9.      To engage in an orderly sale of its assets, Debtor has an immediate need to borrow $1,700,000, to repay its existing postpetition indebtedness and to obtain an additional $750,000 to pay post-petition expenses through September 15, 2013.  The $750,000 will cover expenses identified in the budget attached to the AAI DIP Agreement as Exhibit B, including adequate protection payments, professional fees, insurance premiums, and payroll (the "DIP Budget").  Without this new financing, the Debtor will suffer immediate and irreparable harm.

10.      The existing DIP loan borrowing authority expires on July 15, 2013.  Debtor has been unable to obtain unsecured credit allowable under §503(b)(1) of the Code, or pursuant to §§364(a) and (b) of the Code to take out the existing credit facility, except on the terms and conditions set forth herein.  Lender is unwilling to lend to Debtor except on the terms of the AAI DIP Agreement.  Debtor anticipates consummation of the proposed Section 363 sale to AAI within 45-60 days, obviating additional credit needs beyond September 15, 2013.

11.      The terms of the AAI DIP Agreement have been negotiated in good faith and at arm's length as that term is used at §364(e) of the Code and are in the best interests of the Debtor and its creditors.

## LEGAL ARGUMENT

12.      The court on motion may give a trustee leave to borrow funds according to terms required by a lender, including the granting of a superiority administrative expense and senior

lien on unencumbered property, where this is necessary to preserve the estate and is in the best interests of creditors.  11 U.S.C. Section 364(c) and (d).

13.     The ability of the Debtor to continue its business and maximize the value of its assets under chapter 11 of the Code depends upon obtaining the requested financing from Lender.  Payroll to Debtor's employees and the costs of their health care insurance premiums, partially satisfied from the First Order and the Second Order, must continue to be paid for Debtor to retain these workers' services.  Other obligations and continuing costs of operations, all as set forth in the DIP Budget, must be paid timely for Debtor to survive in bankruptcy, retain value to support the asset acquisition projected to occur through AAI, and thus afford a return to its creditors.  The relief granted by this Court pursuant to this Third Financing Order is thus necessary to avoid immediate and irreparable harm to the Debtor's estate.

14.     Debtor has complied with the federal and local bankruptcy rules and has made its showing as to the need for relief under these provisions of the Code.  The form of an order granting Debtor permission to borrow and to enter into the AAI DIP Agreement, and providing Lender an administrative expense priority right of repayment and a senior security position in Debtor's unencumbered intellectual property, and reasonable findings in connection with such requested relief, is attached hereto as Exhibit 2.  Debtor respectfully submits that the proposed form of order is appropriate and requests that the Court enter it.

**NOTICE OF MOTION AND HEARING**

15.     A hearing on this motion has been set for 11:00 am, July 9, 2013, in Courtroom 4, United States Bankruptcy Court for the District of Oregon, 1001 SW Fifth Avenue, 7th floor, Portland, OR 97204.  Participants may appear telephonically as set forth in the notice of hearing.

16.     Each of the parties set forth below received due notice of the Motion pursuant to Bankruptcy Rules 4001(b)(1), (c)(1) and (d)(1) and 1007(d) and the Local Rules: (a) the Office of the United States Trustee (via ECF), and (b) all parties in interest that have filed a Notice of Appearance (via ECF); (c) all creditors known to the Debtor as asserting liens against the Debtor's assets; and (d) counsel for the Official Committee of Unsecured Creditors.

17.     The notice of the Motion and the request for expedited hearing constitutes good and sufficient notice to the parties in interest pursuant to Bankruptcy Rules 2002, 4001(c) and (d) and 9014, the Local Rules and §102(1) of the Code, as required by §§364(c) and (d) of the Code, and no further notice of, or hearing on, the relief sought in the Motion is necessary or required.

## CONCLUSION

WHEREFORE, Movant prays for an order of the form attached as Exhibit 2 to be entered, authorizing Debtor to obtain post-petition financing under the terms set forth in the AAI DIP Agreement, to enter into the AAI DIP Agreement and to provide Lender:  (a) a senior lien on the intellectual property of Debtor, Debtor's sole unencumbered asset, and (b) a super-priority administrative expense claim pursuant to Section 364(c)(1) of the Code.

DATED this 25th day of June, 2013.


/s/ Gary Underwood Scharff
Gary Underwood Scharff,
Attorney for Debtor

**THIRD MOTION FOR AUTHORITY TO
OBTAIN POSTPETITION FINANCING AND
RELATED RELIEF** - 7

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

Gary Underwood Scharff, OSB #883031
Lead Attorney
Law Office of Gary Underwood Scharff
621 S.W. Morrison Street, Suite 1300
Portland, OR  97205
Tel.: 503-493-4353
Fax: 503-517-8143
Email: gs@scharfflaw.com

Heather A. Brann, PC OSB # 040495
Of Counsel
PO Box 11588
Portland, OR  97211
Tel.: 503 490-6563
Email: branns@earthlink.net
Of Attorneys for Absorbent Technologies, Inc.,
Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>**Absorbent Technologies, Inc.,**<br><br>       Debtor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.:  13-31286-tmb11<br>Chapter 11<br><br>**DECLARATION OF DAVID MOFFENBEIER IN SUPPORT OF THIRD MOTION FOR BORROWING ORDER**<br><br>**Hearing: 11:00 am, 7/9/2013<br>Via Telephone and in Courtroom 4, Bankruptcy Court** |

I, DAVID MOFFENBEIER, state as follows:

1.    I am over the age of 18 and make this statement from personal knowledge and if called upon to testify would testify as set forth herein.

DECLARATION OF DAVID MOFFENBEIER -
1

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

2.    I am the chief executive officer of Absorbent Technologies, Inc., debtor and debtor in possession in this case ("Debtor" or "ATI").  I have held that position since November 5, 2012.  I make this declaration in support of Debtor's third motion for Debtor In Possession financing, which motion seeks leave to borrow from Absorbent Acquisitions, Inc. ("AAI") ("Lender") pursuant to the terms of a financing agreement attached to the motion (the "AAI Financing Agreement").

3.    Debtor's business consists of the manufacture and sale of a super-absorbent polymer starch product, brand name Zeba®, to be included with fertilizer and seeds or seedlings of various crops at the time of planting and initial irrigation.  The product captures water otherwise lost to evaporation, river run-off and seepage into the subsurface water table, greatly improving the hydration of seeds and roots.  The use of Zeba® has been demonstrated over years of testing and sales to significantly increase crop yields, especially in dry soils and climates.

4.    The Zeba® manufacturing process is complex.  In Debtor's early years, developing methods to allow production in sufficient quantities to provide a profitable cost/price ratio proved challenging.  ATI eventually developed and patented such a manufacturing process. As a result of the collapse in bank lending beginning in 2008-2009, however, ATI was unable to acquire bank financing to complete construction of its new factory and install its special manufacturing equipment to take advantage of that production innovation.  With production continuing to occur in relatively limited quantities at high costs, Debtor struggled to sustain its business, leading eventually to this bankruptcy filing.

5.    Debtor has communicated with AAI concerning its interest in acquiring substantially all of Debtor's assets through a sale under Section 363(b) of the Bankruptcy Code ("Sale"), and investing additional cash to assume leases and resume operations to profit from the

Law Office of Gary Underwood Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

Zeba® product outside bankruptcy.  The proposed consideration to Debtor under the Sale would provide cash and a minority equity share in AAI to be distributed to creditors through a liquidating Chapter 11 plan.

6.      Debtor has to date borrowed approximately $790,000 from United Phosphorus, Inc. ("UPI") and Joseph A. Nathan living trust ("Nathan") (collectively, "Existing DIP Lenders") pursuant to the Court's order of May 2, 2013 (the "Second Loan").  To operate its business and engage in its plan for an orderly sale of its assets, Debtor has an immediate need to borrow $1,700,000, as of July 15, 2013, the expiration date of the Second Loan.  That figure represents repayment in full of the Existing DIP Lenders under the Second Loan estimated to be $950,000 as of July 15, 2013, plus an additional $750,000 to pay additional postpetition expenses, through September 15, 2013, as set forth in Debtor's budget, attached as Exhibit 1 to the AAI DIP Agreement.

7.      ATI has sought out new sources of Debtor In Possession financing since May 2, 2013, to assure take-out of the Second Loan on or before July 15, 2013, and to continuing funding Debtor's operations pending consummation of the Sale.  As of this date Debtor has been unable to obtain unsecured or secured credit other than through the financing facility proposed here.

8.      The terms of the AAI DIP Agreement between the Debtor and Lender pursuant to which the proposed financing will be provided to the Debtor by Lenders have been negotiated in good faith and at arm's length as that term is used at §364(e) of the Bankruptcy Code and are in the best interests of the Debtor and its creditors.

9.      The ability of the Debtor to continue its business and maximize the value of its assets under chapter 11 of the Bankruptcy Code depends upon obtaining the financing requested

here from Lender.  Immediate and irreparable harm to the Debtor and the Debtor's estate will result if the proposed financing is not obtained.

I affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this 25th day of June, 2013.

/s/ David Moffenbeier

**DECLARATION OF DAVID MOFFENBEIER** - 4

EXHIBIT 1

**DEBTOR IN POSSESSION FINANCING AGREEMENT**

This Debtor in Possession Financing Agreement (this "Agreement") is made and entered into as of June 21, 2013, by and between Absorbent Technologies, Inc., an Oregon corporation ("Debtor"), and Absorbent Acquisitions, Inc. ("AAI," referred to herein as "Lender").

**RECITALS**

A.      Debtor filed a petition under Chapter 11 of the Bankruptcy Code on March 8, 2013 ("Petition Date"), in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court").  Debtor's bankruptcy case is administered under Case No. 13-31286 tmb11 (the "Bankruptcy Case").

B.      Debtor currently is unable to obtain the funds required to operate after the Petition Date other than by borrowing on the terms set forth in this Agreement. Lender is unwilling to lend to Debtor except on the terms of this Agreement.

C.      To operate its business or engage in an orderly sale of its assets, Debtor has an immediate need to borrow funds to finance the expenses set forth in the budget attached as *Exhibit B* and Debtor will suffer immediate and irreparable harm if it is not immediately permitted to borrow pursuant to the terms of this Agreement. Pending entry of a Bankruptcy Court order after not less than 14 days' notice as required by Federal Rule of Bankruptcy Procedure (FRBP) 4001(b), this Agreement is intended to allow Debtor to borrow only to the extent necessary to avoid immediate and irreparable harm to Debtor.

D. The parties now desire to set forth the conditions on which Lender will make postpetition Advances to Debtor.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties agree as follows:

**Article 1**

**INCORPORATION OF RECITALS, DEFINITIONS,**

**AND EXHIBITS**

**1.1 Recitals**. The foregoing recitals are incorporated into this Agreement by this reference.

**1.2 Definitions**. Except as otherwise defined here or as the context requires otherwise, (a) capitalized terms used here shall have the meanings assigned to them in Appendix A and (b) all other terms will have the meanings, if any, given to them in the Bankruptcy Code.

**1.3 Exhibits**. The exhibits referred to in and attached to this Agreement are incorporated into this Agreement by this reference.

## Article 2

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement, Debtor makes the following representations, covenants, and warranties, which survive execution and delivery of this Agreement and are not affected or waived by any inspection or examination made by, or on behalf of, Lender:

(a) Debtor is a duly authorized and existing corporation in good standing in all states in which it transacts business. Debtor has been duly authorized to enter into this Agreement and to perform its obligations and covenants as stated here.

(b) Debtor has full power and legal capacity to execute, deliver, and perform the terms and provisions of this Agreement and all of the Loan Documents that it is required to execute, deliver, and perform by the terms of this Agreement.

(c) Executing, delivering, and performing this Agreement will not constitute a breach or default under any other agreement to which Debtor is a party or by which Debtor may be bound or affected, or a violation of any law, regulation, court order, or decree of any governmental department, commission, board, bureau, agency, or instrumentality, that may affect Debtor or the Intellectual Property Collateral.

(d) Debtor is not in default under any material provision of any applicable statute, rule, order, certificate, license, or regulation of any governmental authority having jurisdiction over it or its business operations.

(e) With the exception of the Bankruptcy Case and related Adversary Proceeding, *D2 Polymer Technologies, Inc. v. Absorbent Technologies, Inc.*, Case No. 13-03089 (the "Adversary Proceeding"), there are no actions, suits, or

proceedings pending or threatened against or affecting Debtor before any court or before any governmental or administrative body or agency that could have a material adverse effect on Debtor.

(f) Debtor has not proposed and will not propose to Lender any Budget that will not permit Debtor to make all expenditures necessary for Debtor to comply with all requirements of this Agreement, including Article 6.

(g) Debtor has not failed to disclose to Lender any material fact necessary to make the representations and warranties that are made, in light of the circumstances under which they are made, not misleading.

(h) Notwithstanding the allegations asserted by D2 Polymer Technologies in the Adversary Proceeding, Debtor contends that it owns the Intellectual Property Collateral, and upon entry of the Interim Approval Order the Intellectual Property Collateral will not be subject to any lien, security interest, encumbrance, license or other impairment that is senior to the liens granted to Lender.

<h2 style="text-align:center">Article 3</h2>

<h2 style="text-align:center">CONDITIONS PRECEDENT</h2>

Before Lender will be bound to the terms of this Agreement, or have any obligation to make any Advance to Debtor, the following conditions must have been fulfilled to Lender's satisfaction:

(a)  Lender shall have received capital sufficient to fund AAI and this Financing Agreement. AAI represents it continues to develop capitalization of the company and will undertake its best efforts to fund this DIP facility upon completion of such capitalization.

(b) An order in the form attached hereto as Exhibit A or otherwise satisfactory to the Lender, in its sole discretion, approving this Agreement after a preliminary or final hearing must be entered by the Bankruptcy Court (the **"Approval Order"**).

(c) Debtor and Lender must execute one or more financing statements with collateral description and all other Loan Documents required by this Agreement, all in form satisfactory to the Lender, in its sole discretion.

(d) The representations and warranties of Article 2 above must be true and correct.

(e) No Default exists under this Agreement or under any of the Loan Documents.

## Article 4

## LOAN COMMITMENT

**4.1    Loan Agreement Advances.** Lender agrees, subject to the terms and conditions of, and relying upon the representations set forth in, this Agreement, and provided that no Event of Default then exists, to make postpetition Advances to Debtor in an aggregate principal amount not to exceed $1,700,000 (the "**Loan Commitment**"), on the schedule provided in Exhibit B. Notwithstanding anything in this Agreement to the contrary, no Advances will be made in the event of a failure of the condition precedent set forth in Article 3 (a) above. Notwithstanding anything in this Agreement to the contrary, Lender shall not be obligated to make Advances in excess of the principal amount of $1,700,000.

**4.2    DIP Note.** All Advances under this Agreement may, at the election of Lender, be evidenced by one or more promissory notes in form satisfactory to Lender. Separate notes for each Advance, however, will not be required and the amount reflected upon the records of Lender shall be conclusive as to the amount owing Lender from time to time, absent manifest error.

**4.3    Interest**. All Advances under this Agreement shall bear simple interest at the rate of 8% per annum.

**4.4    Reimbursement of Expenses**. In addition to all Advances made by Lender under this Agreement, Debtor shall reimburse Lender for all costs, expenses and reasonable attorney fees incurred by Lender in connection with or arising out of the negotiation, documentation and administration of this Agreement and the Loan Documents, including all costs and expenses incurred by Lender following an Event of Default. All outstanding indebtedness under this Agreement, including accrued interest, fees, and expenses, shall be due in full upon the earlier to occur of: (a) an Event of Default; (b) the sale of substantially all of the Debtor's assets; (c) the sale or other disposition of any Intellectual Property; or (d) September 15, 2013.

**4.5 Court Approval**. Within one (1) business day of Lender's execution of this Agreement, Debtor shall file a motion for authorization to borrow pursuant to the terms of this Agreement and give notice of that motion, this Agreement, the proposed Interim Approval Order and the preliminary hearing on approval of this Agreement in accordance with FRBP 4001(d). Pending entry of a Bankruptcy Court order finally approving this Agreement ("Final Hearing"), but subject to the entry of

an Interim Approval Order in form satisfactory to Lender in its sole discretion approving this Agreement, Debtor may borrow $1,300,000 from Lender of which approximately $950,000 shall be used to repay amounts borrowed by Debtor from Nathan and UPI pursuant to an Order of this Court entered May 2, 2013 (Docket No. 89, the "Second DIP Financing Order")).

     **4.6  Final Court Approval**. Debtor's authority to borrow from Lender continues after the Final Hearing concludes only if the Bankruptcy Court has entered an order finally approving this Agreement in form satisfactory to the Lender in its sole discretion (the **"Final Approval Order"**).   Each of the Interim Approval Order and the Final Approval Order is an "Approval Order."

     **4.7 Use of Advances.** Advances made to Debtor under this Agreement shall be used and expended by Debtor exclusively to pay expenses provided for, and in the amounts set forth, in the Budget, provided that the actual expenditures for any single Budget line item in any week may exceed the budgeted amount by not more than 10%, provided further that the Debtor's actual aggregate expenditures for any week shall not exceed 5% of the Budgeted aggregate expenditures for that week.

     **4.8 Fees of Counsel to the Debtor**. Any reference in the Budget to fees or costs of attorneys or other professional persons engaged by Debtor does not constitute authorization or consent by Lender to disbursement of any such sums, the subordination of Lender's security interests in the Intellectual Property to such fees or costs, or Lender's consent to recovery of those fees or costs by Debtor or any trustee  under Section 506(c).

     **4.9 Termination of Authority to Borrow from Lender**. Debtor's authority to borrow from Lender expires when an Event of Default occurs or 11:59 p.m. on September 15, 2013 (the "Budget Termination Date"), whichever is earlier. Lender may consent in writing to Debtor's borrowing from Lender beyond the Budget Termination Date, in which case all provisions of this Agreement remain in full force and effect, except that the Budget Termination Date will be modified accordingly.

## Article 5

## ADEQUATE PROTECTION

     **5.1 Adequate Protection**. Nothing in this Agreement bars Lender from seeking additional or different adequate protection or relief from the automatic stay

on the ground that Lender has not been afforded adequate protection with respect to any prepetition obligations owing by Debtor to Lender.

**5.2 Grant of Postpetition Lien**. To secure the payment and performance when due (whether at stated maturity, by acceleration or otherwise) any and all Advances and all other indebtedness, liabilities, or obligations of Debtor to Lender under this Agreement and the Loan Documents (the "DIP Indebtedness"), Debtor hereby grants to Lender a continuing first priority security interest in and lien ("Postpetition Lien") on all of Debtor's present and future right, title and interest in, to and under the following, whether now existing or hereafter acquired or arising (the "Intellectual Property Collateral"):

      (a)     Intellectual Property;

      (b)     IP Ancillary Rights;

      (c)     IP Licenses and other Contracts;

      (d)     Related Property; and

      (e)     Proceeds.

The Intellectual Property Collateral also includes all rights and interests developed or acquired by Debtor in any of the foregoing after the date of this Agreement ("After-Acquired Intellectual Property").

**5.3 Documentation**. The Postpetition Lien shall be a first priority security interest in and lien on all Intellectual Property Collateral pursuant to 11 U.S.C. §§ 364(c)(2) and 364(d)(1), and is attached and is perfected automatically by entry of the Bankruptcy Order approving this Agreement. Notwithstanding the automatic perfection of the Postpetition Lien, the Lender is authorized, but not required, to file or record financing statements, intellectual property filings, notices of lien or similar instruments in any jurisdiction, or take any other action in order to validate and perfect the Postpetition Lien. Whether or not the Lender shall, in its sole discretion, choose to file such financing statements, intellectual property filings, notices of lien or similar instruments, or otherwise confirm perfection of the liens and security interests granted to Lender under this Agreement, the Postpetition Lien shall be deemed valid, perfected, allowed, enforceable, unavoidable and not subject to challenge, dispute or subordination as of the date of entry of the Bankruptcy Order.  At Lender's request, Debtor shall promptly execute and deliver to Lender security agreements, financing statements, and any other

instruments or documents considered by Lender to be necessary or desirable to perfect the Postpetition Lien. The automatic stay of 11 USC §362(a) is modified to permit Lender to do all acts permitted or required by this Agreement.

**5.4 Allowed Superpriority Administrative Expense Claim.** Any Interim Approval Order and Final Approval Order shall provide all of the DIP Indebtedness shall constitute an allowed superpriority administrative expense claim in this bankruptcy case, pursuant to 11 U.S.C. § 364(c)(1), with priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject only to the Carve-Out Expenses. "Carve-Out Expenses" means (i) all unpaid fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, (ii) all unpaid fees payable to the Clerk of the Court; and (iii) all allowed but unpaid Budgeted fees and expenses of any professionals for the Debtor and the Creditors Committee for services rendered prior to an Event of Default, plus up to $50,000 in the aggregate for allowed but unpaid fees and expenses of any professionals for the Debtor and any official committee of unsecured creditors appointed in the Bankruptcy Case incurred subsequent to an Event of Default, provided that the total amount of the Carve-Out Expenses under this clause (iii) shall not exceed $260,000 in the aggregate without the written consent of the Lender.

**5.5 No Waiver or Admission**. Nothing contained in this Agreement constitutes or causes a waiver of Lender's rights or the priority of Lender's liens and security interests in any prepetition property of the Debtor that is not Intellectual Property Collateral or a waiver of any right to adequate to protection of any such interest.

## Article 6

## COVENANTS

**6.1 Affirmative Covenants**. Debtor covenants that it shall:

(a) Maintain and preserve its corporate existence.

(b) Keep its books of account in accordance with generally accepted accounting principles, consistently applied, and reported on the basis of a fiscal year ending December 31, 2013.

(c) Provide to Lender at or before 12 noon on each Wednesday a report containing the following information:

(i) Cash income for the prior week and for the period since the Petition Date;

(ii) Cash expenditures by Budget line items for the prior week and for the time period since the Petition Date;

(iii) A comparison of actual weekly and cumulative income and expenditures by line item to Budgeted weekly and cumulative income and expenditures by line item;

(d) A copy of Debtor's check registers, showing all checks written by Debtor during the week ending on the preceding Friday and identifying each check listed in the register by check number, date, payee, amount, and Budget category; and

(e) A report in a form reasonably satisfactory to Lender identifying Debtor's actual collections from sales of assets, and expenditures related to such sales, for both the preceding week and the cumulative period of time since the Petition Date.

(f) Deliver to Lender on or before the tenth day of each month ending after the date of this Agreement an aged listing, by account debtor, of accounts receivable as of the last day of the prior month

(g) Deliver to Lender  no later than 10 days after the close of each month ending after the date of this Agreement, within 20 days after the close of each calendar quarter ending after the date of this Agreement, and within 30 days after the close of each fiscal year ending after the date of this Agreement, the following unaudited financial statements of Debtor compiled by Debtor's independent certified public accountants: balance sheet, income statement, statement of cash flows, and accounts payable and inventory listings as of the last day of the prior month and for the periods of the prior month, the fiscal quarter to the end of the prior month, and the fiscal year to the end of the prior month, all in reasonable detail and certified by Debtor to be true and correct.

(h) Provide to Lender at no charge copies of any audited financial statements that Debtor provides to any third party.

(i) Provide to Lender certificates of insurance and, if requested by Lender, copies of all insurance policies required by the Loan Documents, and maintain all insurance required by the Loan Documents in full force and effect.

(j) Allow Lender or its agents, representatives, or workers to enter Debtor's places of business at any reasonable time after prior written notice to Debtor for the

purpose of inspecting and copying any of Debtor's books and records, and for the purpose of performing any of the acts that Lender is authorized to perform under the terms of this Agreement.  Any such inspection will take place during ordinary business hours and will not unduly interfere with the operation of Debtor's business. Lender shall give Debtor reasonable notice before conducting an inspection. Twenty-four hours' notice is conclusively deemed to be reasonable. Lender's inspection rights are in addition to all of Lender's rights to inspect all secured assets under its security agreements with Debtor and otherwise.

(k) Deliver to Lender copies of all reports filed by Debtor or its affiliates with any governmental agency.

(m) With reasonable promptness, provide other information respecting the business, operations, and financial condition of Debtor or its affiliates as Lender may from time to time reasonably request.

(n) Maintain all material licenses and permits, and all related or other agreements, necessary for Debtor to operate its business, as may now exist or be modified or expanded.

(o) At all times comply with any and all material regulations, rules, or requirements of any federal agency or department and of any state, local, or municipal government, agency, or department that may at any time have jurisdiction or power to regulate, license, or grant permits in respect of the facilities or activities of Debtor, whether the regulations, rules, or requirements presently exist or are modified, promulgated, or implemented after the date of this Agreement.

(p) Keep its properties in good repair and in good working order and condition, in a manner consistent with past practices and comparable to industry standards; make from time to time all appropriate and proper repairs, renewals, replacements, additions, and improvements to the properties; and keep all equipment that may now or in the future be subject to compliance with standards or rules imposed by any governmental agency or authority, or state or local governments or instrumentalities, in full compliance with those standards or rules.

(q) Duly pay and discharge all lawful claims, whether for labor, materials, rentals, taxes, or anything else, that might or could, if unpaid, become a lien or charge on Debtor's property, unless and to the extent only that the validity of a claim, after written notice of the claim is given to Lender, is being contested in good faith and by appropriate proceedings. If Debtor contests any charge as allowed above,

Debtor must establish adequate reserves against possible liability with respect to the charge.

(r) Timely pay all of its employees, in accordance with its agreements with the employees and all applicable law, for services rendered after the Petition Date, and pay all payroll and other taxes imposed on Debtor with respect to its employees or otherwise that accrue after the Petition Date.

(s) Immediately advise Lender in writing of any Hazardous Materials Claim.

(t) At Debtor's sole cost and expense, keep and maintain its properties and each portion of its properties in compliance with, and not cause or permit its properties or any portion to be in violation of, any Hazardous Materials Laws.

(u) Promptly give written notice to Lender of any of the following:

(i) Any citation, order to show cause, or other legal process or order that could have a material adverse effect on Debtor, directing Debtor to become a party to or to appear at any proceeding or hearing by or before any governmental agency or instrumentality or any municipality or other agency or instrumentality that has granted Debtor a license, certificate of compliance, or permit, and include with the notice a copy of any citation, order to show cause, or other legal process or order. Debtor shall defend against any claims against it, at Debtor's expense.

(ii) Any (A) refusal or failure by any governmental agency or instrumentality to renew or extend any material license, certificate of compliance, or permit, or (B) proposed or actual revocation, termination, or modification (whether favorable or adverse) thereof, or (C) dispute or other action with respect thereto, or (D) denial or threatened denial or revocation or modification by any governmental agency or instrumentality of any material authorization required by law, or (E) notice from any governmental agency or instrumentality of the imposition of any material fines or penalties or forfeitures or (F) threats or notice with respect to any of the foregoing or with respect to any proceeding or hearing that might result in any of the foregoing.

(iii) Any dispute concerning, or any threatened nonrenewal or modification of, any material lease for real or personal property to which Debtor is a party.

(iv) Any postpetition actions, proceedings, or claims of which Debtor may have notice, that may be commenced or asserted against Debtor in which the amount involved is $50,000 or more, and that is not fully covered by insurance or that, if not solely a claim for monetary damages, could, if adversely determined, have a material adverse effect on Debtor.

(v) Promptly notify Lender if Debtor becomes aware of a Default or Event of Default hereunder.

(w) Notify Lender of any written offers to purchase Debtor's assets out of the ordinary course of business.

(x) Provide Lender with copies of all pleadings filed in this case, except proofs of claim, that do not evidence service on Lender or its counsel.

(y) Meet with Lender on reasonable notice, at reasonable times, and at reasonable intervals to inform Lender of the status of the Bankruptcy Case.

(z) Upon Lender's demand, duly execute and deliver, or cause to be duly executed and delivered, to Lender other instruments, agreements, and documents and do or cause to be done other acts that may be necessary or proper in the reasonable opinion of Lender to carry out more effectively the provisions and purpose of this Agreement.

(aa) In good faith answer and defend against the complaint filed by D2 Polymer Technologies, Inc. against ATI in the Bankruptcy Court on April 24, 2013 (Adversary Proceeding Number 13-03089-tmb).

**6.2 Negative Covenants**. Debtor covenants that, as long as this Agreement is in effect, and until all Advances and other obligations and indebtedness owing Lender under this Agreement are paid or satisfied in full, Debtor shall not:

(a) Without the prior written consent of Lender, obtain credit.

(b) Employ any Person when it will be unable to timely pay the Person the required compensation or any taxes.

(c) Cause or permit the Intellectual Property to be subject to any lien, encumbrance, license, assignment or other transfer or impairment of any kind.

(d) Without the prior written consent of Lender, enter into any transaction, other than on terms reasonably believed to be at least as favorable as those that could be obtained from an unrelated party, in which an affiliate of Debtor has any interest, or make any payment or agree to make any payment to any such affiliate, or transfer or agree to transfer ownership or possession of any of its business or assets, tangible or intangible, real, personal, or mixed, to any affiliate.

(e) Without the prior written consent of Lender, lend money, make credit available (other than in the ordinary course of business to customers), or lend property or the use of property to any Person, or purchase or repurchase the stock or indebtedness, or all or a substantial part of the assets or properties, of any Person, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly or by any instrument having the effect of assuring any Person's payment or performance or capability) the indebtedness, performance, obligations, stock, or dividends of any Person, or agree to do any of the foregoing, except the endorsement of negotiable instruments for deposit or collection in the ordinary course of business.

(f) Without the prior written consent of Lender, invest in (by capital contribution or otherwise) or acquire or purchase or make any commitment to purchase the obligation or stock or equity of any Person except (i) the purchase of direct obligations of the government of the United States of America or any agency or instrumentality thereof, (ii) interest-bearing certificates of deposit or repurchase agreements issued by any commercial banking institution satisfactory to Lender, (iii) stock or obligations issued in settlement of Debtor's claims against others by reason of bankruptcy or a composition or readjustment of debt or reorganization of any debtor of Debtor.

(g) Without the prior written consent of Lender, enter into any business that is substantially different from and/or not connected with the businesses in which Debtor is presently engaged, or make any substantial change in the nature of its businesses or operations.

(h) Without the prior written consent of Lender, change the chief executive office of Debtor if the effect of the change in location would adversely affect Lender's security interest in the Intellectual Property without (i) prior written notice to Lender, and (ii) executing, delivering, and filing (and paying filing fees and taxes) all documents as may be necessary or advisable in Lender's opinion to continue to perfect and protect the liens and security interests in the Intellectual Property.

(i) Without the prior written consent of Lender, enter into any agreement (other than employment agreements) with any Person that confers on the Person the right or authority to control or direct a major portion of the business or assets of Debtor.

(j) Permit its properties or any portion of them to be a site for the storage, use, generation, manufacture, disposal, or transportation of Hazardous Materials.

(k) Permit any Hazardous Materials that were owned or generated by Debtor to be disposed of off their properties other than in properly licensed disposal sites.

(l)  Without the prior written consent of Lender, enter into any settlement or compromise of any adversary proceeding, contested matter or other dispute involving the Intellectual Property.

## Article 7

### EVENTS OF DEFAULT

**7.1 Events of Default**. Time is of the essence in this Agreement and the Loan Documents. The occurrence of any one or more of the following constitutes an Event of Default under this Agreement and the Loan Documents:

(a)     If Debtor fails to perform any of its obligations under, or to comply with any of the terms, conditions, and covenants that are contained in, this Agreement, or any other Loan Document or other agreement, document, or instrument that Debtor has given or in the future gives to Lender to evidence or secure any obligation or indebtedness of Debtor to Lender.

(b)     If any statement, warranty, or representation that Debtor makes in this Agreement or any statement, warranty, or representation that Debtor or any third party has made or in the future makes in any other Loan Document, certificate, report, or other document, instrument, or agreement that is delivered under this Agreement or in connection with any obligation or indebtedness of Debtor to Lender, is false or inaccurate in any material respect when made.

(c)     Subject to resolution of the Adversary Proceeding, if this Agreement shall for any reason shall fail to create a valid and perfected first priority security interest in the Intellectual Property, or if such security interest shall fail to remain in full force and effect, or if any action is taken to discontinue or to assert the invalidity or unenforceability of this Agreement, or Lender's security interest in the Intellectual Property.

(d)      Any one of the following is timely filed: (i) notice of appeal of the Interim Approval Order or the Final Approval Order, (ii) motion for leave to appeal any Approval Order, (iii) motion to extend the time to file a notice of appeal or motion for leave to appeal any Approval Order, or (iv) motion to alter or amend any Approval Order, whether or not the Approval Order is stayed.

(e)      Custody or control of any substantial part of Debtor's property is assumed by any governmental agency or authority or any court of competent jurisdiction at the insistence of any governmental agency or authority, or any governmental regulatory agency or authority takes any final action that would have a material adverse effect on Debtor.

(f)      Any governmental agency or instrumentality refuses or fails to issue, renew, or extend any lease, license, contract, certificate of compliance, or permit with respect to the operation of Debtor's business, or any governmental agency or instrumentality denies, forfeits, or revokes any license, permit, or authorization required by law, and the government action could have a material adverse effect on Debtor.

(g)      If, in Lender's sole judgment and discretion, any event occurs that has a material adverse effect on Debtor's business or financial condition, or that materially increases Lender's risk.

(h)      Debtor's authority to borrow from Lender terminates or expires.

(i)      The Bankruptcy Court announces from the bench or enters any order or judgment holding any material provision of this Agreement invalid or unenforceable.

(j)      The Bankruptcy Court announces from the bench or enters any order dismissing the Bankruptcy Case or converting that case to a Chapter 7 case, or Debtor files a motion to convert that case to a Chapter 7 case.

(k)      Debtor fails to make when due any payment required under this Agreement.

(o)  A Final Approval Order, substantially in the form of the Interim Approval Order attached hereto as Exhibit A and otherwise in form and content acceptable to Lender in its absolute discretion, has not been entered by the Bankruptcy Court on or before July 15, 2013.

(p)  Judgment is entered against ATI on any count of the complaint filed by D2 Polymer Technologies, Inc. against ATI in the Bankruptcy Court on April 24, 2013 (Adversary Proceeding Number 13-03089-tmb).

**7.2   Remedies on Default**. If an Event of Default occurs, Debtor's authority to borrow from Lender shall automatically terminate without notice from Lender and Lender shall have the absolute right to refuse to disburse any funds hereunder. At their option and election and in their sole discretion, Lender may exercise alternatively or cumulatively any or all of the rights, privileges or remedies available to Lender at law or in equity, including as may be provided by the Uniform Commercial Code and any other applicable law. All rights and remedies given by this Agreement and the other Loan Documents are cumulative and not exclusive of any other rights or remedies available to Lender, and no course of dealing between Debtor and Lender or any delay or omission in exercising any right or remedy operates as a waiver of any right or remedy, and every right and remedy may be exercised from time to time and as often as is deemed appropriate by Lender.

## Article 8

## (Intentionally Omitted)

## Article 9

## MISCELLANEOUS

**9.1   Waiver and Estoppel**. Lender may at any time and from time to time waive in writing any one or more of the terms and/or conditions contained in this Agreement, but any waiver will be deemed to be made pursuant to this Agreement and not in modification of it, and any such waiver in any instance, or under any particular circumstances, will not be construed as a waiver of the condition or of any subsequent Default or Event of Default. No such waiver shall be effective unless provided in writing by Lender.  Lender's failure to promptly exercise their rights or remedies will not be deemed to be a waiver or grounds for the claim of estoppel.

**9.2 Conflict**. The terms and conditions of this Agreement and of the Loan Documents are intended to complement and supplement each other, and are to be construed as consistent and complementary. If the terms or conditions of the Loan Documents conflict with the terms and conditions of this Agreement, the terms and conditions of this Agreement control.

**9.3 Captions**. The captions and headings are merely for convenience and are not a substantive part of this Agreement.

**9.4 Complete and Final Agreement**. This Agreement and the Loan Documents are the complete and final agreement of the parties, and no provision can or will be waived or modified by conduct or oral agreement either before or after this Agreement is executed.

**9.5 Governing Law**. The rights, duties, liabilities, and obligations of the parties under this Agreement will be construed and governed by and under the laws of the State of Oregon, excluding principles of conflict of laws.

**9.6 Notices**. All notices, requests, consents, demands, approvals, and other communications under this Agreement are deemed to have been duly given, made, or served if in writing and delivered personally or mailed by first-class mail, postage prepaid, or sent via fax or electronic mail, to the respective parties to this Agreement as follows:

(a) If to Debtor:    Absorbent Technologies, Inc.
8705 SW Nimbus Avenue, Suite 230
Beaverton, OR 97008
Attn:  David Moffenbeier
Fax: 503-699-3026
Email: dmoffenbeier@zeba.com

with a copy to:    Gary Underwood Scharff, Esq.
1300 American Bank Building
621 SW Morrison Street
Portland, OR 97205
Email: gs@scharfflaw.com

(b) If to Lender:    Absorbent Acquisitions Inc.
**[PHYSICAL ADDRESS AND CONTACT FOR AAI]**

with a copy to:    Michael C. Walch
Attorney at Law
Zions Bank Building
10 East South Temple, Suite 900
Salt Lake City, Utah 84133
Email: mcwalch@cnmlaw.com

The designation of the Persons to be notified or the address of such Persons for the purposes of notice may be changed from time to time by similar notice in writing,

except that any communication regarding a change of address is deemed to be given or made when received by the party to whom the communication was sent.

**9.8 Further Assurances**. At any time and from time to time, on the reasonable request of Lender, the parties shall promptly execute and deliver further instruments and documents and take further actions as Lender may reasonably request to obtain or preserve the full benefits of this Agreement and the rights and powers granted in the Agreement and granted in the Loan Documents.

**9.9 Severability**. If any provision of this Agreement is held to be invalid or unenforceable, all other provisions nevertheless continue in full force and effect.

**9.10 Counterparts**. This Agreement may be executed in one or more counterparts, each of which will constitute an original. Faxed signatures will serve as original signatures for purposes of evidencing an intent to be bound by the terms of this Agreement. The parties shall exchange original executed signature pages to Lender on or before July 2, 2013.

**9.11 Notice**.

UNDER OREGON LAW, MOST AGREEMENTS, PROMISES, AND COMMITMENTS MADE BY LENDER CONCERNING LOANS AND OTHER CREDIT EXTENSIONS THAT ARE NOT FOR PERSONAL, FAMILY, OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY THE BORROWER'S RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION, AND BE SIGNED BY LENDER TO BE ENFORCEABLE.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement on the date first written above.

DEBTOR:

ABSORBENT TECHNOLOGIES, INC.

_____

By
Name:  David C. Moffenbeier
Title:  Chief Executive Officer

LENDER:

ABSRBENT ACQUISITIONS, INC.

_____

By
Name:  _____
Title:  _____

# APPENDIX A

## DEFINITIONS

As used in this Agreement, the following terms have the meanings set forth below:

"Advance(s)" shall mean each borrowing by Debtor pursuant to the terms of this Agreement.

"Agreement" means this debtor in possession financing agreement.

"Approval Order" has the meaning set forth in Section 4.6 of this Agreement.

"Bankruptcy Case" means Debtor's Chapter 11 Bankruptcy case pending in the Bankruptcy Court under Case No. 13-31286tmb11.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Oregon.

"Budget" means the budget attached as Exhibit A. "Budget Termination Date" has the meaning set forth in Section 4.9 of this Agreement.

"Budgeted" means an income or expense item set forth in a Budget.

"Budgeted Item" means a Rejected Item that was given in payment of an expense that, if paid, would not cause Debtor to exceed its line-item expenditure authority under the Budget.

"Business Day" means any day except a Saturday, Sunday, or other day on which national Lenders in the state of Oregon are authorized or required by law to close.

"Contracts" means all contracts, leases, licenses, undertakings, franchise agreements or other agreements, whether oral or in written or electronic form,

including but not limited to contracts related in any way to any Intellectual Property, and all rights of Debtor under any of the foregoing.

"Copyright Office" means the U.S. Copyright Office.

"Copyrights" means any (a) copyrights, whether registered or unregistered, (b) copyright registrations or applications in any IP Filing Office, (c) continuations, renewals, or extensions thereof, and (d) IP Ancillary Rights related to any of the foregoing.

"Debtor" means Absorbent Technologies, Inc., an Oregon corporation.

"Default" means any condition or event that constitutes an Event of Default, or that with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Event of Default" means any of the events described in Section 7.1 of this Agreement.

"Final Hearing" has the meaning set forth in Section 4.5 of this Agreement.

"Hazardous Materials" means any oil or petrochemical products, PCBs, asbestos, urea formaldehyde, flammable explosives, radioactive materials, hazardous wastes, toxic substances, or related materials, including, without limitation, any substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," or "toxic substances" under any applicable federal or state laws or regulations.

"Hazardous Materials Claim" means (1) any and all enforcement, cleanup, removal, or other governmental or regulatory actions instituted, completed, or threatened pursuant to any applicable Hazardous Materials Laws; and (2) any and all claims made or threatened by any third party against Debtor or the property of either of them relating to damage, contribution, cost recovery, compensation, loss, or injury resulting from any Hazardous Materials.

"Hazardous Materials Laws" means all federal, state, or local laws, ordinances, regulations, orders, and directives pertaining to Hazardous Materials. "Indebtedness" means all items that, in accordance with generally accepted accounting principles, would be included in determining total liabilities as shown on the liabilities side of the balance sheet as of the date that "Indebtedness" is to be determined and, in any event, includes liabilities secured by any mortgage, deed of

trust, pledge, lien, or security interest on property owned or acquired, whether or not such a liability has been assumed, and the guaranties, endorsements (other than for collection in the ordinary course of business), and other contingent obligations in respect of the obligations of other Persons.

"Intellectual Property" means all Patents, Copyrights, Trademarks and other intellectual property, whether or not embodied in any tangible medium, including licenses, know-how, trade secrets, customer and supplier lists, proprietary information, inventions, methods, process, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the right to limit the use or disclose thereof by any person or entity, pricing and cost information, business and marketing plans and proposals, consulting agreements, engineering contracts and such other assets which relate to such goodwill.

"IP Ancillary Rights" means, with respect to any other Intellectual Property, as applicable, (a) all rights to royalties, revenues, income or other payments related to such Intellectual Property, arising or payable at any time, under IP Licenses or otherwise, (b) all rights to enforce, collect or perform any Contracts related to such Intellectual Property, (c) all causes of action and rights to claim, sue for or collect damages for, or enjoin or obtain other legal or equitable relief for, any past, present or future infringement, misappropriation, dilution, violation, unfair competition, or other impairment (whether past, present or future) of such Intellectual Property, and (d) all rights to obtain any of the foregoing.

"IP Filing Office" means the PTO (for Patents and Trademarks), the Copyright Office (for Copyrights), or any similar office or agency in any Jurisdiction.

"IP License" means any Contract in which Debtor directly or indirectly grants or is granted  a license or other right, whether exclusive or non-exclusive, (i) to use or develop any Intellectual Property, (ii) to receive royalties, revenues, income or other payment related to any Intellectual Property, or (iii) to exercise any other right with respect to any Intellectual Property.

"Loan Commitment" means $1.7 million.

"Loan Documents" means this Agreement, and all other agreements, instruments, and documents arising out of or relating to Debtor's Indebtedness to Lender, as well as all renewals and modifications thereof.

"Loans" means the loans by Lender to Debtor.

"Patents" means any (a) letters patent of the United States or any other Jurisdiction, (b) patent applications, petty patents, patents of addition and other filings in any IP Filing Office, (c) continuations, continuations-in-part, renewals, divisions, extensions and reexaminations thereof and (d) IP Ancillary Rights related to any of the foregoing.

"Person" means any individual, partnership, joint venture, firm, corporation, association, trust, or other enterprise, or any government or political subdivision or agency, department, or instrumentality thereof.

"Petition Date" has the meaning set forth in Recital A of the Agreement.

"Postpetition Lien" means the security interest and lien granted by Section 5.2 of this Agreement.

"Proceeds" means whatever is receivable or received from or upon the sale, lease, license, collection, use, assignment, exchange or other disposition, whether voluntary or involuntary, of any Intellectual Property Collateral, including "proceeds" as defined in UCC Section 9-102(a)(64) and, including (i) any accounts, chattel paper, instruments, general intangibles, cash and other proceeds payable in respect of any of the Intellectual Property Collateral, (ii) any proceeds of any insurance, indemnity, warranty or guaranty payable with respect to any of the Intellectual Property Collateral, (iii) any and all claims and payments (in any form whatsoever) made or due and payable in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Intellectual Property Collateral by any Person acting under color of governmental authority, and (iv) any and all other amounts paid or payable under or in connection with any of the Intellectual Property Collateral or for or on account of any damage or injury to or conversion of any Intellectual Property Collateral by any Person.

"Property" means all the real and personal property of Debtor acquired either before or after the Petition Date, tangible or intangible, including, but not limited to, all land, buildings, fixtures, trade fixtures, accounts, contract rights, general intangibles, rights to payment of every kind, including rights to tax refunds, equipment, fixtures, trade fixtures, motor vehicles, goods, machinery, inventory, farm products, chattel paper, leases, conditional sale agreements, cash, deposit accounts, notes, documents, documents of title, instruments, securities, shares of capital stock, capital equities, and other securities of and claims against any corporation, joint venture, or partnership, pledges and agreements to pledge, rights in and claims under insurance policies, letters of credit, trademarks, trade names, trade styles, licenses, customer lists, goodwill, instruments, bills of lading,

warehouse receipts and trust receipts, and all renewals, replacements, substitutions, additions, accessions, rents, profits, issues, products, and proceeds (whether due to voluntary or involuntary disposition) of the foregoing, all whether now owned or hereafter acquired. "Property" includes proceeds, products, rents, and profits of Intellectual Property Collateral acquired by Debtor after the Petition Date, including, but not limited to, all funds hereafter deposited into the Cash Collateral Account or advanced to the Operating Account. "Property" does not include any avoidance or recovery powers of Debtor or any trustee under Bankruptcy Code Chapter 5.

"PTO" means the U.S. Patent and Trademark Office.

"Related Property" means, with respect to any Intellectual Property, (i) all accounts, deposit accounts, general intangibles, instruments, investment property and other personal property at any time constituting, evidencing or arising under or with respect to such Intellectual Property, (ii) all substitutions and replacements for any of the foregoing, and (iii) all Debtor's books, records, information and data with respect to any of the foregoing.

"Reporting Requirements" means the requirements of Section 6.1(c) of this Agreement.

"Trademarks" means (a) any marks, whether or not registered, including trademarks, service marks, trade names, corporate names, company names, business names, trade styles, designs, logos, colors, sounds, trade dress, and any other source identifiers, (b) the goodwill of the business symbolized by or associated with the foregoing, (c) any trademark registrations, applications and other filings in any IP Filing Office, and (d) IP Ancillary Rights related to any of the foregoing.

"UPI" means United Phosphorous Inc.

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re: | )    Case No.:  13-31286-tmb11 |
| **Absorbent Technologies, Inc.,** | ) |
| | )    Chapter 11 |
| | ) |
|      Debtor. | )    **THIRD ORDER (A) AUTHORIZING** |
| | )    **DEBTOR TO OBTAIN** |
| | )    **POSTPETITION FINANCING** |
| | )    **PURSUANT TO 11 U.S.C. §§ 105, 362,** |
| | )    **364(c)(1), 364(c)(2), 364(d)(1) AND** |
| | )    **364(e);** |
| | )    **(B) GRANTING POSTPETITION** |
| | )    **LIENS AND SUPERPRIORITY** |
| | )    **ADMINISTRATIVE EXPENSE** |
| | )    **STATUS; AND** |
| | )    **(C) AUTHORIZING DEBTOR TO** |
| | )    **ENTER INTO  POSTPETITION** |
| | )    **LENDING AGREEMENT ($1,700,000)** |
| | )☐ |
| |      **[PROPOSED]** |

Upon the Motion of Absorbent Technologies, Inc., debtor and debtor-in-possession (the

"***Debtor***"), dated June 25, 2013 (Docket No. __, the "***Motion***"), seeking, *inter alia*, (i) authority

pursuant to §§364(c)(1), 364(c)(2) and 364(d)(1) of the United States Bankruptcy Code, 11

U.S.C. §§101-1330 (the "***Bankruptcy Code***"), Rules 4001 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 4001-1 of the Local Rules of the

United States Bankruptcy Court for the District of Oregon (the "**Local Rules**"), for the Debtor to obtain post-petition loans of up to $1,700,000 from Absorbent Acquisitions Inc., an Oregon corporation (**"AAI"** or, "**Lender**") secured by first priority security interests in and liens upon all of the Debtor's intellectual property and all proceeds thereof, whether now existing or hereafter acquired, pursuant to §§364(c)(2) and 364(d)(1) of the Bankruptcy Code, (ii) authority for the Debtor to enter into the Debtor in Possession Financing Agreement dated **[June 25, 2013]** between Lender and Debtor, a copy of which is attached hereto as Exhibit A (as amended by this Order, the "**AAI DIP Agreement**"), (iii) approval of the terms and conditions of the AAI DIP Agreement, and (iv) authority to grant Lender super-priority administrative claim status pursuant to §364(c)(1) of the Bankruptcy Code. Upon the Motion, the files and pleadings in this case, the record of the proceedings heretofore held before this Court with respect to the Motion and upon completion of such hearing and after due deliberation and sufficient cause appearing therefor, the parties hereto stipulate and the Court hereby finds and concludes as follows:

A.      Each of the parties set forth below received due notice of the Motion pursuant to Bankruptcy Rules 4001(b)(1), (c)(1) and (d)(1) and 1007(d) and the Local Rules: (a) the Office of the United States Trustee; (b) all parties in interest that have filed a Notice of Appearance in the Debtor's chapter 11 case, including the County of Linn, through its counsel; (c) all creditors known to the Debtor who may have liens against the Debtor's assets, including Joseph A. Nathan living trust ua dtd 12/30/1996, Joseph A. Nathan, trustee ("Nathan")  and United Phosphorus, Inc. ("UPI"); and (d) counsel to the Official Committee of Unsecured Creditors (the "**Committee**").

B.      The Debtor filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code on March 8, 2013 (the "*Petition Date*") and has thereafter continued in the

management and possession of its business and properties as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

C.    The Debtor is currently operating under the terms of a Debtor In Possession Financing Agreement with two entities jointly extending credit to Debtor, Nathan and UPI, pursuant to an Order of this Court entered May 2, 2013 (Docket No. 89, the ***Second DIP Financing Order"***).  The Second DIP Financing Order provided for immediate payment in full of the outstanding balance of $66,260.85 due Nathan from Debtor under an earlier DIP Financing Order (the "First Order").  That balance due under the First Order was fully and timely satisfied from loans made to Debtor pursuant to the Second DIP Financing Order.  Authority to borrow under the Second DIP Financing Order expires on July 15, 2013.  Without the proposed financing, the Debtor will not have the funds necessary to timely pay in full on July 15, 2013 amounts owed Nathan and UPI under the Second DIP Financing Order (the "Second DIP Loan Repayment"), or pay lease and insurance obligations, post-petition payroll and other costs and administrative expenses necessary to manage and preserve its assets and properties for the period of July 15, 2013 through September 15, 2013 (the "Third DIP Loan Period").  In the absence of such loan, the Debtor will suffer immediate and irreparable harm.

D.    The Debtor has requested that the Lender make loans and advances to the Debtor in order to provide funds to be used by the Debtor to (i) make when due the Second DIP Loan Repayment in the sum of approximately $950,000, which amount Debtor represents is sufficient for such repayment; and (ii) pay the obligations set forth on the Budget attached hereto as Exhibit B (the ***Approved Expenses"***) which are necessary during the Third DIP Loan Period for Debtor to continue in business, remain a viable entity and reorganize under chapter 11 of the Bankruptcy Code.

E.    The Debtor is unable to obtain unsecured credit allowable under §503(b)(1) of the Bankruptcy Code, or pursuant to §§364(a) and (b) of the Bankruptcy Code, except on the terms and conditions set forth herein.

F.    No other source of financing exists for the Third DIP Loan Period other than from the Lender.  The terms of the AAI DIP Agreement between the Debtor and Lender pursuant to which the proposed financing will be provided to the Debtor by Lender have been negotiated in good faith and at arm's length as that term is used at §364(e) of the Bankruptcy Code and are in the best interests of the Debtor and its creditors, and this Order is subject to, and Lender is entitled to the benefits of, the provisions of §§363(m) and 364(e) of the Bankruptcy Code.

G.    The holders of pre-petition liens granted by the Debtor on the proceeds of the Debtors' intellectual property, but not on the intellectual property itself, do not hold perfected liens on any such proceeds, and accordingly are not entitled to any adequate protection on account of the liens granted to Lender pursuant to this Order.

H.    The ability of the Debtor to continue its business and maximize the value of its assets under chapter 11 of the Bankruptcy Code depends upon obtaining such financing from Lender and therefore immediate and irreparable harm to the Debtor and the Debtor's estate will result if the proposed financing is not obtained.  The relief granted by this Court pursuant to this Order is necessary to avoid such immediate and irreparable harm to the Debtor's estate.

I.    The consideration of this Motion constitutes a "core proceeding" pursuant to 28 U.S.C. §§157(b)(2)(A), (D), (G), (K), (M) and (O) and 1334, and this Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§157 and 1334.

J.      The notice of the Motion and hearing constitutes good and sufficient notice to the parties in interest pursuant to Bankruptcy Rules 2002, 4001(c) and (d) and 9014, the Local Rules and §102(1) of the Bankruptcy Code, as required by §§364(c) and (d) of the Bankruptcy Code, and no further notice of, or hearing on, the relief sought in the Motion is necessary or required.

K.      Lender is in the process of acquiring funds to allow it to make the loans contemplated in the AAI DIP Financing Agreement.  Acquisition of such funds is a precondition to any performance obligations of Lender under the AAI DIP Financing Agreement.

L.      Lender is also in the process of acquiring funds to purchase substantially all of the assets of Debtor pursuant to §363 of the Bankruptcy Code, to be consummated as soon as possible after July 15, 2013.

**THEREFORE, ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, THAT:**

1.      The Motion is granted on the terms set forth in this Order.  This Order is valid immediately and fully effective upon its entry.  (This Order may sometimes hereinafter be referred to as the "***Order***").

2.      From the date of the entry of this Order, the Debtor is hereby authorized and empowered to obtain post-petition loans and advances from Lender, throughout the Third DIP Loan Period, on and pursuant to the terms of this Order and the terms and conditions set forth in the AAI DIP Agreement as modified herein, in such amount or amounts as may be available thereunder (all post-petition obligations, liabilities and indebtedness owed by the Debtor to Lender of whatever kind or nature or description arising under or relating to the AAI DIP Agreement is referred to herein as the "***AAI DIP Indebtedness***"); provided, however, that the

outstanding principal balance of the AAI DIP Indebtedness shall not exceed $1,700,000. Amounts repaid on the AAI DIP Indebtedness from time to time shall not be available for re-borrowing (i.e., Lender is not extending a revolving credit facility).

3.     The Debtor shall be authorized to use the post-petition advances under the DIP Agreement only for payment of the Approved Expenses and subject to the terms and conditions set forth in the AAI DIP Agreement and this Order.  Lender's obligation to fund amounts under the AAI DIP Agreement is expressly conditioned on the Debtor's compliance with the terms and conditions of the AAI DIP Agreement and this Order and the absence of any pending Event of Default.  Any disbursement by the Debtor other than for Approved Expenses shall constitute an Event of Default under this Order unless Lender consents to those changes in writing.

4.     The Debtor is authorized and directed to execute, deliver, perform and comply with the terms and covenants of the AAI DIP Agreement.

5.     To secure the repayment the AAI DIP Indebtedness, Lender shall have, and the Debtor hereby grants to Lender, pursuant to sections 364(c)(2) and 364(d)(1), effective as of payment in full of Nathan and UPI pursuant to Paragraph 18 of the Second DIP Financing Order, a valid, binding, continuing and perfected first priority security interest in and lien on all of Debtor's interests in Intellectual Property Collateral (as defined in the DIP Agreement) and all proceeds thereof, whether now owned or hereafter acquired by Debtor (the "*Collateral*"), and not any of Debtor's other personal property (the "**AAI DIP Loan Lien**"); provided, however, that the AAI DIP Loan Lien shall be subject to the Carve-Out Expenses (as defined in paragraph 6 below).

6.     In addition to and without derogation of, the AAI DIP Loan Lien, the Lender also is hereby granted an allowed superpriority administrative expense claim in this bankruptcy case,

pursuant to 11 U.S.C. § 364(c)(1), with priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject only to the Carve-Out Expenses. "Carve-Out Expenses" means (i) all unpaid fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, (ii) all unpaid fees payable to the Clerk of the Court; and (iii) all allowed but unpaid Budgeted fees and expenses of any professionals for the Debtor and the Committee for services rendered prior to an Event of Default, plus up to $50,000 in the aggregate for allowed but unpaid fees and expenses of any professionals for the Debtor and the Committee incurred subsequent to an Event of Default, provided that the total amount of the Carve-Out Expenses under this clause (iii) shall not exceed $260,000 in the aggregate without the written consent of the Lender.

7.       This Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the Lender's security interests in and lien on the Collateral granted to Lender as set forth herein, without the necessity of filing, recording or serving any financing statements, mortgages or other documents which may otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the security interests and liens granted to Lender in this Order and the DIP Agreement.  Such security interests and liens granted to Lender shall be prior and senior to all security interests, liens, claims, and encumbrances of all other creditors in and to the Collateral and shall be subject only to the Carve-Out Expenses to the extent provided in paragraph 6 above.  If Lender shall, in its sole discretion, elect for any reason to file any such financing statements or other documents with respect to such security interests and liens, the Debtor is authorized and directed to execute, or cause to be executed, all such financing statements or other documents upon Lender's request and the filing, recording or service (as the case may be) of such financing statements or similar documents shall be deemed

to have been made at the time of and on the Petition Date.  Lender may, in its sole discretion, file a certified copy of this Order in any filing or recording office in any County or other jurisdiction in which the Debtor has real or personal property and, in such event, the subject filing or recording officer is authorized and directed to file or record such certified copy of this Order.

8.      The Debtor is hereby authorized and directed to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements in addition to the DIP Agreement as Lender may reasonably require as evidence of the DIP Indebtedness and for the protection of the Collateral, or which may be otherwise deemed necessary by Lender to effectuate the terms and conditions of this Order and the DIP Agreement.

9.      The automatic stay provisions of §362 of the Bankruptcy Code are vacated and modified only to the extent necessary to permit Lender to implement the financing of the Debtor and the provisions of this Order.

10.      The Debtor is authorized and directed to provide Lender, unless there is a written waiver by Lender in each instance, all of the documentation, reports, schedules, assignments, financial statements, insurance policies and endorsements, access, inspection, audits, information and other rights which the Debtor is required to provide to Lender under the AAI DIP Agreement.

11.      Nothing herein shall be construed as consent to the allowance of any fees and expenses of the professionals retained by the Debtor or the Committee, or shall affect the right of Lender or any other interested party to object to the allowance and payment of such fees and expenses.

12.      In the event of the occurrence of any of the following: (a) the failure of the Debtor to perform in any material respect any of its obligations pursuant to this Order; (b) the

occurrence of any "Event of Default" under the AAI DIP Agreement; (c) the termination or non-renewal of the AAI DIP Agreement, as provided for therein and in this Order; (d) the appointment of a trustee appointed pursuant to sections §1104(a)(1) or 1104(a)(2) of the Bankruptcy Code; (e) dismissal or conversion to chapter 7 of the Debtor's chapter 11 case; (f) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating or amending this Order; (g) the Debtor's filing, without the express written consent of Lender, of a motion requesting authority to incur indebtedness either (A) having administrative expense priority equal or superior to the administrative expense priority granted to Lender under this Order or (B) secured by a security interest or lien in the Collateral; (h) any party (including the Debtor) filing a motion or application for an order seeking to (i) revoke, reverse, stay the implementation of, modify, supplement or amend this Order, (ii) invalidate, raise defenses to, or otherwise challenge the extent, amount, validity, perfection, priority or enforceability of the security interests and liens of Lender in the Collateral (provided that the filing or prosecution of a motion or complaint to determine the existence and scope of D2 Polymer's interest, if any, in the Debtor's intellectual property shall not be an Event of Default), or (iii) sell, assign, lease, license or encumber any Collateral unless the DIP Obligations will be paid in full, in cash prior to or at the time of such sale, assignment, lease, license or encumbrance; (i) the filing of any proposed chapter 11 plan that does not provide for the payment in full, in cash, of the DIP Obligations on the effective date of such chapter 11 plan; (j) any party obtaining relief from the automatic stay with respect to any Collateral or any nonresidential real property lease of the Debtors (the foregoing being referred to in this Order, individually, as an "***Event of Default***" and, collectively, as "***Events of Default***"); then, unless such Event of Default is specifically waived in writing by Lender, the Lender may, at its election, by written notice to the Debtor, the United

States Trustee and counsel for the Committee (a "*Default Notice*"), immediately cease making loans to the Debtor under the AAI DIP Agreement, terminate the AAI DIP Agreement and declare all of the AAI DIP Indebtedness due and payable in full.

13.    Upon the payment in full of all DIP Indebtedness to Lender, or upon the termination of the AAI DIP Agreement, Lender shall have no further obligations pursuant to the terms of this Order and/or the AAI DIP Agreement.

14.    The provisions of this Order shall be binding upon the Debtor and its successors and assigns, including any chapter 7 or chapter 11 trustee or other fiduciary hereafter appointed as a legal representative of the Debtor or with respect to property of the estate of the Debtor, whether under chapter 11 of the Bankruptcy Code or in any subsequent chapter 7 case, and shall also be binding upon all creditors of the Debtor and other parties in interest.

15.    The AAI DIP Indebtedness may be used by Lender to "credit bid" for the assets and property of the Debtor as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether such sale is effectuated through section 363(b) and/or section 1129(b) of the Bankruptcy Code, or otherwise.

16.    If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect (a) the validity of any AAI DIP Indebtedness incurred by the Debtor to Lender prior to the effective date of such modification, vacation or stay, or (b) the validity or enforceability of Lender's security interest and lien in the Collateral, or the priority authorized or created hereby or pursuant to the AAI DIP Agreement, with respect to any AAI DIP Indebtedness incurred prior to the effective date of such modification, vacation or stay.  Notwithstanding any such modification, vacation or stay, any indebtedness, obligations or liabilities incurred by the Debtor to Lenders prior to the effective

date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Order, and Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein and pursuant to the AAI DIP Agreement with respect to all such indebtedness, obligations or liabilities.

17.    The AAI DIP Agreement is modified as set forth in this Order. Without limiting the scope of the immediately preceding sentence, the maturity date of the AAI DIP Indebtedness under the AAI DIP Agreement shall be September 15, 2013.  Anything herein to the contrary notwithstanding, Lender shall not be required to make any advances to Debtor while an Event of Default exists.  To the extent that the terms of the AAI DIP Agreement are in conflict with the terms and conditions of this Order, the terms and conditions of this Order shall control.

18.    Effective upon: (a) entry of this Order; and (b) the occurrence of Lender's financing contingencies that are conditions precedent to funding of the loans provided for under the AAI DIP Agreement: (i) Debtor shall  repay all advances made by Nathan and UPI to Debtor under the Debtor in Possession Financing Agreement approved under the Second DIP Financing Order; and (ii) neither the Debtor nor Nathan nor UPI shall have any further rights or obligations under the First Order or the Second DIP Financing Order, all of which shall be supplanted by the rights and obligations of the parties under this Order.

19.    Nothing contained in this Order shall be deemed to terminate, modify or release any obligations of the Debtor to Nathan with respect to any pre-petition indebtedness, obligation, or liability.

20.    The terms of this Order shall be valid and binding upon the Debtor, all creditors of the Debtor, and all other parties in interest from and after the date of this Order.

21.     Nothing contained herein shall affect or impair Nathan's right to seek adequate protection of his interests in any pre-petition collateral.

22.     Nothing contained herein shall: (a) be deemed to constitute or constitute a commitment by Lender to continue to make advances to the Debtor or to finance the Debtor's chapter 11 case beyond the Third DIP Loan Period; or (b) limit Lender's right to seek such other relief as to the Debtor, the Collateral or the Debtor's estate as may be otherwise provided in the Bankruptcy Code.

23.     The Debtor and Lender shall continue to negotiate in good faith for a sale of the assets of Debtor to Lender pursuant to §363 of the Bankruptcy Code on terms acceptable to the Debtor, the Lender and the Committee, to be consummated as soon as possible after July 15, 2013.

###

Presented by:


_____
Gary Underwood Scharff, OSB# 883031
Law Office of Gary Underwood Scharff
621 SW Morrison Street #1300
Portland, OR 97205
gs@scharfflaw.com
T: 503-493-4353
Attorneys for Debtor

Approved as to form:
Greene & Markley, P.C.


By_____
    David A. Foraker, OSB# 81228
Attorneys for Official Committee of Unsecured Creditors
cc:  ECF Participants and other parties noted in Paragraph A, above

# EXHIBIT B

| Cash Flow to Sept 15 - No Production | Cumulative | Disbursed Week8 | Disbursed Week9 | Disbursed Week10 | Disbursed Week11 | Disbursed Week12 | Disbursed Week13 | Disbursed Week14 | Disbursed Week15 | Disbursed Week16 | Disbursed Week17 | Disbursed Week18 | Disbursed Week19 | Disbursed Week20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | To | Begin | Begin | Begin | Begin | Begin | Begin | Begin | Begin | Begin | Begin | Begin | Begin | Begin | Budgeted |
| Shutdown Productionn-Scenario | 16-Jun | 17-Jun | 24-Jun | 1-Jul | 8-Jul | 15-Jul | 22-Jul | 29-Jul | 5-Aug | 12-Aug | 19-Aug | 26-Aug | 2-Sep | 9-Sep | |
| **Budget** | | | | | | | | | | | | | | | |
| Cash out flows: | | | | | | | | | | | | | | | |
| Supplies | 27,800 | - | - | 3,900 | - | - | - | 3,900 | | - | - | - | 3,900 | - | 39,500 |
| Utilities | 18,890 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 41,315 |
| Payroll | 266,202 | 17,913 | 17,913 | 17,913 | 17,913 | 148,646 | 17,913 | 17,913 | 17,913 | 17,913 | 17,913 | 17,913 | 17,913 | 17,913 | 629,799 |
| Rent | 126,742 | - | - | 119,520 | - | - | - | 63,372 | - | - | - | - | 63,372 | - | 373,006 |
| Insurance | 80,106 | 2,500 | - | 40,250 | - | 1,500 | - | 10,900 | - | - | 1,500 | - | 10,900 | - | 147,656 |
| Leases (Forklifts) | 2,700 | - | - | - | 900 | - | - | - | 900 | - | - | - | 900 | - | 5,400 |
| Carve Out - Professional Services | - | - | - | - | - | 160,000 | - | - | 100,000 | - | - | - | - | - | 260,000 |
| Patent annuity payments | 20,000 | - | - | 5,000 | - | - | - | - | - | - | - | - | - | - | 25,000 |
| Repay DIP Loan | 66,000 | - | - | - | - | 950,000 | - | - | - | - | - | - | - | - | 1,016,000 |
| Other | 28,150 | 6,075 | 5,075 | 6,800 | 9,375 | 4,375 | 4,375 | 4,375 | 6,075 | 4,375 | 4,375 | 4,375 | 6,075 | 4,375 | 98,250 |
| Total Cash Outflows | 636,591 | 28,213 | 24,713 | 195,107 | 29,913 | 1,266,246 | 24,013 | 102,184 | 126,613 | 24,013 | 25,513 | 24,013 | 104,784 | 24,013 | 2,635,926 |
| Cash Inflows: | | | | | | | | | | | | | | | |
| Beginning Cash | - | | | | | | | | | | | | | | - |
| Customer Sales | - | | | | | | | | | | | | | | - |
| DIP Financing AAI | | | | | | 1,300,000 | - | 100,000 | 150,000 | | 150,000 | | | | 1,700,000 |
| *DIP InitialFinancing | 700,000 | - | 100,000 | 100,000 | - | | | | | | | | - | - | 900,000 |
| Total Cash Inflows | 700,000 | - | 100,000 | 100,000 | - | 1,300,000 | - | 100,000 | 150,000 | - | 150,000 | - | - | - | 2,600,000 |
| Net Cash | 63,409 | (28,213) | 75,287 | (95,107) | (29,913) | 33,754 | (24,013) | (2,184) | 23,387 | (24,013) | 124,487 | (24,013) | (104,784) | (24,013) | (35,926) |
| | | | | | | | | | | | | | | | |
| Rolling (Deficit) Surplus | 100,959 | 72,747 | 148,034 | 52,927 | 23,014 | 56,768 | 32,755 | 30,571 | 53,959 | 29,946 | 154,434 | 130,421 | 25,637 | 1,624 | |
| | | | | | | | | | | | | | | | |
| **Actual Spent** | | | | | | | | | | | | | | | |
| Cash out flows: | - | | | | | | | | | | | | | | |
| Supplies | 30,554 | | | | | | | | | | | | | | |
| Utilities | 18,808 | | | | | | | | | | | | | | |
| Payroll | 258,873 | | | | | | | | | | | | | | |
| Rent | 145,688 | | | | | | | | | | | | | | |
| Insurance | 69,154 | | | | | | | | | | | | | | |
| Leases (Forklifts) | 3,545 | | | | | | | | | | | | | | |
| Carve Out - Professional Services | - | | | | | | | | | | | | | | |
| Patent annuity payments | 13,100 | | | | | | | | | | | | | | |
| Repay Joe Nathan | 66,000 | | | | | | | | | | | | | | |
| Other | 35,666 | | | | | | | | | | | | | | |
| Total Cash Outflows | 641,389 | | | | | | | | | | | | | | |
| Cash Inflows: | | | | | | | | | | | | | | | |
| Beginning Cash | | | | | | | | | | | | | | | |
| Customer Sales or Other Cash | | | | | | | | | | | | | | | |
| (1)*DIP Financing | | | | | | | | | | | | | | | |
| Total Cash Available | | | | | | | | | | | | | | | |
| Ending Cash Balance | 114,604 | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Cumulative Spent | 641,389 | | | | | | | | | | | | | | |
| Weekly Variance | | | | | | | | | | | | | | | |
| % Variance | | | | | | | | | | | | | | | |
| Cumulative Variance | (4,798) | | | | | | | | | | | | | | |
| % Variance | -0.8% | | | | | | | | | | | | | | |

| Cash Flow to Sept 15- No Production | | Est | Est | Est | Est | Est | Est | Est | Est | Est | Est | Est | Est | Est | Disbursed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shutdown Production-nn-Scenario | | 17-Jun | 24-Jun | 1-Jul | 8-Jul | 15-Jul | 22-Jul | 29-Jul | 5-Aug | 12-Aug | 19-Aug | 26-Aug | 2-Sep | 9-Sep | Totals |
| | | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | Week 19 | Week 20 | 13 Weeks |
| Production Raw Materials and Supplies | | | | | | | | | | | | | | | |
| Nitrogen | | | | 3,900 | | | | 3,900 | | | | | 3,900 | | 11,700 |
| Acrylo | | | | | | | | | | | | | | | - |
| Purchased materials & Freight | | | | | | | | | | | | | | | - |
| Chemicals | | | | | | | | | | | | | | | - |
| Starch | | | | | | | | | | | | | | | - |
| Total Supplies | | - | - | 3,900 | - | - | - | 3,900 | - | - | - | - | 3,900 | - | 11,700 |
| | | | | | | | | | | | | | | | |
| Electricity | | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 11,375 |
| Natural Gas | | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 8,125 |
| Water and Sewer | | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 2,925 |
| Total Utilities | | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 22,425 |
| Operating Costs-Payroll | | | | | | | | | | | | | | | |
| Ferry Production (Tank Farm Crew) | | | | | | | | | | | | | | | |
| Queen Production (Dough & Finish& Lab) | | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 14,023 |
| Production Worker | | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 12,415 |
| HSME Manager | | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 15,261 |
| Engineering | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Payroll Total | | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 41,699 |
| Other Costs | | | | | | | | | | | | | | | |
| Spare Parts | | | | | | | | | | | | | | | - |
| City of Albany-DEQ Permits and Test | | | | | | | | | | | | | | | - |
| Repairs &Supplies | | | | | | | | | | | | | | | - |
| Equipment Rent (Forklifts) | | | | | 900 | | | | 900 | | | | 900 | | 2,700 |
| Other Supplies/freight | | 75 | 75 | 2500 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 3,400 |
| Total Other Costs | | 75 | 75 | 2,500 | 975 | 75 | 75 | 75 | 975 | 75 | 75 | 75 | 975 | 75 | 6,100 |
| | | | | | | | | | | | | | | | |
| Totals Production and Operations | | 5,008 | 5,008 | 11,333 | 5,908 | 5,008 | 5,008 | 8,908 | 5,908 | 5,008 | 5,008 | 5,008 | 9,808 | 5,008 | 81,924 |
| Admin Costs: | | | | | | | | | | | | | | | 0 |
| Management Payroll (8) | | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 142,034 |
| Priority pre-petition wages | | | | - | | 117,250 | | - | | | | | | | 117,250 |
| Payroll Taxes | | | | - | | | | | | | | | | | - |
| 401k at 3% | | | | - | | | | | | | | | | | - |
| Payroll Taxes | | 1,370 | 1,370 | 1,370 | 1,370 | 11,336 | 1,370 | 1,370 | 1,370 | 1,370 | 1,370 | 1,370 | 1,370 | 1,370 | 25,038 |
| 401k at 3% | | 423 | 423 | 423 | 423 | 3,940 | 423 | 423 | 423 | 423 | 423 | 423 | 423 | 423 | 8,166 |
| Rent -Queen Street | | | | 77,843 | | | | 44,390 | | | | | 44,390 | | 122,233 |
| Rent- Ferry Street | | | | 23,616 | | | | 8,613 | | | | | 8,613 | | 32,230 |
| Rent -Beaverton Office | | | | 18,061 | | | | 10,368 | | | | | 10,368 | | 28,429 |
| Insurance-Liability,Fire, DO | | | | 29,350 | | | | | | | | | | | 29,350 |
| Insurance Health and Dental | | | | 10,900 | | | | 10,900 | | | | | 10,900 | | 21,800 |
| Insurance Worker's Comp | | 2,500 | | | | 1,500 | | | | | 1,500 | | | | 5,500 |
| Patent anuity payments | | | | 5,000 | | | | | | | | | | | 5,000 |
| Repay DIP Loan | | | | | | 950,000 | | | | | | | | | 950,000 |
| Professional Services | | | | | | 160,000 | | | 100,000 | | | | | | 260,000 |
| Other Obligations (Phone-Utilities,etc) | | 3,500 | 2,500 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 3,500 | 1,800 | 1,800 | 1,800 | 3,500 | 1,800 | 23,900 |
| Contingency | | 2,500 | 2,500 | 2,500 | 7,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 32,500 |
| Total Est Admin Cost | | 23,205 | 19,705 | 183,775 | 24,005 | 1,261,239 | 19,005 | 93,277 | 120,705 | 19,005 | 20,505 | 19,005 | 94,977 | 19,005 | 1,803,429 |
| | | | | | | | | | | | | | | | |
| Total Company Costs by Week | | 28,213 | 24,713 | 195,107 | 29,913 | 1,266,246 | 24,013 | 102,184 | 126,613 | 24,013 | 25,513 | 24,013 | 104,784 | 24,013 | 1,885,353 |

| Cash Flow to Sept 15- No Production | |
|---|---|
| Shutdown Productionn-Scenario | Comments |
| | |
| Production Raw Materials and Supplies | |
| Nitrogen | Gas and Storage ( Non Explosive) |
| Acrylo | Raw Material plus Freight |
| Purchased materials & Freight | Payment to Tongaat Hulett |
| Chemicals | Chemicals used in production |
| Starch | Raw Material plus Freight |
| Total Supplies | |
| | |
| Electricity | Operations at sub capacity (PP&L) |
| Natural Gas | Operations at sub capacity (NW Natural Gas) |
| Water and Sewer | Water minimal discharge |
| Total Utilities | |
| Operating Costs-Payroll | |
| Ferry Production (Tank Farm Crew) | |
| Queen Production (Dough & Finish& Lab) | Matt Blanchard |
| Production Worker | Dave Galleher |
| HSME Manager | Glenda Fleming |
| Engineering | |
| | |
| Payroll Total | |
| Other Costs | |
| Spare Parts | Preventative Maintenance |
| City of Albany-DEQ Permits and Test | Added Water , Air& Sewer Discharge |
| Repairs &Supplies | General Repairs & Maint |
| Equipment Rent (Forklifts) | |
| Other Supplies/freight | Other  Supplies including Freight |
| Total Other Costs | |
| | |
| Totals Production and Operations | |
| Admin Costs: | |
| Management Payroll (8) | Retain current management |
| Priority pre-petition wages | 10 employees |
| Payroll Taxes | |
| 401K at 3% | |
| Payroll Taxes | FICA, Medicare, FUTA, SUTA |
| 401k at 3% | 3% match 401k |
| Rent -Queen Street | FHA |
| Rent- Ferry Street | Lombard Foods |
| Rent -Beaverton Office | PS Business Parks |
| Insurance-Liability,Fire, DO | Flatrion Capital |
| Insurance Health and Dental | Providence , ODS |
| Insurance Worker's Comp | Liberty Mutual |
| Patent anuity payments | |
| Repay DIP Loan | |
| Professional Services | |
| Other Obligations (Phone-Utilities,etc) | |
| Contingency | |
| Total Est Admin Cost | |
| | |
| Total Company Costs by Week | |

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re: | )    Case No.:  13-31286-tmb11 |
| **Absorbent Technologies, Inc.,** | ) |
| | )    Chapter 11 |
| | ) |
| Debtor. | )    **THIRD ORDER (A) AUTHORIZING** |
| | )    **DEBTOR TO OBTAIN** |
| | )    **POSTPETITION FINANCING** |
| | )    **PURSUANT TO 11 U.S.C. §§ 105, 362,** |
| | )    **364(c)(1), 364(c)(2), 364(d)(1) AND** |
| | )    **364(e);** |
| | )    **(B) GRANTING POSTPETITION** |
| | )    **LIENS AND SUPERPRIORITY** |
| | )    **ADMINISTRATIVE EXPENSE** |
| | )    **STATUS; AND** |
| | )    **(C) AUTHORIZING DEBTOR TO** |
| | )    **ENTER INTO  POSTPETITION** |
| | )    **LENDING AGREEMENT ($1,700,000)** |
| | )    **[PROPOSED]** |

Upon the Motion of Absorbent Technologies, Inc., debtor and debtor-in-possession (the "***Debtor***"), dated June 25, 2013 (Docket No. __, the "***Motion***"), seeking, *inter alia*, (i) authority pursuant to §§364(c)(1), 364(c)(2) and 364(d)(1) of the United States Bankruptcy Code, 11 U.S.C. §§101-1330 (the "***Bankruptcy Code***"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 4001-1 of the Local Rules of the

United States Bankruptcy Court for the District of Oregon (the "***Local Rules***"), for the Debtor to obtain post-petition loans of up to $1,700,000 from Absorbent Acquisitions Inc., an Oregon corporation (**"AAI"** or, "***Lender***") secured by first priority security interests in and liens upon all of the Debtor's intellectual property and all proceeds thereof, whether now existing or hereafter acquired, pursuant to §§364(c)(2) and 364(d)(1) of the Bankruptcy Code, (ii) authority for the Debtor to enter into the Debtor in Possession Financing Agreement dated **[June 25, 2013]** between Lender and Debtor, a copy of which is attached hereto as Exhibit A (as amended by this Order, the "***AAI DIP Agreement***"), (iii) approval of the terms and conditions of the AAI DIP Agreement, and (iv) authority to grant Lender super-priority administrative claim status pursuant to §364(c)(1) of the Bankruptcy Code.  Upon the Motion, the files and pleadings in this case, the record of the proceedings heretofore held before this Court with respect to the Motion and upon completion of such hearing and after due deliberation and sufficient cause appearing therefor, the parties hereto stipulate and the Court hereby finds and concludes as follows:

A.      Each of the parties set forth below received due notice of the Motion pursuant to Bankruptcy Rules 4001(b)(1), (c)(1) and (d)(1) and 1007(d) and the Local Rules: (a) the Office of the United States Trustee; (b)  all parties in interest that have filed a Notice of Appearance in the Debtor's chapter 11 case, including the County of Linn, through its counsel; (c) all creditors known to the Debtor who may have liens against the Debtor's assets, including Joseph A. Nathan living trust ua dtd 12/30/1996, Joseph A. Nathan, trustee ("Nathan")  and United Phosphorus, Inc. ("UPI"); and (d) counsel to the Official Committee of Unsecured Creditors (the "**Committee**").

B.      The Debtor filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code on March 8, 2013 (the *"**Petition Date**"*) and has thereafter continued in the

management and possession of its business and properties as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

C.     The Debtor is currently operating under the terms of a Debtor In Possession Financing Agreement with two entities jointly extending credit to Debtor, Nathan and UPI, pursuant to an Order of this Court entered May 2, 2013 (Docket No. 89, the **"Second DIP Financing Order"**).  The Second DIP Financing Order provided for immediate payment in full of the outstanding balance of $66,260.85 due Nathan from Debtor under an earlier DIP Financing Order (the "First Order").  That balance due under the First Order was fully and timely satisfied from loans made to Debtor pursuant to the Second DIP Financing Order.  Authority to borrow under the Second DIP Financing Order expires on July 15, 2013.  Without the proposed financing, the Debtor will not have the funds necessary to timely pay in full on July 15, 2013 amounts owed Nathan and UPI under the Second DIP Financing Order (the "Second DIP Loan Repayment"), or pay lease and insurance obligations, post-petition payroll and other costs and administrative expenses necessary to manage and preserve its assets and properties for the period of July 15, 2013 through September 15, 2013 (the "Third DIP Loan Period").  In the absence of such loan, the Debtor will suffer immediate and irreparable harm.

D.     The Debtor has requested that the Lender make loans and advances to the Debtor in order to provide funds to be used by the Debtor to (i) make when due the Second DIP Loan Repayment in the sum of approximately $950,000, which amount Debtor represents is sufficient for such repayment; and (ii) pay the obligations set forth on the Budget attached hereto as Exhibit B (the **"Approved Expenses"**) which are necessary during the Third DIP Loan Period for Debtor to continue in business, remain a viable entity and reorganize under chapter 11 of the Bankruptcy Code.

E.      The Debtor is unable to obtain unsecured credit allowable under §503(b)(1) of the Bankruptcy Code, or pursuant to §§364(a) and (b) of the Bankruptcy Code, except on the terms and conditions set forth herein.

F.      No other source of financing exists for the Third DIP Loan Period other than from the Lender.  The terms of the AAI DIP Agreement between the Debtor and Lender pursuant to which the proposed financing will be provided to the Debtor by Lender have been negotiated in good faith and at arm's length as that term is used at §364(e) of the Bankruptcy Code and are in the best interests of the Debtor and its creditors, and this Order is subject to, and Lender is entitled to the benefits of, the provisions of §§363(m) and 364(e) of the Bankruptcy Code.

G.      The holders of pre-petition liens granted by the Debtor on the proceeds of the Debtors' intellectual property, but not on the intellectual property itself, do not hold perfected liens on any such proceeds, and accordingly are not entitled to any adequate protection on account of the liens granted to Lender pursuant to this Order.

H.      The ability of the Debtor to continue its business and maximize the value of its assets under chapter 11 of the Bankruptcy Code depends upon obtaining such financing from Lender and therefore immediate and irreparable harm to the Debtor and the Debtor's estate will result if the proposed financing is not obtained.  The relief granted by this Court pursuant to this Order is necessary to avoid such immediate and irreparable harm to the Debtor's estate.

I.      The consideration of this Motion constitutes a "core proceeding" pursuant to 28 U.S.C. §§157(b)(2)(A), (D), (G), (K), (M) and (O) and 1334, and this Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§157 and 1334.

J.      The notice of the Motion and hearing constitutes good and sufficient notice to the parties in interest pursuant to Bankruptcy Rules 2002, 4001(c) and (d) and 9014, the Local Rules and §102(1) of the Bankruptcy Code, as required by §§364(c) and (d) of the Bankruptcy Code, and no further notice of, or hearing on, the relief sought in the Motion is necessary or required.

K.      Lender is in the process of acquiring funds to allow it to make the loans contemplated in the AAI DIP Financing Agreement.  Acquisition of such funds is a precondition to any performance obligations of Lender under the AAI DIP Financing Agreement.

L.      Lender is also in the process of acquiring funds to purchase substantially all of the assets of Debtor pursuant to §363 of the Bankruptcy Code, to be consummated as soon as possible after July 15, 2013.

**THEREFORE, ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, THAT:**

1.      The Motion is granted on the terms set forth in this Order.  This Order is valid immediately and fully effective upon its entry.  (This Order may sometimes hereinafter be referred to as the "***Order***").

2.      From the date of the entry of this Order, the Debtor is hereby authorized and empowered to obtain post-petition loans and advances from Lender, throughout the Third DIP Loan Period, on and pursuant to the terms of this Order and the terms and conditions set forth in the AAI DIP Agreement as modified herein, in such amount or amounts as may be available thereunder (all post-petition obligations, liabilities and indebtedness owed by the Debtor to Lender of whatever kind or nature or description arising under or relating to the AAI DIP Agreement is referred to herein as the "***AAI DIP Indebtedness***"); provided, however, that the

outstanding principal balance of the AAI DIP Indebtedness shall not exceed $1,700,000. Amounts repaid on the AAI DIP Indebtedness from time to time shall not be available for re-borrowing (i.e., Lender is not extending a revolving credit facility).

3.      The Debtor shall be authorized to use the post-petition advances under the DIP Agreement only for payment of the Approved Expenses and subject to the terms and conditions set forth in the AAI DIP Agreement and this Order.  Lender's obligation to fund amounts under the AAI DIP Agreement is expressly conditioned on the Debtor's compliance with the terms and conditions of the AAI DIP Agreement and this Order and the absence of any pending Event of Default.  Any disbursement by the Debtor other than for Approved Expenses shall constitute an Event of Default under this Order unless Lender consents to those changes in writing.

4.      The Debtor is authorized and directed to execute, deliver, perform and comply with the terms and covenants of the AAI DIP Agreement.

5.      To secure the repayment the AAI DIP Indebtedness, Lender shall have, and the Debtor hereby grants to Lender, pursuant to sections 364(c)(2) and 364(d)(1), effective as of payment in full of Nathan and UPI pursuant to Paragraph 18 of the Second DIP Financing Order, a valid, binding, continuing and perfected first priority security interest in and lien on all of Debtor's interests in Intellectual Property Collateral (as defined in the DIP Agreement) and all proceeds thereof, whether now owned or hereafter acquired by Debtor (the "*Collateral*"), and not any of Debtor's other personal property (the "**AAI DIP Loan Lien**"); provided, however, that the AAI DIP Loan Lien shall be subject to the Carve-Out Expenses (as defined in paragraph 6 below).

6.      In addition to and without derogation of, the AAI DIP Loan Lien, the Lender also is hereby granted an allowed superpriority administrative expense claim in this bankruptcy case,

pursuant to 11 U.S.C. § 364(c)(1), with priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject only to the Carve-Out Expenses. "Carve-Out Expenses" means (i) all unpaid fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, (ii) all unpaid fees payable to the Clerk of the Court; and (iii) all allowed but unpaid Budgeted fees and expenses of any professionals for the Debtor and the Committee for services rendered prior to an Event of Default, plus up to $50,000 in the aggregate for allowed but unpaid fees and expenses of any professionals for the Debtor and the Committee incurred subsequent to an Event of Default, provided that the total amount of the Carve-Out Expenses under this clause (iii) shall not exceed $260,000 in the aggregate without the written consent of the Lender.

7.     This Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the Lender's security interests in and lien on the Collateral granted to Lender as set forth herein, without the necessity of filing, recording or serving any financing statements, mortgages or other documents which may otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the security interests and liens granted to Lender in this Order and the DIP Agreement.  Such security interests and liens granted to Lender shall be prior and senior to all security interests, liens, claims, and encumbrances of all other creditors in and to the Collateral and shall be subject only to the Carve-Out Expenses to the extent provided in paragraph 6 above.  If Lender shall, in its sole discretion, elect for any reason to file any such financing statements or other documents with respect to such security interests and liens, the Debtor is authorized and directed to execute, or cause to be executed, all such financing statements or other documents upon Lender's request and the filing, recording or service (as the case may be) of such financing statements or similar documents shall be deemed

to have been made at the time of and on the Petition Date.  Lender may, in its sole discretion, file a certified copy of this Order in any filing or recording office in any County or other jurisdiction in which the Debtor has real or personal property and, in such event, the subject filing or recording officer is authorized and directed to file or record such certified copy of this Order.

8.      The Debtor is hereby authorized and directed to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements in addition to the DIP Agreement as Lender may reasonably require as evidence of the DIP Indebtedness and for the protection of the Collateral, or which may be otherwise deemed necessary by Lender to effectuate the terms and conditions of this Order and the DIP Agreement.

9.      The automatic stay provisions of §362 of the Bankruptcy Code are vacated and modified only to the extent necessary to permit Lender to implement the financing of the Debtor and the provisions of this Order.

10.      The Debtor is authorized and directed to provide Lender, unless there is a written waiver by Lender in each instance, all of the documentation, reports, schedules, assignments, financial statements, insurance policies and endorsements, access, inspection, audits, information and other rights which the Debtor is required to provide to Lender under the AAI DIP Agreement.

11.      Nothing herein shall be construed as consent to the allowance of any fees and expenses of the professionals retained by the Debtor or the Committee, or shall affect the right of Lender or any other interested party to object to the allowance and payment of such fees and expenses.

12.      In the event of the occurrence of any of the following: (a) the failure of the Debtor to perform in any material respect any of its obligations pursuant to this Order; (b) the

occurrence of any "Event of Default" under the AAI DIP Agreement; (c) the termination or non-renewal of the AAI DIP Agreement, as provided for therein and in this Order; (d) the appointment of a trustee appointed pursuant to sections §1104(a)(1) or 1104(a)(2) of the Bankruptcy Code; (e) dismissal or conversion to chapter 7 of the Debtor's chapter 11 case; (f) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating or amending this Order; (g) the Debtor's filing, without the express written consent of Lender, of a motion requesting authority to incur indebtedness either (A) having administrative expense priority equal or superior to the administrative expense priority granted to Lender under this Order or (B) secured by a security interest or lien in the Collateral; (h) any party (including the Debtor) filing a motion or application for an order seeking to (i) revoke, reverse, stay the implementation of, modify, supplement or amend this Order, (ii) invalidate, raise defenses to, or otherwise challenge the extent, amount, validity, perfection, priority or enforceability of the security interests and liens of Lender in the Collateral (provided that the filing or prosecution of a motion or complaint to determine the existence and scope of D2 Polymer's interest, if any, in the Debtor's intellectual property shall not be an Event of Default), or (iii) sell, assign, lease, license or encumber any Collateral unless the DIP Obligations will be paid in full, in cash prior to or at the time of such sale, assignment, lease, license or encumbrance; (i) the filing of any proposed chapter 11 plan that does not provide for the payment in full, in cash, of the DIP Obligations on the effective date of such chapter 11 plan; (j) any party obtaining relief from the automatic stay with respect to any Collateral or any nonresidential real property lease of the Debtors (the foregoing being referred to in this Order, individually, as an "*Event of Default*" and, collectively, as "*Events of Default*"); then, unless such Event of Default is specifically waived in writing by Lender, the Lender may, at its election, by written notice to the Debtor, the United

States Trustee and counsel for the Committee (a "*Default Notice*"), immediately cease making loans to the Debtor under the AAI DIP Agreement, terminate the AAI DIP Agreement and declare all of the AAI DIP Indebtedness due and payable in full.

13.    Upon the payment in full of all DIP Indebtedness to Lender, or upon the termination of the AAI DIP Agreement, Lender shall have no further obligations pursuant to the terms of this Order and/or the AAI DIP Agreement.

14.    The provisions of this Order shall be binding upon the Debtor and its successors and assigns, including any chapter 7 or chapter 11 trustee or other fiduciary hereafter appointed as a legal representative of the Debtor or with respect to property of the estate of the Debtor, whether under chapter 11 of the Bankruptcy Code or in any subsequent chapter 7 case, and shall also be binding upon all creditors of the Debtor and other parties in interest.

15.    The AAI DIP Indebtedness may be used by Lender to "credit bid" for the assets and property of the Debtor as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether such sale is effectuated through section 363(b) and/or section 1129(b) of the Bankruptcy Code, or otherwise.

16.    If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect (a) the validity of any AAI DIP Indebtedness incurred by the Debtor to Lender prior to the effective date of such modification, vacation or stay, or (b) the validity or enforceability of Lender's security interest and lien in the Collateral, or the priority authorized or created hereby or pursuant to the AAI DIP Agreement, with respect to any AAI DIP Indebtedness incurred prior to the effective date of such modification, vacation or stay.  Notwithstanding any such modification, vacation or stay, any indebtedness, obligations or liabilities incurred by the Debtor to Lenders prior to the effective

date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Order, and Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein and pursuant to the AAI DIP Agreement with respect to all such indebtedness, obligations or liabilities.

17.     The AAI DIP Agreement is modified as set forth in this Order. Without limiting the scope of the immediately preceding sentence, the maturity date of the AAI DIP Indebtedness under the AAI DIP Agreement shall be September 15, 2013.  Anything herein to the contrary notwithstanding, Lender shall not be required to make any advances to Debtor while an Event of Default exists.  To the extent that the terms of the AAI DIP Agreement are in conflict with the terms and conditions of this Order, the terms and conditions of this Order shall control.

18.     Effective upon: (a) entry of this Order; and (b) the occurrence of Lender's financing contingencies that are conditions precedent to funding of the loans provided for under the AAI DIP Agreement: (i) Debtor shall  repay all advances made by Nathan and UPI to Debtor under the Debtor in Possession Financing Agreement approved under the Second DIP Financing Order; and (ii) neither the Debtor nor Nathan nor UPI shall have any further rights or obligations under the First Order or the Second DIP Financing Order, all of which shall be supplanted by the rights and obligations of the parties under this Order.

19.     Nothing contained in this Order shall be deemed to terminate, modify or release any obligations of the Debtor to Nathan with respect to any pre-petition indebtedness, obligation, or liability.

20.     The terms of this Order shall be valid and binding upon the Debtor, all creditors of the Debtor, and all other parties in interest from and after the date of this Order.

21.     Nothing contained herein shall affect or impair Nathan's right to seek adequate protection of his interests in any pre-petition collateral.

22.     Nothing contained herein shall: (a) be deemed to constitute or constitute a commitment by Lender to continue to make advances to the Debtor or to finance the Debtor's chapter 11 case beyond the Third DIP Loan Period; or (b) limit Lender's right to seek such other relief as to the Debtor, the Collateral or the Debtor's estate as may be otherwise provided in the Bankruptcy Code.

23.     The Debtor and Lender shall continue to negotiate in good faith for a sale of the assets of Debtor to Lender pursuant to §363 of the Bankruptcy Code on terms acceptable to the Debtor, the Lender and the Committee, to be consummated as soon as possible after July 15, 2013.

###

Presented by:

_____
Gary Underwood Scharff, OSB# 883031
Law Office of Gary Underwood Scharff
621 SW Morrison Street #1300
Portland, OR 97205
gs@scharfflaw.com
T: 503-493-4353
Attorneys for Debtor

Approved as to form:
Greene & Markley, P.C.


By_____
    David A. Foraker, OSB# 81228
Attorneys for Official Committee of Unsecured Creditors
cc:  ECF Participants and other parties noted in Paragraph A, above

# EXHIBIT A

# DEBTOR IN POSSESSION FINANCING AGREEMENT

This Debtor in Possession Financing Agreement (this "Agreement") is made and entered into as of June 21, 2013, by and between Absorbent Technologies, Inc., an Oregon corporation ("Debtor"), and Absorbent Acquisitions, Inc. ("AAI," referred to herein as "Lender").

## RECITALS

A.     Debtor filed a petition under Chapter 11 of the Bankruptcy Code on March 8, 2013 ("Petition Date"), in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court").  Debtor's bankruptcy case is administered under Case No. 13-31286 tmb11 (the "Bankruptcy Case").

B.     Debtor currently is unable to obtain the funds required to operate after the Petition Date other than by borrowing on the terms set forth in this Agreement. Lender is unwilling to lend to Debtor except on the terms of this Agreement.

C.     To operate its business or engage in an orderly sale of its assets, Debtor has an immediate need to borrow funds to finance the expenses set forth in the budget attached as *Exhibit B* and Debtor will suffer immediate and irreparable harm if it is not immediately permitted to borrow pursuant to the terms of this Agreement. Pending entry of a Bankruptcy Court order after not less than 14 days' notice as required by Federal Rule of Bankruptcy Procedure (FRBP) 4001(b), this Agreement is intended to allow Debtor to borrow only to the extent necessary to avoid immediate and irreparable harm to Debtor.

D. The parties now desire to set forth the conditions on which Lender will make postpetition Advances to Debtor.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties agree as follows:

## Article 1

## INCORPORATION OF RECITALS, DEFINITIONS,

## AND EXHIBITS

**1.1 Recitals**. The foregoing recitals are incorporated into this Agreement by this reference.

**1.2 Definitions**. Except as otherwise defined here or as the context requires otherwise, (a) capitalized terms used here shall have the meanings assigned to them in Appendix A and (b) all other terms will have the meanings, if any, given to them in the Bankruptcy Code.

**1.3 Exhibits**. The exhibits referred to in and attached to this Agreement are incorporated into this Agreement by this reference.

**Article 2**

**REPRESENTATIONS AND WARRANTIES**

To induce Lender to enter into this Agreement, Debtor makes the following representations, covenants, and warranties, which survive execution and delivery of this Agreement and are not affected or waived by any inspection or examination made by, or on behalf of, Lender:

(a) Debtor is a duly authorized and existing corporation in good standing in all states in which it transacts business. Debtor has been duly authorized to enter into this Agreement and to perform its obligations and covenants as stated here.

(b) Debtor has full power and legal capacity to execute, deliver, and perform the terms and provisions of this Agreement and all of the Loan Documents that it is required to execute, deliver, and perform by the terms of this Agreement.

(c) Executing, delivering, and performing this Agreement will not constitute a breach or default under any other agreement to which Debtor is a party or by which Debtor may be bound or affected, or a violation of any law, regulation, court order, or decree of any governmental department, commission, board, bureau, agency, or instrumentality, that may affect Debtor or the Intellectual Property Collateral.

(d) Debtor is not in default under any material provision of any applicable statute, rule, order, certificate, license, or regulation of any governmental authority having jurisdiction over it or its business operations.

(e) With the exception of the Bankruptcy Case and related Adversary Proceeding, *D2 Polymer Technologies, Inc. v. Absorbent Technologies, Inc.*, Case No. 13-03089 (the "Adversary Proceeding"), there are no actions, suits, or

proceedings pending or threatened against or affecting Debtor before any court or before any governmental or administrative body or agency that could have a material adverse effect on Debtor.

(f) Debtor has not proposed and will not propose to Lender any Budget that will not permit Debtor to make all expenditures necessary for Debtor to comply with all requirements of this Agreement, including Article 6.

(g) Debtor has not failed to disclose to Lender any material fact necessary to make the representations and warranties that are made, in light of the circumstances under which they are made, not misleading.

(h) Notwithstanding the allegations asserted by D2 Polymer Technologies in the Adversary Proceeding, Debtor contends that it owns the Intellectual Property Collateral, and upon entry of the Interim Approval Order the Intellectual Property Collateral will not be subject to any lien, security interest, encumbrance, license or other impairment that is senior to the liens granted to Lender.

## Article 3

## CONDITIONS PRECEDENT

Before Lender will be bound to the terms of this Agreement, or have any obligation to make any Advance to Debtor, the following conditions must have been fulfilled to Lender's satisfaction:

(a)  Lender shall have received capital sufficient to fund AAI and this Financing Agreement. AAI represents it continues to develop capitalization of the company and will undertake its best efforts to fund this DIP facility upon completion of such capitalization.

(b) An order in the form attached hereto as Exhibit A or otherwise satisfactory to the Lender, in its sole discretion, approving this Agreement after a preliminary or final hearing must be entered by the Bankruptcy Court (the **"Approval Order"**).

(c) Debtor and Lender must execute one or more financing statements with collateral description and all other Loan Documents required by this Agreement, all in form satisfactory to the Lender, in its sole discretion.

(d) The representations and warranties of Article 2 above must be true and correct.

(e)  No Default exists under this Agreement or under any of the Loan Documents.

## Article 4

## LOAN COMMITMENT

**4.1    Loan Agreement Advances.** Lender agrees, subject to the terms and conditions of, and relying upon the representations set forth in, this Agreement, and provided that no Event of Default then exists, to make postpetition Advances to Debtor in an aggregate principal amount not to exceed $1,700,000 (the "**Loan Commitment**"), on the schedule provided in Exhibit B. Notwithstanding anything in this Agreement to the contrary, no Advances will be made in the event of a failure of the condition precedent set forth in Article 3 (a) above. Notwithstanding anything in this Agreement to the contrary, Lender shall not be obligated to make Advances in excess of the principal amount of $1,700,000.

**4.2    DIP Note.**  All Advances under this Agreement may, at the election of Lender, be evidenced by one or more promissory notes in form satisfactory to Lender.  Separate notes for each Advance, however, will not be required and the amount reflected upon the records of Lender shall be conclusive as to the amount owing Lender from time to time, absent manifest error.

**4.3    Interest**.  All Advances under this Agreement shall bear simple interest at the rate of 8% per annum.

**4.4    Reimbursement of Expenses**. In addition to all Advances made by Lender under this Agreement, Debtor shall reimburse Lender for all costs, expenses and reasonable attorney fees incurred by Lender in connection with or arising out of the negotiation, documentation and administration of this Agreement and the Loan Documents, including all costs and expenses incurred by Lender following an Event of Default. All outstanding indebtedness under this Agreement, including accrued interest, fees, and expenses, shall be due in full upon the earlier to occur of: (a) an Event of Default; (b) the sale of substantially all of the Debtor's assets; (c) the sale or other disposition of any Intellectual Property; or (d) September 15, 2013.

**4.5 Court Approval**. Within one (1) business day of Lender's execution of this Agreement, Debtor shall file a motion for authorization to borrow pursuant to the terms of this Agreement and give notice of that motion, this Agreement, the proposed Interim Approval Order and the preliminary hearing on approval of this Agreement in accordance with FRBP 4001(d). Pending entry of a Bankruptcy Court order finally approving this Agreement ("<u>Final Hearing</u>"), but subject to the entry of

an Interim Approval Order in form satisfactory to Lender in its sole discretion approving this Agreement, Debtor may borrow $1,300,000 from Lender of which approximately $950,000 shall be used to repay amounts borrowed by Debtor from Nathan and UPI pursuant to an Order of this Court entered May 2, 2013 (Docket No. 89, the "Second DIP Financing Order")).

**4.6  Final Court Approval**. Debtor's authority to borrow from Lender continues after the Final Hearing concludes only if the Bankruptcy Court has entered an order finally approving this Agreement in form satisfactory to the Lender in its sole discretion (the **"Final Approval Order"**).   Each of the Interim Approval Order and the Final Approval Order is an "Approval Order."

**4.7 Use of Advances.** Advances made to Debtor under this Agreement shall be used and expended by Debtor exclusively to pay expenses provided for, and in the amounts set forth, in the Budget, provided that the actual expenditures for any single Budget line item in any week may exceed the budgeted amount by not more than 10%, provided further that the Debtor's actual aggregate expenditures for any week shall not exceed 5% of the Budgeted aggregate expenditures for that week.

**4.8 Fees of Counsel to the Debtor**. Any reference in the Budget to fees or costs of attorneys or other professional persons engaged by Debtor does not constitute authorization or consent by Lender to disbursement of any such sums, the subordination of Lender's security interests in the Intellectual Property to such fees or costs, or Lender's consent to recovery of those fees or costs by Debtor or any trustee  under Section 506(c).

**4.9 Termination of Authority to Borrow from Lender**. Debtor's authority to borrow from Lender expires when an Event of Default occurs or 11:59 p.m. on September 15, 2013 (the "Budget Termination Date"), whichever is earlier. Lender may consent in writing to Debtor's borrowing from Lender beyond the Budget Termination Date, in which case all provisions of this Agreement remain in full force and effect, except that the Budget Termination Date will be modified accordingly.

## Article 5

## ADEQUATE PROTECTION

**5.1 Adequate Protection**. Nothing in this Agreement bars Lender from seeking additional or different adequate protection or relief from the automatic stay

on the ground that Lender has not been afforded adequate protection with respect to any prepetition obligations owing by Debtor to Lender.

**5.2 Grant of Postpetition Lien**. To secure the payment and performance when due (whether at stated maturity, by acceleration or otherwise) any and all Advances and all other indebtedness, liabilities, or obligations of Debtor to Lender under this Agreement and the Loan Documents (the "DIP Indebtedness"), Debtor hereby grants to Lender a continuing first priority security interest in and lien ("Postpetition Lien") on all of Debtor's present and future right, title and interest in, to and under the following, whether now existing or hereafter acquired or arising (the "Intellectual Property Collateral"):

      (a)     Intellectual Property;

      (b)     IP Ancillary Rights;

      (c)     IP Licenses and other Contracts;

      (d)     Related Property; and

      (e)     Proceeds.

The Intellectual Property Collateral also includes all rights and interests developed or acquired by Debtor in any of the foregoing after the date of this Agreement ("After-Acquired Intellectual Property").

**5.3 Documentation**. The Postpetition Lien shall be a first priority security interest in and lien on all Intellectual Property Collateral pursuant to 11 U.S.C. §§ 364(c)(2) and 364(d)(1), and is attached and is perfected automatically by entry of the Bankruptcy Order approving this Agreement. Notwithstanding the automatic perfection of the Postpetition Lien, the Lender is authorized, but not required, to file or record financing statements, intellectual property filings, notices of lien or similar instruments in any jurisdiction, or take any other action in order to validate and perfect the Postpetition Lien. Whether or not the Lender shall, in its sole discretion, choose to file such financing statements, intellectual property filings, notices of lien or similar instruments, or otherwise confirm perfection of the liens and security interests granted to Lender under this Agreement, the Postpetition Lien shall be deemed valid, perfected, allowed, enforceable, unavoidable and not subject to challenge, dispute or subordination as of the date of entry of the Bankruptcy Order.  At Lender's request, Debtor shall promptly execute and deliver to Lender security agreements, financing statements, and any other

instruments or documents considered by Lender to be necessary or desirable to perfect the Postpetition Lien. The automatic stay of 11 USC §362(a) is modified to permit Lender to do all acts permitted or required by this Agreement.

**5.4 Allowed Superpriority Administrative Expense Claim.**  Any Interim Approval Order and Final Approval Order shall provide all of the DIP Indebtedness shall constitute an allowed superpriority administrative expense claim in this bankruptcy case, pursuant to 11 U.S.C. § 364(c)(1), with priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject only to the Carve-Out Expenses. "Carve-Out Expenses" means (i) all unpaid fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, (ii) all unpaid fees payable to the Clerk of the Court; and (iii) all allowed but unpaid Budgeted fees and expenses of any professionals for the Debtor and the Creditors Committee for services rendered prior to an Event of Default, plus up to $50,000 in the aggregate for allowed but unpaid fees and expenses of any professionals for the Debtor and any official committee of unsecured creditors appointed in the Bankruptcy Case incurred subsequent to an Event of Default, provided that the total amount of the Carve-Out Expenses under this clause (iii) shall not exceed $260,000 in the aggregate without the written consent of the Lender.

**5.5 No Waiver or Admission**. Nothing contained in this Agreement constitutes or causes a waiver of Lender's rights or the priority of Lender's liens and security interests in any prepetition property of the Debtor that is not Intellectual Property Collateral or a waiver of any right to adequate to protection of any such interest.

## Article 6

## COVENANTS

**6.1 Affirmative Covenants**. Debtor covenants that it shall:

(a) Maintain and preserve its corporate existence.

(b) Keep its books of account in accordance with generally accepted accounting principles, consistently applied, and reported on the basis of a fiscal year ending December 31, 2013.

(c) Provide to Lender at or before 12 noon on each Wednesday a report containing the following information:

(i) Cash income for the prior week and for the period since the Petition Date;

(ii) Cash expenditures by Budget line items for the prior week and for the time period since the Petition Date;

(iii) A comparison of actual weekly and cumulative income and expenditures by line item to Budgeted weekly and cumulative income and expenditures by line item;

(d) A copy of Debtor's check registers, showing all checks written by Debtor during the week ending on the preceding Friday and identifying each check listed in the register by check number, date, payee, amount, and Budget category; and

(e) A report in a form reasonably satisfactory to Lender identifying Debtor's actual collections from sales of assets, and expenditures related to such sales, for both the preceding week and the cumulative period of time since the Petition Date.

(f) Deliver to Lender on or before the tenth day of each month ending after the date of this Agreement an aged listing, by account debtor, of accounts receivable as of the last day of the prior month

(g) Deliver to Lender  no later than 10 days after the close of each month ending after the date of this Agreement, within 20 days after the close of each calendar quarter ending after the date of this Agreement, and within 30 days after the close of each fiscal year ending after the date of this Agreement, the following unaudited financial statements of Debtor compiled by Debtor's independent certified public accountants: balance sheet, income statement, statement of cash flows, and accounts payable and inventory listings as of the last day of the prior month and for the periods of the prior month, the fiscal quarter to the end of the prior month, and the fiscal year to the end of the prior month, all in reasonable detail and certified by Debtor to be true and correct.

(h) Provide to Lender at no charge copies of any audited financial statements that Debtor provides to any third party.

(i) Provide to Lender certificates of insurance and, if requested by Lender, copies of all insurance policies required by the Loan Documents, and maintain all insurance required by the Loan Documents in full force and effect.

(j) Allow Lender or its agents, representatives, or workers to enter Debtor's places of business at any reasonable time after prior written notice to Debtor for the

purpose of inspecting and copying any of Debtor's books and records, and for the purpose of performing any of the acts that Lender is authorized to perform under the terms of this Agreement.  Any such inspection will take place during ordinary business hours and will not unduly interfere with the operation of Debtor's business. Lender shall give Debtor reasonable notice before conducting an inspection. Twenty-four hours' notice is conclusively deemed to be reasonable. Lender's inspection rights are in addition to all of Lender's rights to inspect all secured assets under its security agreements with Debtor and otherwise.

(k) Deliver to Lender copies of all reports filed by Debtor or its affiliates with any governmental agency.

(m) With reasonable promptness, provide other information respecting the business, operations, and financial condition of Debtor or its affiliates as Lender may from time to time reasonably request.

(n) Maintain all material licenses and permits, and all related or other agreements, necessary for Debtor to operate its business, as may now exist or be modified or expanded.

(o) At all times comply with any and all material regulations, rules, or requirements of any federal agency or department and of any state, local, or municipal government, agency, or department that may at any time have jurisdiction or power to regulate, license, or grant permits in respect of the facilities or activities of Debtor, whether the regulations, rules, or requirements presently exist or are modified, promulgated, or implemented after the date of this Agreement.

(p) Keep its properties in good repair and in good working order and condition, in a manner consistent with past practices and comparable to industry standards; make from time to time all appropriate and proper repairs, renewals, replacements, additions, and improvements to the properties; and keep all equipment that may now or in the future be subject to compliance with standards or rules imposed by any governmental agency or authority, or state or local governments or instrumentalities, in full compliance with those standards or rules.

(q) Duly pay and discharge all lawful claims, whether for labor, materials, rentals, taxes, or anything else, that might or could, if unpaid, become a lien or charge on Debtor's property, unless and to the extent only that the validity of a claim, after written notice of the claim is given to Lender, is being contested in good faith and by appropriate proceedings. If Debtor contests any charge as allowed above,

Debtor must establish adequate reserves against possible liability with respect to the charge.

(r) Timely pay all of its employees, in accordance with its agreements with the employees and all applicable law, for services rendered after the Petition Date, and pay all payroll and other taxes imposed on Debtor with respect to its employees or otherwise that accrue after the Petition Date.

(s) Immediately advise Lender in writing of any Hazardous Materials Claim.

(t) At Debtor's sole cost and expense, keep and maintain its properties and each portion of its properties in compliance with, and not cause or permit its properties or any portion to be in violation of, any Hazardous Materials Laws.

(u) Promptly give written notice to Lender of any of the following:

(i) Any citation, order to show cause, or other legal process or order that could have a material adverse effect on Debtor, directing Debtor to become a party to or to appear at any proceeding or hearing by or before any governmental agency or instrumentality or any municipality or other agency or instrumentality that has granted Debtor a license, certificate of compliance, or permit, and include with the notice a copy of any citation, order to show cause, or other legal process or order. Debtor shall defend against any claims against it, at Debtor's expense.

(ii) Any (A) refusal or failure by any governmental agency or instrumentality to renew or extend any material license, certificate of compliance, or permit, or (B) proposed or actual revocation, termination, or modification (whether favorable or adverse) thereof, or (C) dispute or other action with respect thereto, or (D) denial or threatened denial or revocation or modification by any governmental agency or instrumentality of any material authorization required by law, or (E) notice from any governmental agency or instrumentality of the imposition of any material fines or penalties or forfeitures or (F) threats or notice with respect to any of the foregoing or with respect to any proceeding or hearing that might result in any of the foregoing.

(iii) Any dispute concerning, or any threatened nonrenewal or modification of, any material lease for real or personal property to which Debtor is a party.

(iv) Any postpetition actions, proceedings, or claims of which Debtor may have notice, that may be commenced or asserted against Debtor in which the amount involved is $50,000 or more, and that is not fully covered by insurance or that, if not solely a claim for monetary damages, could, if adversely determined, have a material adverse effect on Debtor.

(v) Promptly notify Lender if Debtor becomes aware of a Default or Event of Default hereunder.

(w) Notify Lender of any written offers to purchase Debtor's assets out of the ordinary course of business.

(x) Provide Lender with copies of all pleadings filed in this case, except proofs of claim, that do not evidence service on Lender or its counsel.

(y) Meet with Lender on reasonable notice, at reasonable times, and at reasonable intervals to inform Lender of the status of the Bankruptcy Case.

(z) Upon Lender's demand, duly execute and deliver, or cause to be duly executed and delivered, to Lender other instruments, agreements, and documents and do or cause to be done other acts that may be necessary or proper in the reasonable opinion of Lender to carry out more effectively the provisions and purpose of this Agreement.

(aa) In good faith answer and defend against the complaint filed by D2 Polymer Technologies, Inc. against ATI in the Bankruptcy Court on April 24, 2013 (Adversary Proceeding Number 13-03089-tmb).

**6.2 Negative Covenants**. Debtor covenants that, as long as this Agreement is in effect, and until all Advances and other obligations and indebtedness owing Lender under this Agreement are paid or satisfied in full, Debtor shall not:

(a) Without the prior written consent of Lender, obtain credit.

(b) Employ any Person when it will be unable to timely pay the Person the required compensation or any taxes.

(c) Cause or permit the Intellectual Property to be subject to any lien, encumbrance, license, assignment or other transfer or impairment of any kind.

(d) Without the prior written consent of Lender, enter into any transaction, other than on terms reasonably believed to be at least as favorable as those that could be obtained from an unrelated party, in which an affiliate of Debtor has any interest, or make any payment or agree to make any payment to any such affiliate, or transfer or agree to transfer ownership or possession of any of its business or assets, tangible or intangible, real, personal, or mixed, to any affiliate.

(e) Without the prior written consent of Lender, lend money, make credit available (other than in the ordinary course of business to customers), or lend property or the use of property to any Person, or purchase or repurchase the stock or indebtedness, or all or a substantial part of the assets or properties, of any Person, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly or by any instrument having the effect of assuring any Person's payment or performance or capability) the indebtedness, performance, obligations, stock, or dividends of any Person, or agree to do any of the foregoing, except the endorsement of negotiable instruments for deposit or collection in the ordinary course of business.

(f) Without the prior written consent of Lender, invest in (by capital contribution or otherwise) or acquire or purchase or make any commitment to purchase the obligation or stock or equity of any Person except (i) the purchase of direct obligations of the government of the United States of America or any agency or instrumentality thereof, (ii) interest-bearing certificates of deposit or repurchase agreements issued by any commercial banking institution satisfactory to Lender, (iii) stock or obligations issued in settlement of Debtor's claims against others by reason of bankruptcy or a composition or readjustment of debt or reorganization of any debtor of Debtor.

(g) Without the prior written consent of Lender, enter into any business that is substantially different from and/or not connected with the businesses in which Debtor is presently engaged, or make any substantial change in the nature of its businesses or operations.

(h) Without the prior written consent of Lender, change the chief executive office of Debtor if the effect of the change in location would adversely affect Lender's security interest in  the Intellectual Property without (i) prior written notice to Lender, and (ii) executing, delivering, and filing (and paying filing fees and taxes) all documents as may be necessary or advisable in Lender's opinion to continue to perfect and protect the liens and security interests in the  Intellectual Property.

(i) Without the prior written consent of Lender, enter into any agreement (other than employment agreements) with any Person that confers on the Person the right or authority to control or direct a major portion of the business or assets of Debtor.

(j) Permit its properties or any portion of them to be a site for the storage, use, generation, manufacture, disposal, or transportation of Hazardous Materials.

(k) Permit any Hazardous Materials that were owned or generated by Debtor to be disposed of off their properties other than in properly licensed disposal sites.

(l)  Without the prior written consent of Lender, enter into any settlement or compromise of any adversary proceeding, contested matter or other dispute involving the Intellectual Property.

## Article 7

## EVENTS OF DEFAULT

**7.1 Events of Default**. Time is of the essence in this Agreement and the Loan Documents. The occurrence of any one or more of the following constitutes an Event of Default under this Agreement and the Loan Documents:

(a)    If Debtor fails to perform any of its obligations under, or to comply with any of the terms, conditions, and covenants that are contained in, this Agreement, or any other Loan Document or other agreement, document, or instrument that Debtor has given or in the future gives to Lender to evidence or secure any obligation or indebtedness of Debtor to Lender.

(b)    If any statement, warranty, or representation that Debtor makes in this Agreement or any statement, warranty, or representation that Debtor or any third party has made or in the future makes in any other Loan Document, certificate, report, or other document, instrument, or agreement that is delivered under this Agreement or in connection with any obligation or indebtedness of Debtor to Lender, is false or inaccurate in any material respect when made.

(c)    Subject to resolution of the Adversary Proceeding, if this Agreement shall for any reason shall fail to create a valid and perfected first priority security interest in the Intellectual Property, or if such security interest shall fail to remain in full force and effect, or if any action is taken to discontinue or to assert the invalidity or unenforceability of this Agreement, or Lender's security interest in the Intellectual Property.

(d)      Any one of the following is timely filed: (i) notice of appeal of the Interim Approval Order or the Final Approval Order, (ii) motion for leave to appeal any Approval Order, (iii) motion to extend the time to file a notice of appeal or motion for leave to appeal any Approval Order, or (iv) motion to alter or amend any Approval Order, whether or not the Approval Order is stayed.

(e)      Custody or control of any substantial part of Debtor's property is assumed by any governmental agency or authority or any court of competent jurisdiction at the insistence of any governmental agency or authority, or any governmental regulatory agency or authority takes any final action that would have a material adverse effect on Debtor.

(f)      Any governmental agency or instrumentality refuses or fails to issue, renew, or extend any lease, license, contract, certificate of compliance, or permit with respect to the operation of Debtor's business, or any governmental agency or instrumentality denies, forfeits, or revokes any license, permit, or authorization required by law, and the government action could have a material adverse effect on Debtor.

(g)      If, in Lender's sole judgment and discretion, any event occurs that has a material adverse effect on Debtor's business or financial condition, or that materially increases Lender's risk.

(h)      Debtor's authority to borrow from Lender terminates or expires.

(i)      The Bankruptcy Court announces from the bench or enters any order or judgment holding any material provision of this Agreement invalid or unenforceable.

(j)      The Bankruptcy Court announces from the bench or enters any order dismissing the Bankruptcy Case or converting that case to a Chapter 7 case, or Debtor files a motion to convert that case to a Chapter 7 case.

(k)      Debtor fails to make when due any payment required under this Agreement.

(o)  A Final Approval Order, substantially in the form of the Interim Approval Order attached hereto as Exhibit A and otherwise in form and content acceptable to Lender in its absolute discretion, has not been entered by the Bankruptcy Court on or before July 15, 2013.

(p)  Judgment is entered against ATI on any count of the complaint filed by D2 Polymer Technologies, Inc. against ATI in the Bankruptcy Court on April 24, 2013 (Adversary Proceeding Number 13-03089-tmb).

**7.2   Remedies on Default**. If an Event of Default occurs, Debtor's authority to borrow from Lender shall automatically terminate without notice from Lender and Lender shall have the absolute right to refuse to disburse any funds hereunder. At their option and election and in their sole discretion, Lender may exercise alternatively or cumulatively any or all of the rights, privileges or remedies available to Lender at law or in equity, including as may be provided by the Uniform Commercial Code and any other applicable law. All rights and remedies given by this Agreement and the other Loan Documents are cumulative and not exclusive of any other rights or remedies available to Lender, and no course of dealing between Debtor and Lender or any delay or omission in exercising any right or remedy operates as a waiver of any right or remedy, and every right and remedy may be exercised from time to time and as often as is deemed appropriate by Lender.

## Article 8

## (Intentionally Omitted)

## Article 9

## MISCELLANEOUS

**9.1   Waiver and Estoppel**. Lender may at any time and from time to time waive in writing any one or more of the terms and/or conditions contained in this Agreement, but any waiver will be deemed to be made pursuant to this Agreement and not in modification of it, and any such waiver in any instance, or under any particular circumstances, will not be construed as a waiver of the condition or of any subsequent Default or Event of Default. No such waiver shall be effective unless provided in writing by Lender.  Lender's failure to promptly exercise their rights or remedies will not be deemed to be a waiver or grounds for the claim of estoppel.

**9.2 Conflict**. The terms and conditions of this Agreement and of the Loan Documents are intended to complement and supplement each other, and are to be construed as consistent and complementary. If the terms or conditions of the Loan Documents conflict with the terms and conditions of this Agreement, the terms and conditions of this Agreement control.

**9.3 Captions**. The captions and headings are merely for convenience and are not a substantive part of this Agreement.

**9.4 Complete and Final Agreement**. This Agreement and the Loan Documents are the complete and final agreement of the parties, and no provision can or will be waived or modified by conduct or oral agreement either before or after this Agreement is executed.

**9.5 Governing Law**. The rights, duties, liabilities, and obligations of the parties under this Agreement will be construed and governed by and under the laws of the State of Oregon, excluding principles of conflict of laws.

**9.6 Notices**. All notices, requests, consents, demands, approvals, and other communications under this Agreement are deemed to have been duly given, made, or served if in writing and delivered personally or mailed by first-class mail, postage prepaid, or sent via fax or electronic mail, to the respective parties to this Agreement as follows:

(a) If to Debtor:    Absorbent Technologies, Inc.
8705 SW Nimbus Avenue, Suite 230
Beaverton, OR 97008
Attn:  David Moffenbeier
Fax: 503-699-3026
Email: dmoffenbeier@zeba.com

with a copy to:    Gary Underwood Scharff, Esq.
1300 American Bank Building
621 SW Morrison Street
Portland, OR 97205
Email: gs@scharfflaw.com

(b) If to Lender:    Absorbent Acquisitions Inc.
**[PHYSICAL ADDRESS AND CONTACT FOR AAI]**

with a copy to:    Michael C. Walch
Attorney at Law
Zions Bank Building
10 East South Temple, Suite 900
Salt Lake City, Utah 84133
Email: mcwalch@cnmlaw.com

The designation of the Persons to be notified or the address of such Persons for the purposes of notice may be changed from time to time by similar notice in writing,

except that any communication regarding a change of address is deemed to be given or made when received by the party to whom the communication was sent.

**9.8 Further Assurances**. At any time and from time to time, on the reasonable request of Lender, the parties shall promptly execute and deliver further instruments and documents and take further actions as Lender may reasonably request to obtain or preserve the full benefits of this Agreement and the rights and powers granted in the Agreement and granted in the Loan Documents.

**9.9 Severability**. If any provision of this Agreement is held to be invalid or unenforceable, all other provisions nevertheless continue in full force and effect.

**9.10 Counterparts**. This Agreement may be executed in one or more counterparts, each of which will constitute an original. Faxed signatures will serve as original signatures for purposes of evidencing an intent to be bound by the terms of this Agreement. The parties shall exchange original executed signature pages to Lender on or before July 2, 2013.

**9.11 Notice**.

UNDER OREGON LAW, MOST AGREEMENTS, PROMISES, AND COMMITMENTS MADE BY LENDER CONCERNING LOANS AND OTHER CREDIT EXTENSIONS THAT ARE NOT FOR PERSONAL, FAMILY, OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY THE BORROWER'S RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION, AND BE SIGNED BY LENDER TO BE ENFORCEABLE.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement on the date first written above.

DEBTOR:

ABSORBENT TECHNOLOGIES, INC.

_____

By
Name:  David C. Moffenbeier
Title:  Chief Executive Officer

LENDER:

ABSRBENT ACQUISITIONS, INC.
_____

By
Name: _____
Title: _____

# APPENDIX A

## DEFINITIONS

As used in this Agreement, the following terms have the meanings set forth below:

"Advance(s)" shall mean each borrowing by Debtor pursuant to the terms of this Agreement.

"Agreement" means this debtor in possession financing agreement.

"Approval Order" has the meaning set forth in Section 4.6 of this Agreement.

"Bankruptcy Case" means Debtor's Chapter 11 Bankruptcy case pending in the Bankruptcy Court under Case No. 13-31286tmb11.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Oregon.

"Budget" means the budget attached as Exhibit A.  "Budget Termination Date" has the meaning set forth in Section 4.9 of this Agreement.

"Budgeted" means an income or expense item set forth in a Budget.

"Budgeted Item" means a Rejected Item that was given in payment of an expense that, if paid, would not cause Debtor to exceed its line-item expenditure authority under the Budget.

"Business Day" means any day except a Saturday, Sunday, or other day on which national Lenders in the state of Oregon are authorized or required by law to close.

"Contracts" means all contracts, leases, licenses, undertakings, franchise agreements or other agreements, whether oral or in written or electronic form,

including but not limited to contracts related in any way to any Intellectual Property, and all rights of Debtor under any of the foregoing.

"Copyright Office" means the U.S. Copyright Office.

"Copyrights" means any (a) copyrights, whether registered or unregistered, (b) copyright registrations or applications in any IP Filing Office, (c) continuations, renewals, or extensions thereof, and (d) IP Ancillary Rights related to any of the foregoing.

"Debtor" means Absorbent Technologies, Inc., an Oregon corporation.

"Default" means any condition or event that constitutes an Event of Default, or that with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Event of Default" means any of the events described in Section 7.1 of this Agreement.

"Final Hearing" has the meaning set forth in Section 4.5 of this Agreement.

"Hazardous Materials" means any oil or petrochemical products, PCBs, asbestos, urea formaldehyde, flammable explosives, radioactive materials, hazardous wastes, toxic substances, or related materials, including, without limitation, any substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," or "toxic substances" under any applicable federal or state laws or regulations.

"Hazardous Materials Claim" means (1) any and all enforcement, cleanup, removal, or other governmental or regulatory actions instituted, completed, or threatened pursuant to any applicable Hazardous Materials Laws; and (2) any and all claims made or threatened by any third party against Debtor or the property of either of them relating to damage, contribution, cost recovery, compensation, loss, or injury resulting from any Hazardous Materials.

"Hazardous Materials Laws" means all federal, state, or local laws, ordinances, regulations, orders, and directives pertaining to Hazardous Materials.
"Indebtedness" means all items that, in accordance with generally accepted accounting principles, would be included in determining total liabilities as shown on the liabilities side of the balance sheet as of the date that "Indebtedness" is to be determined and, in any event, includes liabilities secured by any mortgage, deed of

trust, pledge, lien, or security interest on property owned or acquired, whether or not such a liability has been assumed, and the guaranties, endorsements (other than for collection in the ordinary course of business), and other contingent obligations in respect of the obligations of other Persons.

"Intellectual Property" means all Patents, Copyrights, Trademarks and other intellectual property, whether or not embodied in any tangible medium, including licenses, know-how, trade secrets, customer and supplier lists, proprietary information, inventions, methods, process, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the right to limit the use or disclose thereof by any person or entity, pricing and cost information, business and marketing plans and proposals, consulting agreements, engineering contracts and such other assets which relate to such goodwill.

"IP Ancillary Rights" means, with respect to any other Intellectual Property, as applicable, (a) all rights to royalties, revenues, income or other payments related to such Intellectual Property, arising or payable at any time, under IP Licenses or otherwise, (b) all rights to enforce, collect or perform any Contracts related to such Intellectual Property, (c) all causes of action and rights to claim, sue for or collect damages for, or enjoin or obtain other legal or equitable relief for, any past, present or future infringement, misappropriation, dilution, violation, unfair competition, or other impairment (whether past, present or future) of such Intellectual Property, and (d) all rights to obtain any of the foregoing.

 "IP Filing Office" means the PTO (for Patents and Trademarks), the Copyright Office (for Copyrights), or any similar office or agency in any Jurisdiction.

"IP License" means any Contract in which Debtor directly or indirectly grants or is granted  a license or other right, whether exclusive or non-exclusive, (i) to use or develop any Intellectual Property, (ii) to receive royalties, revenues, income or other payment related to any Intellectual Property, or (iii) to exercise any other right with respect to any Intellectual Property.

 "Loan Commitment" means $1.7 million.

"Loan Documents" means this Agreement, and all other agreements, instruments, and documents arising out of or relating to Debtor's Indebtedness to Lender, as well as all renewals and modifications thereof.

"Loans" means the loans by Lender to Debtor.

"Patents" means any (a) letters patent of the United States or any other
Jurisdiction, (b) patent applications, petty patents, patents of addition and other
filings in any IP Filing Office, (c) continuations, continuations-in-part, renewals,
divisions, extensions and reexaminations thereof and (d) IP Ancillary Rights related
to any of the foregoing.

 "Person" means any individual, partnership, joint venture, firm, corporation,
association, trust, or other enterprise, or any government or political subdivision or
agency, department, or instrumentality thereof.

"Petition Date" has the meaning set forth in Recital A of the Agreement.

"Postpetition Lien" means the security interest and lien granted by Section 5.2 of
this Agreement.

"Proceeds" means whatever is receivable or received from or upon the sale, lease,
license, collection, use, assignment, exchange or other disposition, whether
voluntary or involuntary, of any Intellectual Property Collateral, including
"proceeds" as defined in UCC Section 9-102(a)(64) and, including (i) any accounts,
chattel paper, instruments, general intangibles, cash and other proceeds payable in
respect of any of the Intellectual Property Collateral, (ii) any proceeds of any
insurance, indemnity, warranty or guaranty payable with respect to any of the
Intellectual Property Collateral, (iii) any and all claims and payments (in any form
whatsoever) made or due and payable in connection with any requisition,
confiscation, condemnation, seizure or forfeiture of all or any part of the Intellectual
Property Collateral by any Person acting under color of governmental authority, and
(iv) any and all other amounts paid or payable under or in connection with any of
the Intellectual Property Collateral or for or on account of any damage or injury to
or conversion of any Intellectual Property Collateral by any Person.

"Property" means all the real and personal property of Debtor acquired either
before or after the Petition Date, tangible or intangible, including, but not limited to,
all land, buildings, fixtures, trade fixtures, accounts, contract rights, general
intangibles, rights to payment of every kind, including rights to tax refunds,
equipment, fixtures, trade fixtures, motor vehicles, goods, machinery, inventory,
farm products, chattel paper, leases, conditional sale agreements, cash, deposit
accounts, notes, documents, documents of title, instruments, securities, shares of
capital stock, capital equities, and other securities of and claims against any
corporation, joint venture, or partnership, pledges and agreements to pledge, rights
in and claims under insurance policies, letters of credit, trademarks, trade names,
trade styles, licenses, customer lists, goodwill, instruments, bills of lading,

warehouse receipts and trust receipts, and all renewals, replacements, substitutions, additions, accessions, rents, profits, issues, products, and proceeds (whether due to voluntary or involuntary disposition) of the foregoing, all whether now owned or hereafter acquired. "Property" includes proceeds, products, rents, and profits of Intellectual Property Collateral acquired by Debtor after the Petition Date, including, but not limited to, all funds hereafter deposited into the Cash Collateral Account or advanced to the Operating Account. "Property" does not include any avoidance or recovery powers of Debtor or any trustee under Bankruptcy Code Chapter 5.

"PTO" means the U.S. Patent and Trademark Office.

"Related Property" means, with respect to any Intellectual Property, (i) all accounts, deposit accounts, general intangibles, instruments, investment property and other personal property at any time constituting, evidencing or arising under or with respect to such Intellectual Property, (ii) all substitutions and replacements for any of the foregoing, and (iii) all Debtor's books, records, information and data with respect to any of the foregoing.

"Reporting Requirements" means the requirements of Section 6.1(c) of this Agreement.

"Trademarks" means (a) any marks, whether or not registered, including trademarks, service marks, trade names, corporate names, company names, business names, trade styles, designs, logos, colors, sounds, trade dress, and any other source identifiers, (b) the goodwill of the business symbolized by or associated with the foregoing, (c) any trademark registrations, applications and other filings in any IP Filing Office, and (d) IP Ancillary Rights related to any of the foregoing.

"UPI" means United Phosphorous Inc.

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF OREGON**

In re:

**Absorbent Technologies, Inc.,**

        Debtor.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)□

Case No.:  13-31286-tmb11

Chapter 11

**THIRD ORDER (A) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(d)(1) AND 364(e); (B) GRANTING POSTPETITION LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; AND (C) AUTHORIZING DEBTOR TO ENTER INTO  POSTPETITION LENDING AGREEMENT ($1,700,000)**

**[PROPOSED]**

Upon the Motion of Absorbent Technologies, Inc., debtor and debtor-in-possession (the "***Debtor***"), dated June 25, 2013 (Docket No. __, the "***Motion***"), seeking, *inter alia*, (i) authority pursuant to §§364(c)(1), 364(c)(2) and 364(d)(1) of the United States Bankruptcy Code, 11 U.S.C. §§101-1330 (the "***Bankruptcy Code***"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 4001-1 of the Local Rules of the

United States Bankruptcy Court for the District of Oregon (the "***Local Rules***"), for the Debtor to obtain post-petition loans of up to $1,700,000 from Absorbent Acquisitions Inc., an Oregon corporation (**"AAI"** or, "***Lender***") secured by first priority security interests in and liens upon all of the Debtor's intellectual property and all proceeds thereof, whether now existing or hereafter acquired, pursuant to §§364(c)(2) and 364(d)(1) of the Bankruptcy Code, (ii) authority for the Debtor to enter into the Debtor in Possession Financing Agreement dated **[June 25, 2013]** between Lender and Debtor, a copy of which is attached hereto as Exhibit A (as amended by this Order, the "***AAI DIP Agreement***"), (iii) approval of the terms and conditions of the AAI DIP Agreement, and (iv) authority to grant Lender super-priority administrative claim status pursuant to §364(c)(1) of the Bankruptcy Code.  Upon the Motion, the files and pleadings in this case, the record of the proceedings heretofore held before this Court with respect to the Motion and upon completion of such hearing and after due deliberation and sufficient cause appearing therefor, the parties hereto stipulate and the Court hereby finds and concludes as follows:

A.    Each of the parties set forth below received due notice of the Motion pursuant to Bankruptcy Rules 4001(b)(1), (c)(1) and (d)(1) and 1007(d) and the Local Rules: (a) the Office of the United States Trustee; (b)  all parties in interest that have filed a Notice of Appearance in the Debtor's chapter 11 case, including the County of Linn, through its counsel; (c) all creditors known to the Debtor who may have liens against the Debtor's assets, including Joseph A. Nathan living trust ua dtd 12/30/1996, Joseph A. Nathan, trustee ("Nathan")  and United Phosphorus, Inc. ("UPI"); and (d) counsel to the Official Committee of Unsecured Creditors (the "**Committee**").

B.    The Debtor filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code on March 8, 2013 (the *"**Petition Date**"*) and has thereafter continued in the

management and possession of its business and properties as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

C.  The Debtor is currently operating under the terms of a Debtor In Possession Financing Agreement with two entities jointly extending credit to Debtor, Nathan and UPI, pursuant to an Order of this Court entered May 2, 2013 (Docket No. 89, the ***Second DIP Financing Order***).  The Second DIP Financing Order provided for immediate payment in full of the outstanding balance of $66,260.85 due Nathan from Debtor under an earlier DIP Financing Order (the "First Order").  That balance due under the First Order was fully and timely satisfied from loans made to Debtor pursuant to the Second DIP Financing Order.  Authority to borrow under the Second DIP Financing Order expires on July 15, 2013.  Without the proposed financing, the Debtor will not have the funds necessary to timely pay in full on July 15, 2013 amounts owed Nathan and UPI under the Second DIP Financing Order (the "Second DIP Loan Repayment"), or pay lease and insurance obligations, post-petition payroll and other costs and administrative expenses necessary to manage and preserve its assets and properties for the period of July 15, 2013 through September 15, 2013 (the "Third DIP Loan Period").  In the absence of such loan, the Debtor will suffer immediate and irreparable harm.

D.  The Debtor has requested that the Lender make loans and advances to the Debtor in order to provide funds to be used by the Debtor to (i) make when due the Second DIP Loan Repayment in the sum of approximately $950,000, which amount Debtor represents is sufficient for such repayment; and (ii) pay the obligations set forth on the Budget attached hereto as Exhibit B (the ***Approved Expenses***) which are necessary during the Third DIP Loan Period for Debtor to continue in business, remain a viable entity and reorganize under chapter 11 of the Bankruptcy Code.

E.      The Debtor is unable to obtain unsecured credit allowable under §503(b)(1) of the Bankruptcy Code, or pursuant to §§364(a) and (b) of the Bankruptcy Code, except on the terms and conditions set forth herein.

F.      No other source of financing exists for the Third DIP Loan Period other than from the Lender.  The terms of the AAI DIP Agreement between the Debtor and Lender pursuant to which the proposed financing will be provided to the Debtor by Lender have been negotiated in good faith and at arm's length as that term is used at §364(e) of the Bankruptcy Code and are in the best interests of the Debtor and its creditors, and this Order is subject to, and Lender is entitled to the benefits of, the provisions of §§363(m) and 364(e) of the Bankruptcy Code.

G.      The holders of pre-petition liens granted by the Debtor on the proceeds of the Debtors' intellectual property, but not on the intellectual property itself, do not hold perfected liens on any such proceeds, and accordingly are not entitled to any adequate protection on account of the liens granted to Lender pursuant to this Order.

H.      The ability of the Debtor to continue its business and maximize the value of its assets under chapter 11 of the Bankruptcy Code depends upon obtaining such financing from Lender and therefore immediate and irreparable harm to the Debtor and the Debtor's estate will result if the proposed financing is not obtained.  The relief granted by this Court pursuant to this Order is necessary to avoid such immediate and irreparable harm to the Debtor's estate.

I.      The consideration of this Motion constitutes a "core proceeding" pursuant to 28 U.S.C. §§157(b)(2)(A), (D), (G), (K), (M) and (O) and 1334, and this Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§157 and 1334.

J.      The notice of the Motion and hearing constitutes good and sufficient notice to the parties in interest pursuant to Bankruptcy Rules 2002, 4001(c) and (d) and 9014, the Local Rules and §102(1) of the Bankruptcy Code, as required by §§364(c) and (d) of the Bankruptcy Code, and no further notice of, or hearing on, the relief sought in the Motion is necessary or required.

K.      Lender is in the process of acquiring funds to allow it to make the loans contemplated in the AAI DIP Financing Agreement.  Acquisition of such funds is a precondition to any performance obligations of Lender under the AAI DIP Financing Agreement.

L.      Lender is also in the process of acquiring funds to purchase substantially all of the assets of Debtor pursuant to §363 of the Bankruptcy Code, to be consummated as soon as possible after July 15, 2013.


**THEREFORE, ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, THAT:**

1.      The Motion is granted on the terms set forth in this Order.  This Order is valid immediately and fully effective upon its entry.  (This Order may sometimes hereinafter be referred to as the "***Order***").

2.      From the date of the entry of this Order, the Debtor is hereby authorized and empowered to obtain post-petition loans and advances from Lender, throughout the Third DIP Loan Period, on and pursuant to the terms of this Order and the terms and conditions set forth in the AAI DIP Agreement as modified herein, in such amount or amounts as may be available thereunder (all post-petition obligations, liabilities and indebtedness owed by the Debtor to Lender of whatever kind or nature or description arising under or relating to the AAI DIP Agreement is referred to herein as the "***AAI DIP Indebtedness***"); provided, however, that the

outstanding principal balance of the AAI DIP Indebtedness shall not exceed $1,700,000. Amounts repaid on the AAI DIP Indebtedness from time to time shall not be available for re-borrowing (i.e., Lender is not extending a revolving credit facility).

3.     The Debtor shall be authorized to use the post-petition advances under the DIP Agreement only for payment of the Approved Expenses and subject to the terms and conditions set forth in the AAI DIP Agreement and this Order.  Lender's obligation to fund amounts under the AAI DIP Agreement is expressly conditioned on the Debtor's compliance with the terms and conditions of the AAI DIP Agreement and this Order and the absence of any pending Event of Default.  Any disbursement by the Debtor other than for Approved Expenses shall constitute an Event of Default under this Order unless Lender consents to those changes in writing.

4.     The Debtor is authorized and directed to execute, deliver, perform and comply with the terms and covenants of the AAI DIP Agreement.

5.     To secure the repayment the AAI DIP Indebtedness, Lender shall have, and the Debtor hereby grants to Lender, pursuant to sections 364(c)(2) and 364(d)(1), effective as of payment in full of Nathan and UPI pursuant to Paragraph 18 of the Second DIP Financing Order, a valid, binding, continuing and perfected first priority security interest in and lien on all of Debtor's interests in Intellectual Property Collateral (as defined in the DIP Agreement) and all proceeds thereof, whether now owned or hereafter acquired by Debtor (the "*Collateral*"), and not any of Debtor's other personal property (the "**AAI DIP Loan Lien**"); provided, however, that the AAI DIP Loan Lien shall be subject to the Carve-Out Expenses (as defined in paragraph 6 below).

6.     In addition to and without derogation of, the AAI DIP Loan Lien, the Lender also is hereby granted an allowed superpriority administrative expense claim in this bankruptcy case,

pursuant to 11 U.S.C. § 364(c)(1), with priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject only to the Carve-Out Expenses. "Carve-Out Expenses" means (i) all unpaid fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, (ii) all unpaid fees payable to the Clerk of the Court; and (iii) all allowed but unpaid Budgeted fees and expenses of any professionals for the Debtor and the Committee for services rendered prior to an Event of Default, plus up to $50,000 in the aggregate for allowed but unpaid fees and expenses of any professionals for the Debtor and the Committee incurred subsequent to an Event of Default, provided that the total amount of the Carve-Out Expenses under this clause (iii) shall not exceed $260,000 in the aggregate without the written consent of the Lender.

7.    This Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the Lender's security interests in and lien on the Collateral granted to Lender as set forth herein, without the necessity of filing, recording or serving any financing statements, mortgages or other documents which may otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the security interests and liens granted to Lender in this Order and the DIP Agreement.  Such security interests and liens granted to Lender shall be prior and senior to all security interests, liens, claims, and encumbrances of all other creditors in and to the Collateral and shall be subject only to the Carve-Out Expenses to the extent provided in paragraph 6 above.  If Lender shall, in its sole discretion, elect for any reason to file any such financing statements or other documents with respect to such security interests and liens, the Debtor is authorized and directed to execute, or cause to be executed, all such financing statements or other documents upon Lender's request and the filing, recording or service (as the case may be) of such financing statements or similar documents shall be deemed

to have been made at the time of and on the Petition Date.  Lender may, in its sole discretion, file a certified copy of this Order in any filing or recording office in any County or other jurisdiction in which the Debtor has real or personal property and, in such event, the subject filing or recording officer is authorized and directed to file or record such certified copy of this Order.

8.      The Debtor is hereby authorized and directed to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements in addition to the DIP Agreement as Lender may reasonably require as evidence of the DIP Indebtedness and for the protection of the Collateral, or which may be otherwise deemed necessary by Lender to effectuate the terms and conditions of this Order and the DIP Agreement.

9.      The automatic stay provisions of §362 of the Bankruptcy Code are vacated and modified only to the extent necessary to permit Lender to implement the financing of the Debtor and the provisions of this Order.

10.     The Debtor is authorized and directed to provide Lender, unless there is a written waiver by Lender in each instance, all of the documentation, reports, schedules, assignments, financial statements, insurance policies and endorsements, access, inspection, audits, information and other rights which the Debtor is required to provide to Lender under the AAI DIP Agreement.

11.     Nothing herein shall be construed as consent to the allowance of any fees and expenses of the professionals retained by the Debtor or the Committee, or shall affect the right of Lender or any other interested party to object to the allowance and payment of such fees and expenses.

12.     In the event of the occurrence of any of the following: (a) the failure of the Debtor to perform in any material respect any of its obligations pursuant to this Order; (b) the

occurrence of any "Event of Default" under the AAI DIP Agreement; (c) the termination or non-renewal of the AAI DIP Agreement, as provided for therein and in this Order; (d) the appointment of a trustee appointed pursuant to sections §1104(a)(1) or 1104(a)(2) of the Bankruptcy Code; (e) dismissal or conversion to chapter 7 of the Debtor's chapter 11 case; (f) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating or amending this Order; (g) the Debtor's filing, without the express written consent of Lender, of a motion requesting authority to incur indebtedness either (A) having administrative expense priority equal or superior to the administrative expense priority granted to Lender under this Order or (B) secured by a security interest or lien in the Collateral; (h) any party (including the Debtor) filing a motion or application for an order seeking to (i) revoke, reverse, stay the implementation of, modify, supplement or amend this Order, (ii) invalidate, raise defenses to, or otherwise challenge the extent, amount, validity, perfection, priority or enforceability of the security interests and liens of Lender in the Collateral (provided that the filing or prosecution of a motion or complaint to determine the existence and scope of D2 Polymer's interest, if any, in the Debtor's intellectual property shall not be an Event of Default), or (iii) sell, assign, lease, license or encumber any Collateral unless the DIP Obligations will be paid in full, in cash prior to or at the time of such sale, assignment, lease, license or encumbrance; (i) the filing of any proposed chapter 11 plan that does not provide for the payment in full, in cash, of the DIP Obligations on the effective date of such chapter 11 plan; (j) any party obtaining relief from the automatic stay with respect to any Collateral or any nonresidential real property lease of the Debtors (the foregoing being referred to in this Order, individually, as an "*Event of Default*" and, collectively, as "*Events of Default*"); then, unless such Event of Default is specifically waived in writing by Lender, the Lender may, at its election, by written notice to the Debtor, the United

States Trustee and counsel for the Committee (a "*Default Notice*"), immediately cease making loans to the Debtor under the AAI DIP Agreement, terminate the AAI DIP Agreement and declare all of the AAI DIP Indebtedness due and payable in full.

13.    Upon the payment in full of all DIP Indebtedness to Lender, or upon the termination of the AAI DIP Agreement, Lender shall have no further obligations pursuant to the terms of this Order and/or the AAI DIP Agreement.

14.    The provisions of this Order shall be binding upon the Debtor and its successors and assigns, including any chapter 7 or chapter 11 trustee or other fiduciary hereafter appointed as a legal representative of the Debtor or with respect to property of the estate of the Debtor, whether under chapter 11 of the Bankruptcy Code or in any subsequent chapter 7 case, and shall also be binding upon all creditors of the Debtor and other parties in interest.

15.    The AAI DIP Indebtedness may be used by Lender to "credit bid" for the assets and property of the Debtor as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether such sale is effectuated through section 363(b) and/or section 1129(b) of the Bankruptcy Code, or otherwise.

16.    If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect (a) the validity of any AAI DIP Indebtedness incurred by the Debtor to Lender prior to the effective date of such modification, vacation or stay, or (b) the validity or enforceability of Lender's security interest and lien in the Collateral, or the priority authorized or created hereby or pursuant to the AAI DIP Agreement, with respect to any AAI DIP Indebtedness incurred prior to the effective date of such modification, vacation or stay.  Notwithstanding any such modification, vacation or stay, any indebtedness, obligations or liabilities incurred by the Debtor to Lenders prior to the effective

date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Order, and Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein and pursuant to the AAI DIP Agreement with respect to all such indebtedness, obligations or liabilities.

17.    The AAI DIP Agreement is modified as set forth in this Order. Without limiting the scope of the immediately preceding sentence, the maturity date of the AAI DIP Indebtedness under the AAI DIP Agreement shall be September 15, 2013.  Anything herein to the contrary notwithstanding, Lender shall not be required to make any advances to Debtor while an Event of Default exists.  To the extent that the terms of the AAI DIP Agreement are in conflict with the terms and conditions of this Order, the terms and conditions of this Order shall control.

18.    Effective upon: (a) entry of this Order; and (b) the occurrence of Lender's financing contingencies that are conditions precedent to funding of the loans provided for under the AAI DIP Agreement: (i) Debtor shall  repay all advances made by Nathan and UPI to Debtor under the Debtor in Possession Financing Agreement approved under the Second DIP Financing Order; and (ii) neither the Debtor nor Nathan nor UPI shall have any further rights or obligations under the First Order or the Second DIP Financing Order, all of which shall be supplanted by the rights and obligations of the parties under this Order.

19.    Nothing contained in this Order shall be deemed to terminate, modify or release any obligations of the Debtor to Nathan with respect to any pre-petition indebtedness, obligation, or liability.

20.    The terms of this Order shall be valid and binding upon the Debtor, all creditors of the Debtor, and all other parties in interest from and after the date of this Order.

21.    Nothing contained herein shall affect or impair Nathan's right to seek adequate protection of his interests in any pre-petition collateral.

22.    Nothing contained herein shall: (a) be deemed to constitute or constitute a commitment by Lender to continue to make advances to the Debtor or to finance the Debtor's chapter 11 case beyond the Third DIP Loan Period; or (b) limit Lender's right to seek such other relief as to the Debtor, the Collateral or the Debtor's estate as may be otherwise provided in the Bankruptcy Code.

23.    The Debtor and Lender shall continue to negotiate in good faith for a sale of the assets of Debtor to Lender pursuant to §363 of the Bankruptcy Code on terms acceptable to the Debtor, the Lender and the Committee, to be consummated as soon as possible after July 15, 2013.

###

Presented by:

_____
Gary Underwood Scharff, OSB# 883031
Law Office of Gary Underwood Scharff
621 SW Morrison Street #1300
Portland, OR 97205
gs@scharfflaw.com
T: 503-493-4353
Attorneys for Debtor

Approved as to form:
Greene & Markley, P.C.


By_____
    David A. Foraker, OSB# 81228
Attorneys for Official Committee of Unsecured Creditors
cc:  ECF Participants and other parties noted in Paragraph A, above

# EXHIBIT B

| Cash Flow to Sept 15 - No Production | Cumulative To | Disbursed Week8 Begin | Disbursed Week9 Begin | Disbursed Week10 Begin | Disbursed Week11 Begin | Disbursed Week12 Begin | Disbursed Week13 Begin | Disbursed Week14 Begin | Disbursed Week15 Begin | Disbursed Week16 Begin | Disbursed Week17 Begin | Disbursed Week18 Begin | Disbursed Week19 Begin | Disbursed Week20 Begin | Total Budgeted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shutdown Productionn-Scenario | 16-Jun | 17-Jun | 24-Jun | 1-Jul | 8-Jul | 15-Jul | 22-Jul | 29-Jul | 5-Aug | 12-Aug | 19-Aug | 26-Aug | 2-Sep | 9-Sep | |
| **Budget** | | | | | | | | | | | | | | | |
| Cash out flows: | | | | | | | | | | | | | | | |
| Supplies | 27,800 | - | - | 3,900 | - | - | - | 3,900 | | - | - | - | 3,900 | - | 39,500 |
| Utilities | 18,890 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 41,315 |
| Payroll | 266,202 | 17,913 | 17,913 | 17,913 | 17,913 | 148,646 | 17,913 | 17,913 | 17,913 | 17,913 | 17,913 | 17,913 | 17,913 | 17,913 | 629,799 |
| Rent | 126,742 | - | - | 119,520 | - | - | - | 63,372 | - | - | - | - | 63,372 | - | 373,006 |
| Insurance | 80,106 | 2,500 | - | 40,250 | - | 1,500 | - | 10,900 | - | - | 1,500 | - | 10,900 | - | 147,656 |
| Carve Out - Professional Services | - | - | - | - | - | 160,000 | - | - | 100,000 | - | - | - | - | - | 260,000 |
| Patent annuity payments | 20,000 | - | - | 5,000 | - | - | - | - | - | - | - | - | - | - | 25,000 |
| Repay DIP Loan | 66,000 | - | - | - | - | 950,000 | - | - | - | - | - | - | - | - | 1,016,000 |
| Other | 28,150 | 6,075 | 5,075 | 6,800 | 9,375 | 4,375 | 4,375 | 4,375 | 6,075 | 4,375 | 4,375 | 4,375 | 6,075 | 4,375 | 98,250 |
| Total Cash Outflows | 636,591 | 28,213 | 24,713 | 195,107 | 29,913 | 1,266,246 | 24,013 | 102,184 | 126,613 | 24,013 | 25,513 | 24,013 | 104,784 | 24,013 | 2,635,926 |
| Cash Inflows: | | | | | | | | | | | | | | | |
| Beginning Cash | - | | | | | | | | | | | | | | |
| Customer Sales | - | | | | | | | | | | | | | | |
| DIP Financing AAI | | | | | | 1,300,000 | - | 100,000 | 150,000 | | 150,000 | | | | 1,700,000 |
| *DIP IntitalFinancing | 700,000 | - | 100,000 | 100,000 | - | | - | | | - | | - | | - | 900,000 |
| Total Cash Inflows | 700,000 | - | 100,000 | 100,000 | - | 1,300,000 | - | 100,000 | 150,000 | - | 150,000 | | | | 2,600,000 |
| Net Cash | 63,409 | (28,213) | 75,287 | (95,107) | (29,913) | 33,754 | (24,013) | (2,184) | 23,387 | (24,013) | 124,487 | (24,013) | (104,784) | (24,013) | (35,926) |
| | | | | | | | | | | | | | | | |
| Rolling (Deficit) Surplus | 100,959 | 72,747 | 148,034 | 52,927 | 23,014 | 56,768 | 32,755 | 30,571 | 53,959 | 29,946 | 154,434 | 130,421 | 25,637 | 1,624 | |
| | | | | | | | | | | | | | | | |
| **Actual Spent** | | | | | | | | | | | | | | | |
| Cash out flows: | - | | | | | | | | | | | | | | |
| Supplies | 30,554 | | | | | | | | | | | | | | |
| Utilities | 18,808 | | | | | | | | | | | | | | |
| Payroll | 258,873 | | | | | | | | | | | | | | |
| Rent | 145,688 | | | | | | | | | | | | | | |
| Insurance | 69,154 | | | | | | | | | | | | | | |
| Leases (Forklifts) | 3,545 | | | | | | | | | | | | | | |
| Carve Out - Professional Services | - | | | | | | | | | | | | | | |
| Patent annuity payments | 13,100 | | | | | | | | | | | | | | |
| Repay Joe Nathan | 66,000 | | | | | | | | | | | | | | |
| Other | 35,666 | | | | | | | | | | | | | | |
| Total Cash Outflows | 641,389 | | | | | | | | | | | | | | |
| Cash Inflows: | | | | | | | | | | | | | | | |
| Beginning Cash | | | | | | | | | | | | | | | |
| Customer Sales or Other Cash | | | | | | | | | | | | | | | |
| (1)*DIP Financing | | | | | | | | | | | | | | | |
| Total Cash Available | | | | | | | | | | | | | | | |
| Ending Cash Balance | 114,604 | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Cumulative Spent | 641,389 | | | | | | | | | | | | | | |
| Weekly Variance | | | | | | | | | | | | | | | |
| % Variance | | | | | | | | | | | | | | | |
| Cumulative Variance | (4,798) | | | | | | | | | | | | | | |
| % Variance | -0.8% | | | | | | | | | | | | | | |

Note: The "Leases (Forklifts)" budget row appears above "Carve Out - Professional Services" with values: 2,700 | - | - | - | 900 | - | - | - | 900 | - | - | - | 900 | - | 5,400

| Cash Flow to Sept 15- No Production | Est | Est | Est | Est | Est | Est | Est | Est | Est | Est | Est | Est | Est | Disbursed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shutdown Production-nn-Scenario | 17-Jun | 24-Jun | 1-Jul | 8-Jul | 15-Jul | 22-Jul | 29-Jul | 5-Aug | 12-Aug | 19-Aug | 26-Aug | 2-Sep | 9-Sep | Totals |
| | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | Week 19 | Week 20 | 13 Weeks |
| Production Raw Materials and Supplies | | | | | | | | | | | | | | |
| Nitrogen | | | 3,900 | | | | 3,900 | | | | | 3,900 | | 11,700 |
| Acrylo | | | | | | | | | | | | | | - |
| Purchased materials & Freight | | | | | | | | | | | | | | - |
| Chemicals | | | | | | | | | | | | | | - |
| Starch | | | | | | | | | | | | | | - |
| Total Supplies | | - | - | 3,900 | - | - | - | 3,900 | - | - | - | - | 3,900 | - | 11,700 |
| | | | | | | | | | | | | | | |
| Electricity | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 11,375 |
| Natural Gas | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 8,125 |
| Water and Sewer | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 2,925 |
| Total Utilities | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 1,725 | 22,425 |
| Operating Costs-Payroll | | | | | | | | | | | | | | |
| Ferry Production (Tank Farm Crew) | | | | | | | | | | | | | | |
| Queen Production (Dough & Finish& Lab) | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 1,079 | 14,023 |
| Production Worker | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 955 | 12,415 |
| HSME Manager | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 1,174 | 15,261 |
| Engineering | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| Payroll Total | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 3,208 | 41,699 |
| Other Costs | | | | | | | | | | | | | | |
| Spare Parts | | | | | | | | | | | | | | - |
| City of Albany-DEQ Permits and Test | | | | | | | | | | | | | | - |
| Repairs &Supplies | | | | | | | | | | | | | | - |
| Equipment Rent (Forklifts) | | | | 900 | | | | 900 | | | | 900 | | 2,700 |
| Other Supplies/freight | 75 | 75 | 2500 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 3,400 |
| Total Other Costs | 75 | 75 | 2,500 | 975 | 75 | 75 | 75 | 975 | 75 | 75 | 75 | 975 | 75 | 6,100 |
| | | | | | | | | | | | | | | |
| Totals Production and Operations | 5,008 | 5,008 | 11,333 | 5,908 | 5,008 | 5,008 | 8,908 | 5,908 | 5,008 | 5,008 | 5,008 | 9,808 | 5,008 | 81,924 |
| Admin Costs: | | | | | | | | | | | | | | 0 |
| Management Payroll (8) | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 12,912 | 142,034 |
| Priority pre-petition wages | | | - | | 117,250 | | - | | | | | | | 117,250 |
| Payroll Taxes | | | - | | | | | | | | | | | - |
| 401K at 3% | | | - | | | | | | | | | | | - |
| Payroll Taxes | 1,370 | 1,370 | 1,370 | 1,370 | 11,336 | 1,370 | 1,370 | 1,370 | 1,370 | 1,370 | 1,370 | 1,370 | 1,370 | 25,038 |
| 401K at 3% | 423 | 423 | 423 | 423 | 3,940 | 423 | 423 | 423 | 423 | 423 | 423 | 423 | 423 | 8,166 |
| Rent -Queen Street | | | 77,843 | | | | 44,390 | | | | | 44,390 | | 122,233 |
| Rent- Ferry Street | | | 23,616 | | | | 8,613 | | | | | 8,613 | | 32,230 |
| Rent -Beaverton Office | | | 18,061 | | | | 10,368 | | | | | 10,368 | | 28,429 |
| Insurance-Liability,Fire, DO | | | 29,350 | | | | | | | | | | | 29,350 |
| Insurance Health and Dental | | | 10,900 | | | | 10,900 | | | | | 10,900 | | 21,800 |
| Insurance Worker's Comp | 2,500 | | | | 1,500 | | | | | | 1,500 | | | 5,500 |
| Patent anuity payments | | | 5,000 | | | | | | | | | | | 5,000 |
| Repay DIP Loan | | | | | 950,000 | | | | | | | | | 950,000 |
| Professional Services | | | | | 160,000 | | | 100,000 | | | | | | 260,000 |
| Other Obligations (Phone-Utilities,etc) | 3,500 | 2,500 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 3,500 | 1,800 | 1,800 | 1,800 | 3,500 | 1,800 | 23,900 |
| Contingency | 2,500 | 2,500 | 2,500 | 7,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 32,500 |
| Total Est Admin Cost | 23,205 | 19,705 | 183,775 | 24,005 | 1,261,239 | 19,005 | 93,277 | 120,705 | 19,005 | 20,505 | 19,005 | 94,977 | 19,005 | 1,803,429 |
| | | | | | | | | | | | | | | |
| Total Company Costs by Week | 28,213 | 24,713 | 195,107 | 29,913 | 1,266,246 | 24,013 | 102,184 | 126,613 | 24,013 | 25,513 | 24,013 | 104,784 | 24,013 | 1,885,353 |

| Cash Flow to Sept 15- No Production | |
|---|---|
| Shutdown Productionn-Scenario | Comments |
| | |
| Production Raw Materials and Supplies | |
| Nitrogen | Gas and Storage ( Non Explosive) |
| Acrylo | Raw Material plus Freight |
| Purchased materials & Freight | Payment to Tongaat Hulett |
| Chemicals | Chemicals used in production |
| Starch | Raw Material plus Freight |
| Total Supplies | |
| | |
| Electricity | Operations at sub capacity (PP&L) |
| Natural Gas | Operations at sub capacity (NW Natural Gas) |
| Water and Sewer | Water minimal discharge |
| Total Utilities | |
| Operating Costs-Payroll | |
| Ferry Production (Tank Farm Crew) | |
| Queen Production (Dough & Finish& Lab) | Matt Blanchard |
| Production Worker | Dave Galleher |
| HSME Manager | Glenda Fleming |
| Engineering | |
| | |
| Payroll Total | |
| Other Costs | |
| Spare Parts | Preventative Maintenance |
| City of Albany-DEQ Permits and Test | Added Water , Air& Sewer Discharge |
| Repairs &Supplies | General Repairs & Maint |
| Equipment Rent (Forklifts) | |
| Other Supplies/freight | Other  Supplies including Freight |
| Total Other Costs | |
| | |
| Totals Production and Operations | |
| Admin Costs: | |
| Management Payroll (8) | Retain current management |
| Priority pre-petition wages | 10 employees |
| Payroll Taxes | |
| 401K at 3% | |
| Payroll Taxes | FICA, Medicare, FUTA, SUTA |
| 401k at 3% | 3% match 401k |
| Rent -Queen Street | FHA |
| Rent- Ferry Street | Lombard Foods |
| Rent -Beaverton Office | PS Business Parks |
| Insurance-Liability,Fire, DO | Flatrion Capital |
| Insurance Health and Dental | Providence , ODS |
| Insurance Worker's Comp | Liberty Mutual |
| Patent anuity payments | |
| Repay DIP Loan | |
| Professional Services | |
| Other Obligations (Phone-Utilities,etc) | |
| Contingency | |
| Total Est Admin Cost | |
| | |
| Total Company Costs by Week | |

CERTIFICATE OF SERVICE

I hebery certify that on this 25th Day of June, 2013, I served the foregoing THIRD MOTION FOR ORDER: (A) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2) AND 364(E): GRANTING POSTPETITION LIENS AND PRIORITY ADMINISTRATIVE EXPENSE STATUS; AND (C) AUTHORIZING DEBTOR TO ENTER INTO AGREEMENT WITH POSTPETITION LENDER; MOFFENBEIER DECLARATION in support thereof and exhibits thereto, including the proposed order granting the motion, by filing with the Court's CM/ECF system.

Submitted by:

/s/ Heather A. Brann
Heather A. Brann PC
PO Box 11588
Portland, OR 97211

Of Attorneys for Debtor
Law Office of Gary Underwood Scharff